# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| AMRO ELSAYED & <br> LOLA SALAMAH (H/W) <br>              Plaintiffs, <br><br> vs. <br><br> FAMILY FARE LLC., and <br> M. M. FOWLER INC., and <br> LEE BARNES, Jr., individually <br> and as President of <br> FAMILY FARE LLC., and <br> M. M. FOWLER INC., and <br> DONALD PILCHER, individually. <br>            Defendants. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

COMPLAINT
(Jury Trial Demanded)

18CV1045.

DEC 26 2018

## COMPLAINT

Plaintiffs Lola Salamah ("Salamah") and Amro Elsayed ("Elsayed"), (h/w), bring this complaint against Defendants Family Fare, LLC. ("Family Fare"), M.M. Fowler, Inc. ("Fowler"), Lee Barnes, Jr. ("Barnes"), Donald Pilcher ("Pilcher"), state as follows: Defendants Misclassified Employee as Franchisee in Violation to the Fair Labor Standards Act ("FLSA"), North Carolina Wage Hour Act ("NCWHA"); Based on Race and National Origin, Defendants Discriminated Against Plaintiffs and Violated the Civil Rights Act of 1866, 42 U.S.C.§ 1981; Defendants Exercised An Unlawful Non-Peaceable Self Help Eviction, Non-Peaceable Repossession and Breached the Peace; Defendants Committed Unfair and Deceptive Trade Practices, Rescission, Fraud, Negligent Misrepresentation and Breach of Covenant of Good Faith and Fair Dealing; Franchise Termination in Bad Faith and; Violation of § 66-94 Article 19. (North Carolina Business Opportunity Sales).

1

## JURISDICTION AND VENUE

1.    This action arises under The Fair Labor Standards Act of 1938 29 U.S.C. § 203, Civil Rights Act of 1866, 42 U.S.C.§ 1981.

2.    This action also arises under North Carolina common law.

3.    This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343.

4.    This Court has supplemental jurisdiction over the state law claim pursuant to 28 U.S.C. § 1367

5.    Fowler and Family Fare have sufficient contacts within the Middle District of North Carolina to subject it to personal jurisdiction in this District, Plaintiffs reside within the Middle District of North Carolina, and the cause of action arises in the Middle District of North Carolina. Accordingly, venue in this District is proper pursuant to 28 U.S.C. § 1391(b) and (c) and 42 U.S.C. § 2000e-5(f)(3).

## SUMMARY OF ACTION

6.    Family Fare is in reality a corporation that misrepresents and misclassified its relation with its store operators, Plaintiffs, as franchisees when they are in fact, employees.

7.    Family Fare had contract operator agreements with a number of different entities across North Carolina relating to and permitting those contract operators to operate Family Fare convenience stores.

8.    Barnes is the president and the owner of Family Fare and Fowler and a citizen of North Carolina.

9.    Pilcher is authorized by Family Fare and Fowler to act as an agent for the principal, and an act by him within the scope of that apparent authority, binds the principal. Pilcher is a citizen of North Carolina.

10.    In the Fall of 2013, Family Fare decided to convert all of the contractor operators to franchisees. Barnes had meetings with the various contracted operators to discuss conversion to a franchise relationship.

2

11.   Salamah entered into an agreement with Defendants for store operation as an independent contractor in June of 2012. Defendants have continuously refused to provide a copy of the mentioned operation agreement upon and after singing it.  The operation period began on the sixteenth of every month and ended on the fifteenth of the following month. Plaintiffs' commission pay transferred to Salamah's separate bank account within ten to fourteen days after the closing period date.

12.   The franchise is a convenience store operation adjacent to gas pumps. The Plaintiffs were required to deposit all operating funds in a bank or depository designated by and assigned only to franchisor along with an accounting of daily receipts of purchases and operating expenses. The franchisor collected all receipts, deducted the amounts due to it for inventory/cash/lottery losses, rent, and other charges; and paid a stipulated share of 50% (percent) of profits to the franchisee. The plaintiffs were not entitled to draw any cash for operational or related expenses. The plaintiffs were not entitled to obtain any merchandise for personal consumption without paying the full retail price of the item.

13.   Plaintiffs allege that Defendants' violations were unfair and deceptive trade practices which have caused Plaintiffs severe punitive and compensatory damages.

14.   Plaintiffs allege that during the six and half years of employment/franchise, Plaintiffs endured humiliation, disrespect, discrimination and emotional distress which ended by Defendants' unlawful and deceptive termination on November 30, 2018.

15.   Plaintiffs allege that racial/national origin discrimination and retaliation for Salamah's new position as a school teacher are the only true motivations for such termination. Defendants' "good cause" for termination is a false claim.

16.   Plaintiffs also allege that Defendants executed an eviction, termination and repossession by an unlawful forcible self help that breached the peace.

## EMPLOYEE MISCLASSIFICATION

17.   Family Fare and its management violated the Federal Fair Labor Standards Act ("FLSA") and the laws of North Carolina which states, with respect, to how it classifies its employees.

3

18.    Defendants designated the store location at which the store franchisee/employee worked. Plaintiffs did not have the option to choose their the store or an option to provide Defendants a location to operate under their license.

19.    Defendants provided and dictated equipment and fixtures to be used in the store by the Plaintiffs and the other store employees. Plaintiffs were not permitted to provide any equipment or supplies with or without Defendant's consent.

20.    Defendants dictated the type, including the specific brand, of gasoline and all other non-gasoline merchandise offered for sale at the store. Defendants executed complete control over transactions at the store.

21.    Defendants dictated the price of all merchandise sold at the store. Defendants imposed its control over the daily operation detail, neglecting franchisee/employee opinion. For instance, in early 2017, although Salamah declared to Pilcher that Little Debbie's (a vendor) was important and there were several distinct customers who came to the store to buy this product especially, against the will of the Plaintiffs, Pilcher removed Little Debbie's fixture rack out of the store.

22.    Defendants exercised control over ordering, purchasing and keeping track of all inventory. Plaintiffs had no control, contract or communication with the inventory count company. Defendants ordered a third party inventory count company and instructed the company to disregard the franchisee and to directly communicate with the franchisor representative. Inventory counts were mandated by the franchisor on a monthly basis. The monthly inventory count dates were kept undisclosed to the franchisee until it was requested to the franchisor to allow formal knowledge of the inventory date. Franchisor began to inform the franchisee of the inventory date sometime around the Fall of 2017, however, the defendants continued to control the whole inventory count process. Defendants refused to provide the franchisee, her employees or representatives, count numbers until the end of the inventory count. Instead, the franchisor, or its representative, provided the book record numbers first to the inventory counters. Inventory counts such as the ones administered at the store are very similar to other corporate stores which have a store manager who is employed and classified as employee.

4

23.    Defendants required that the store franchisee/employee regularly submit daily reports for gas sales, inventory, receipts and deposit all daily operation monies into Fowler's bank account.

24.    Defendants dictated store opening and closing hours. Defendants exercised control over the alarm company to track the times of operation. Pilcher, on a daily basis, monitored the surveillance camera to track when the store in fact, opened or closed for operation. Plaintiffs had no option to extend hours of operation or shrink hours of operation during major holidays such as Thanksgiving, Christmas or New Year's Day. Furthermore, Plaintiffs were required to operate under any circumstances such as, but not limited to severe weather conditions.

25.    Defendants dictated the housekeeping schedule for the store. Plaintiffs had no control over schedule or ordering maintenance.  Defendants performed normal maintenance, improvements and repairs to store, premises, and equipment without Plaintiff's' consent or knowledge.

26.    Defendant controlled the issuing of regulations governing the appearance of store franchisee/employee and all other store employees. Defendant required that store employee/franchisee and all other employees in the store, wear uncompensated corporate mandated uniforms.

27.    Defendants maintained and exercised veto power over personnel decisions made by store franchisee/employee. Defendants issued regulations governing the conduct and dress of store franchisee/employee and all store employees.

28.    Defendants required that store franchisee/employee and other store employees attend training programs provided by Family Fare. Plaintiffs had no power to reject or suggest.

29.    Defendants required Plaintiffs and the store employees to submit to drug testing by Family Fare or its designee. Defendants placed Plaintiffs and the store employees under random drug screening selection. Randomly selected employees were obligated to be examined for any drug usage and would be terminated upon rejection of such examination.

30.    Defendants prohibited store franchisee/employee from engaging in any activity, or offering any goods or services, at the store premises that were not authorized by Family Fare. Defendants regulated the persons who were permitted on the store premises.

31.  Defendants terminated store franchisee/employee and other store employees who did not comply with Family Fare's policies and regulations. Defendant Pilcher required Plaintiffs to fire several store employees, and ultimately Plaintiffs were threatened when they showed any signs of rejection. For instance, Pilcher threatened Salamah that he was going to call the police if he ever saw the store's employee, Ahmed Housary, at the store.

32.  Defendants required that store franchisee/employee sign a non-compete agreement prohibiting store franchisee/employee from directly or indirectly working in another convenience store in the same County in which they worked for Family Fare, for a period of two years after they leave their position with Family Fare.

33.  Defendants dictated all details regarding promotional sales. Defendants maintained exclusive control over all advertising. Defendants kept all manufacturers, wholesale and supply goods' purchase rebates and never shared it with the franchisee/employee.

34.  Defendants retained the right to inspect all books and records, including financial records, records showing the times of store opening and closing, payroll records and employee time records. Family Fare franchise locations are similarly run as a corporate run convenience stores where the store manager is classified as an employee.

35.  Defendants retained ownership of all property and merchandise, and constructive ownership of equipment. Defendants paid all utilities and property taxes on the store and premises.

36.  Defendants maintained ownership over all proceeds arising from the sale of gas and merchandise and requiring that all such proceeds be remitted promptly to Family Fare by means of daily cash deposits into an account controlled exclusively by Family Fare.

37.  Defendants required that store franchisee/employee and/or other store employees attend Family Fare corporate monthly meetings, similar to corporate store manager policies, where the manager is classified as an employee.

38.  Pilcher visited the store several times each week to monitor and strictly enforce the store franchisee/employee's compliance with each of the policies, requirements and practices set forth above, and in addition to any others that may exist.

39.  Franchisor maintained all licenses/permits including but not limited to: alcohol, lottery, gasoline and sales taxes. Franchisee does not have any liability for any license obtained to manage and operate the convenience store.

6

40.    Family Fare routinely disrupted Plaintiffs daily operations using intimidation and bullying tactics which made it impossible for Plaintiffs to conduct productive day-to-day operations. Instead, they lived and worked in fear.

41.    Family Fare engages in the fraudulent misrepresentation of its relation with its store operators in order to avoid paying store operators minimum and overtime wages, medical, pension, and other employment-related benefits.

42.    Plaintiffs were not entitled to any cash or merchandise from operations. Plaintiffs were required to pay full retail price for any goods consumed or damages.

43.    Family Fare's employment relationship is also based on the fact that Family Fare and its franchisees are engaged in the same type of business, and franchisees are not permitted to engage in similar business activity outside of Family Fare operations in their role as franchisees.

44.    Family Fare, as an undisclosed employer, has for many years, deprived franchisee/employee of minimum wage/overtime, pension, and health benefits, FICA, Social Security and Pension benefits.

45.    Plaintiffs argue that the operating Family Fare franchisee does not require any specialized skills, licence, certificate or permit.

46.    After signing the franchise agreement, the franchisor agreed to pay the franchisee an extra $1,000 a month for the duration of four (4) months included in the commission payment; in return, the franchisee had to pay the franchisor back the $1,000 payment installments, each month, for the four (4) months, to cover the franchise fee of $4,000.

47.    After signing the contract, Salamah was obligated to buy the 15-year old gondolas and an old computer to do the required daily paperwork. Salamah was obligated to pay property taxes for the above mentioned equipment at an inflated rate of the actual worth. The franchisor's conduct was constructed to manipulate the actual employment relationship into a manufactured franchise relationship, by establishing that the franchisee owns store equipment. However, on the day of termination, Pilcher denied Salamah's ownership to such equipment.

48.    Pilcher demanded Salamah to avail herself immediately at the franchise location during every random visit he made. For instance, during every visit to the store, Pilcher asked about Salamah's whereabouts. When Pilcher would encounter Elsayed at the store, he would begin shouting and demanding to know Salamah's whereabouts and to see Salamah's schedule.

Case 1:18-cv-01045-CCE-LPA   Document 1   Filed 12/26/18   Page 7 of 37

49.   Pilcher's relationship with Plaintiffs and their employees was established on the concept of "listen and obey". Specifically, in early 2016, Defendant Pilcher approached Plaintiff Elsayed with a new cooler display layout, which was designed by the beer vendors. When Elsayed suggested to keep the beer that were good sellers at the store, and remove the slow-selling beer, Pilcher stated, "Just follow my orders and stop arguing, learn how to obey."

50.   Pilcher constantly threatened Salamah that she can be terminated at his will. Pilcher also informed Salamah that Barnes hired the "best attorneys" who can and will find a "good cause" for termination.

51.   On November 17, 2018, during a discussion between Pilcher and the Plaintiffs, Pilcher advised the Plaintiffs that they are required to contribute "sufficient" hours working in the store. Pilcher referenced Chic-Fil-A as an example of franchisees that are required to work full time in their stores.

52.   The franchisee was obligated to cut bi-weekly checks for herself for a set amount of $1,733 (which was later changed by Defendants to $1,841.67 per period, without Salamah's knowledge or consent), federal withholding of $150, and state tax withholding of $100, even if the franchisee did not work for any reason (i.e., time off, sickness or vacation). Salamah had no control over her own paycheck rate or method. Salamah was obligated to run the payroll through Defendants' designee, PrimePay. Salamah was also obligated to pay PrimePay invoices and fees without objection or negotiation.

53.   Salamah was obligated to buy business insurance and workers compensation insurance from Family Fare's designee. Defendants deprived Salamah's right to negotiate or to object to designee's fees or invoices.

54.   Plaintiffs were obligated to file their annual taxes with Family Fare's designee and pay whatever fee the tax filer required. Defendants exercised exclusive control over selecting such designees and changing the designees whenever they desired. Plaintiffs were deprived from their right to choose with whom to file their annual taxes and denied their right to negotiate the fees associated with filing taxes, which allowed the designees to monopolize the business over the plaintiffs.

55.   Plaintiffs were required to list certain expenses on their tax deductions which were previously approved by the Defendants through the designee (ie, driving expenses, uniforms, etc.,)

56.    Since Salamah started working as a teacher with the Winston Salem Forsyth County School District, franchisor and/or its representatives, declared many times that they were unsatisfied with this decision no matter how many hours she dedicated to the store. Barnes stated to Salamah, "the hours you put in the store now, although you state will be the same amount, will not be in the same effort as it was before you took a position as a teacher."

57.    Since the knowledge of Salamah's position as a school teacher, the franchisor or their representatives, declared that Salamah had to choose between the franchise or her position at the school. On many different occasions, Pilcher asked Salamah if she had yet to decide to quit the teaching position, or sell the store.

58.    During the entire period of employment/franchisement, Pilcher constantly interfered between the Plaintiffs' and employees relationship by giving Salamah's employees orders and work tasks.

59.    Pilcher engaged in intense daily interference, including but not limited to;

      a.    persistent camera review;
      b.    cash audits;
      c.    lottery audits;
      d.    inventory audits;
      e.    payroll audits;
      f.    customer relation montering;
      g.    employees/franchisee's uniform;
      h.    image evaluations; and
      i.    maintenance checks.

60.    All store employees were treated as Pilcher's employees. Pilcher favored to call himself Salamah's supervisor or manager. On the day of termination, Pilcher clearly stated to Salamah, "Whether you accept it or you not, I am your boss."

61.    Over the past six and a half years, Plaintiffs eached worked several sixty (60) to eighty (80) hours work weeks at their store location, out of necessity and in order to properly service their clientele, and were not compensated for overtime benefits consistent with the statute's requirements. Due to the control over the day-to-day business operations of its franchisee, Plaintiffs, are employees who should be afforded the protections of FLSA, NCWHA.

9

62.     Pilcher constantly interfered with Salamah's customer relationships. For instance, a regular customer by the name of "Bruce", visited the store (two to five times) on a daily basis to buy coffee, cigarettes, lottery, beer and various grocery items. The franchisee allowed Bruce complimentary coffee when bringing in his own coffee cup or mug. However, when Pilcher discovered Bruce's complimentary deal, Pilcher demanded that Plaintiffs immediately breach the deal with Bruce and promptly ordered Salamah to request authorization from him before forming any further deals with customers.

63.     Plaintiffs claim that Family Fare, and through it franchisor agent Pilcher, substantially interfered in the plaintiffs' daily operations; such as: (1) hire or fire Plaintiffs employees; (2) retained the name tags for new employees for inspection and approval before employees were hired (3) controlled the work schedules of franchisee/employees; (4) exercised supervision or control over the conditions governing payment of franchisee/employees; (4) dictated the rate or method of payment to franchisee/employees; (5) monitored franchisee payroll system; (5) listed Defendant, Barnes, as the contact person for the state employment tax and the payroll firm; (6) maintained employment records for franchisee/employees; and (7) controlled the login and password for payroll records and timekeeping with PrimePay.

64.     In order for the franchisor to succeed in manipulating the "economic reality" test, when each element of such test is examined, the following sets of facts are true:

   a. Franchisor awarded the plaintiff $4,000 to pay for the fixed franchise fee with intention to gerrymander the economic reality, thus, indicating no initial investment from Plaintiffs;

   b. Franchisor obligated Plaintiffs to purchase worthless store equipment and pay the property tax on the equipment, nonetheless, the franchisor denied Plaintiffs all equipment upon termination;

   c. Franchisor falsely declared that the franchise operation required specialized skills, however, there was no official training, certification, or specialized skills required for the franchise operation. Salamah was a mere subordinated store manganger under Defendants' supervision and control.

   d. Franchisor falsely declared that Salamah's operational decisions were subject to her own profit and losses, yet the entirety of the merchandise, wholesaler and vendor relationships, sales advertising and marketing was reliant upon the will of

10

the franchisor, with no input from Plaintiffs, and in addition, Plaintiffs were reliant solely on these factors to make a profit or loss;

   e.   Franchisor's relationship with Plaintiffs was indefinite, there was no intent from the franchisor to Plaintiffs to complete a job or task and end the relationship, franchisor carries the false belief that the franchisor could terminate Plaintiffs at will, at any moment, for any reason and without notice; and

   f.   control over every aspect of the franchise was at the discretion of the franchisor including work schedules, in so that when Salamah was not putting full time hours or more into the store, the franchisor interfered and demanded Salamah to be present more during daytime hours. Furthermore, when Salamah put hours into the store on a second or third shift, franchisor would not recognize this time as hours put forth into the store.

65.   Plaintiffs repeatedly assert that such manipulation is mere fraud to deprive citizens from their protected rights and it is not, by any means, a compliance to the federal or state law.

**WRONGFUL SALARY DEDUCTION.**

66.   Defendants placed themselves in a superior position to deduct any amount they desired from Salamah's commission payment without her authorization or consent.

67.   Defendants deducted from Salamah's commission payment, any inventory losses or damages at the retail value, uniform costs, cash shortages, credit card chargebacks and store supplies.

68.   Plaintiffs had no control over the determinations of deductions; it was merely a tactic by the defendant to put hindrance on the Plaintiffs every month by exerting money from the commission payment.

69.   During the inventory count on August 8, 2018, the defendants deceptively claimed the store was $5,979.32 short in inventory. Plaintiffs requested permission to hire a forensic accountant to determine the true cause of shortage, however, Defendants declined permission and later blamed the shortage on a system error.

70.     Defendants, during the last three years, deducted from Salamah's pay commission about $40,000. Defendants repossessed the book keeping records on the morning of the termination, therefore it is the Defendant's responsibility to provide the exact figures.

## DISCRIMINATION BASED ON NATION ORIGIN/RACE

71.     Family Fare placed a stranglehold on its Arab/Middle Eastern American franchisees, and has taken aggressive action to abuse contractual rights and diminish these particular franchisee's value in their own investments, and ultimately terminating their contracts and objecting their applications based on their national origin/race.

72.     It is significant to declare that Salamah and Elsayed were the only remaining Arab/Middle Eastern franchisees. In contrast, in 2004, almost all of Fowler's stores were leased and/or operated by Arab/Middle Easterners.

73.     By way of example only, when interrogating Arab/Middle Eastern First/Generation American Plaintiffs and their employees, and making unannounced visits to their stores, Pilcher routinely made derogatory references to Arab/Middle Eastern First/Generation American Plaintiffs and their employees.

74.     On several occasions, Pilcher stated that he can not deal with Arab/Middle Easterners. While at the franchise location, Salamah overheard Pilcher during a phone conversation, explaining his hatred for Arabs. Salamah specifically heard Pilcher saying, "I am done with Arabs." Pilcher has repeatedly refused to give franchise opportunities to several Middle Easterners/Arabs based on their ethnicity.

75.     Pilcher would make unannounced visits to the store locations and tell Elsayed that he needed to find another job somewhere else.

76.     In 2014, after several confrontations between Elsayed and Pilcher, Elsayed switched his hours to work only during the second shift in order to avoid any further communication with Pilcher.

77.     Pilcher, on several occasions, voiced several discriminatory remarks to the franchisee's Middle Easterners/Arab employees. Such remarks include, but are not limited to: "I hate Arabs," or "You can do that at home, not in the U.S." Other discriminatory assertions

12

include printing the name "Mo" on the name tags for franchisee's employees who are named Mohamed.

78. In May of 2018, Plaintiffs received an offer from Mohamed Elmahdy ("Elmahady") to buy the stated franchise location for the amount of $120,000. Elmahdy owns a "Papa John's" franchise and maintains excellent standards. Pilcher never picked up Elmahdy's application from the office stating Elmahdy was "just another Arab crook."

79. Fawaz Al Ahmad, a previous employee of the franchisee, was yelled at by Pilcher when he was confused between a customer's college ID and state issued ID. Pilcher declared, "You can not do this in the U.S., go back home and do it there!"

80. According to Pilcher, he requested that the franchisor exchange his High Point store for a store in Reidsville, which is quite a distance from his managerial territory, because after several confrontations, he could no longer deal with "the crooked Arab", Kalim Andraos.

81. All Middle Eastern/Arab employees of the franchisee favored to work weekends and/or nights to avoid Pilcher's discriminatory remarks, disrespect and humiliation.

82. Pilcher constantly requested the Plaintiffs and their Arab/Middle Eastern American employees not to speak Arabic because such a language would "terrify" the customers.

83. Pilcher refused to give franchise opportunities to several Middle Eastern/Arab Americans such as Mohammed Elazab, Hatem Badawi, Yasser Salem, Mohamed Elmahdy, and many others. All of these applicants have qualifications to be approved by the franchisor, however, some of them have been waiting for the last seven years for Pilcher to present them with an opportunity.

84. Pilcher requested Salamah to tuck the uniform shirt inside her pants, however when Salamah informed him that that dress code conflicted with her religious beliefs, Pilcher responded with, "you gotta choose between violating your religion, or the uniform code."

85. Every Arab/Middle Eastern employee who worked in the store suffered and complained about Pilcher's mistreatment, humiliation, disrespect and discrimination. Pilcher turned the store into a hostile work environment. However, Pilcher treated non Arab/Middle Eastern employees with more respect and professionalism.

86. Pilcher stated that he favored those of Nepalese ethnicity as employees/franchisees because of their "soldier type" work ethic.

13

87.   In last six months, three stores opened up in Pilcher's territory, and only Nepalese men were awarded the three vacant franchises/employment opportunities while several Arab American/Middle Eastern Americans are still long awaiting the opportunity.

88.   Plaintiffs argue that Defendants treated Plaintiffs less favorably with regard to the alleged discriminatory act, than Defendants treated other similarly situated persons who were outside Plaintiffs' protected class as follows:

a.   On November 10, 2018, during a meeting with Elsayed and Salamah, Pilcher stated that other franchisees had to pay for their lottery shortages, nonetheless, they were granted an advancement from Family Fare with a personal loan or their payments were split throughout their commission checks. However, Family Fare refused to advance Salamah a loan for the lottery shortage that occured three years ago.

b.   Pilcher refused Elsayed's application for a franchise opportunity on the spot, without clarification, explanation or reason. Meanwhile, Pilcher accepted applications from other franchisees, who were awarded a second franchise location.

c.   Pilcher treated other franchisees' spouses respectfully and fairly, allowing them to engage in the franchise's operation, but was not equally treating Elsayed in the same manner. Pilcher refused to deal with Elsayed in any and all franchise operations and dealings. Elsayed complained to the franchisor about Pilcher's disrespectful demeanor and restricted objection against Elsayed.

d.   According to comments of common employees of different franchise locations, Pilcher was restricted about Salamah's store compliance to the franchise standards, more than he was about other franchise locations.

e.   Pilcher treated Elsayed in a disrespectful manner and humiliated Elsayed on several different occasions. Pilcher implied and expressed his hostility toward Elsayed to Salamah, several employees and vendors.


**VIOLATION OF NORTH CAROLINA BUSINESS OPPORTUNITY ACT**

89.   Defendants refused to provide Salamah a copy of the franchise agreement upon signing. Salamah was advised that her copy would be mailed to her after Barnes processed the paperwork, which has yet to happen.

14

90. On June 14, 2012, Pilcher deceptively emailed Salamah the figures of the store's operation, and declared the following: "Average for 2011- Monthly Inside sales: $54,250.66, Gas gallons: 78,007, Lotto sales: $9,731.00, and Lottery sales: $9,884.00 That would put the monthly commission average to Operator before payroll/expenses: $7,681.32 Sales during summer last year averaged over $57,458.00 which would put check at $8,066.20. Even spending $4,000.00 on labor would leave you with very good income." In the email, Pilcher falsified the expenses of the payroll operations and failed to reveal the other mandatory expenses included in the business such as: business insurance, workers compensation insurance, invoicing fees, inventory shortage/damages, supplies, yard maintenance and uniform purchases.

91. Salamah, at the time of signing the franchise agreement, was about eight months pregnant. The store operation was the only source of her household income. Her brother Mohamed Salamah, was working at the franchise location full time, and doing so around his full time college schedule. Her husband, Elsayed, was working 60 or more hours per week at the franchise location. Therefore, refusing to sign or objecting to the contract terms, would generate severe financial difficulty to herself, her family and brother.

92. Plaintiffs argue that all amendments signed after entering into the franchise agreement were signed under threat, and without consideration.

93. Plaintiffs have been denied several times from obtaining all signed writing indicating any agreement between the parties, or enforcement against Defendants.

94. All documents signed by Salamah by the Franchisor's request, (such as amendments to the franchise) were signed under economic duress due to the following set of facts and are not limited to: (1) Plaintiffs are victims of a wrongful or unlawful act or threat; (2) such act or threat of losing their franchise deprived Plaintiffs of their unfettered will; (3) as a direct result Plaintiffs were compelled to make a disproportionate exchange of values and gave up something for nothing; (4) any amendment made solely for the purposes of protecting Defendants business and interests, and; (5) Plaintiffs had no adequate legal remedy at that time.

95. Plaintiff argues that a reasonable workload would cost approximately $9,000 a month for labor costs, which is the reason why the franchisor required Salamah to work more than full time at the store.

96. Plaintiffs allege that Defendants failed to illustrate a proper business plan regarding profit and loss.

15

## UNFAIR AND DECEPTIVE TRADE PRACTICES, RESCISSION, FRAUD AND BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING

97.　Competitive store operators/managers at Speedway and Quality Mart convenience stores in the North Carolina area perform the same functions and duties as the Family Fare store managers, but are properly classified as employees. In contrast, Family Fare intentionally misclassified its store operators as franchisees in order to increase their own corporate profits and avoid paying overtime, inventory/cash/lottery losses, medical and pension benefits, FICA and other state and federal employer taxes.

98.　Plaintiffs argue that during the six and half years of operation, Defendants had acted exclusively for only their interest and benefits, neglecting any interest or benefits to the Plaintiffs.

99.　The franchisor dispersed payment for the grocery to the wholesaler (M.R. Williams) on a net 30 agreement after delivery was made. The lottery (scratch off tickets only) funds are paid by the franchisor to the Lottery Commision on the third Tuesday after activation of a package. Lottery (online ticket sales) payment is dispersed by the franchisor on the following Tuesday for the previous week that is closed on Sunday. Franchisor's fuel payment terms were unknown to the Plaintiffs. An average daily balance of the franchisor's business account was above $100,000 which the Plaintiffs had no access or control. Although the franchisor was using the store's operation revenue to generate profit from other activities, Plaintiffs were deprived from a interest/profit of that balance.

100.　On November 23, 2018, Pilcher ensured Plaintiffs that the franchisor had no plan to terminate their franchise, however, Plaintiffs asserted to him that there seemed to be a plan in place and they were willing to get their lawyer involved. Nonetheless, Pilcher deceptively repeated that there is no plan for termination and there was no need to contact any lawyers.

101.　Plaintiffs caused no damages, harm or injuries to Defendants **even though**, Defendant falsely accused Plaintiff to quickly enforce termination.

102.　In the franchise agreement, Family Fare listed three options of operation, howerever, in reality, only one option was truly available to run the operation. Plaintiffs had no choice but to sign and accept the option presented.

16

103. In November 2013, Salamah was required to enter into franchise agreement with Defendants under economic duress of losing the operation. Salamah expressed her concerns to Pilcher regarding several terms of the franchise contract. Pilcher responded by stating, "this is your only option to keep the store."

104. Family Fare manipulated the terms of its franchise contract and for its exclusive interest and to deprive Plaintiffs of any rights under FLSA, NCWHA or 15 U.S. Code Chapter 55, (Petroleum Marketing Practices Act).

105. In the beginning of the franchise operation, Plaintiffs had the employee who worked in the morning shift to separate the cash from the previous day and place it in Plaintiffs' office where Pilcher maintained full access. Elsayed and Salamah witnessed Pilcher embezzle some of this cash during several visits. Moreover, the store's recent assistant manager, El Shiha, complained a few times about the same embezzlement from Pilcher.

106. Pilcher was the sole owner of the office door key and did not give Plaintiffs a copy of they key until three weeks before the termination.

107. In 2014, Barnes falsey explained in the franchise initiation meeting that the franchise is based on providing the franchisee merchandise at the best wholesale price to maximize the franchisee profit. However, in the past six years, Barnes provided Plaintiffs a wholesale price that was significantly higher than the regular market wholesale price and declining any other wholesaler who could offer same the products at a lower price.

108. Since Salamah started operating the store in June of 2012, the contract was kept with the franchisor in excellent standing: the store was never defaulted, fined or had a warning issued until the franchisor became aware that Salamah started a position as a school teacher in December 2017. The problems from the franchisor and its representative began soon after. Franchisor informed Salamah that she was going to receive a default due to a monthly cash shortage (immediately taken from Salamah's commission pay) as small as $300 out of about $140,000 in cash that franchisee deposits throughout the month on a daily basis.

109. During the six and a half years of running the Family Fare store, Salamah accumulated more than $70,000 worth of debt to recover for the many months of alleged loss.

110. Salamah had prospective buyers for her franchise location, however Pilcher declared many times to Salamah that they would likely not allow her to sell her store making Salamah feel threatened, with no rights as an alleged franchisee.

17

111. Defendants, on several occasions, intentionally and deceptively shorted the merchandise inventory counts to maximize their profits. Each time there was a shortage, Defendants refused Plaintiffs' request of investigation by a forensic account firm or recount by a different firm. On several different merchandise inventory count occasions, Defendants blamed shortages on system errors. Plaintiffs' commission pay was deducted by an average of $8,000 a year for these merchandise inventory shortages. Additionally, Plaintiffs had no control of the merchandise inventory counts. For instance, on August 8, 2018, the store was declared short in inventory in the amount of $5,979.32 after a monthly audit. Franchisee requested permission to hire a forensic accounting firm to investigate, however, the franchisor found that there was a systematic error which caused the incredibly high shortage for that month.

112. On the day of termination, Defendants declared they would release commission payments to the Plaintiff, which had been held and kept for two months, only upon signing a waiver to release all legal rights which may be remedied by justice.

113. Upon information and belief, Quality Mart and Speedway have 50-100 locations in the Triad area. Much like Family Fare, Quality Mart and Speedway provides customers with food, beverage, and fuel.

114. Scott Scarano, a former business tax accountant for Family Fare, stated in person to Plaintiffs, that the franchisor falsely created shortages for the franchisees to maximize franchisor's own profit at the cost of the franchisee.

## WRONGFUL IN BAD FAITH TERMINATION, VIOLATION OF A FRANCHISE AGREEMENT AND BREACH OF CONTRACT.

115. Plaintiffs argue that Salamah's acceptance to work as an Elementary School Teacher ruled as a major motivation to terminate the franchise. Defendants desire to maintain an image of the franchise as an operation opportunity, and not as an investment opportunity.

116. Plaintiffs argue that Defendants terminated the franchise agreement in bad faith by falsely accusing the Plaintiffs of a three-year old misconduct which occurred by former employees. Defendants were completely aware of this misconduct and in fact, Pilcher was the person who brought the misconduct to light.

117. During a period of a time which ended in September of 2015, former employees, Benjamin Paradiso ("Ben"), Papa Alen, and others, embezzled scratch off lottery tickets worth

18

approximately $22,800, which the franchisor and/or its representatives were aware. Defendants made an agreement with Plaintiffs to allow repayment to be made in installments. Plaintiffs were able to drop the balance to about $10,000 by repaying the balance slowly over time. Pilcher advised franchisee to add the missing tickets' serial numbers to Storetrak (the franchisors designated accounting system), and remove them from the system when each book was paid. Franchisee followed the advice given by Pilcher by adding the missing lottery ticket serial numbers to Storetrack. Slowly, over time, and as Plaintiffs personally paid for the loss from her own commision earnings, Plaintiffs removed tickets that were paid off.

118. After Ben was fired, he started working for another Family Fare franchisee, Teresa Colon. Ben also stole from Colon about $4,000 worth of lottery tickets. Colon initiated an investigation with the NC lottery commissioner, however the results are unknown.

119. Pilcher was fully aware of the missing lottery, and was present with the franchisee when it initially happened. Pilcher watched the cameras to see how the former employees were playing and taking lottery tickets after the store had closed for the night. However, on November 30, 2018, in front of a police officer on the day of termination, he denied any knowledge of the situation. Pilcher also denied the lottery had been paid for, however, Defendants held and abruptly took the Plaintiffs commission pay for two consecutive months to recover the assumed shortage. This caused the Plaintiffs severe emotional and financial distress.

120. Pilcher constantly treated Plaintiffs as employees. For instance, on May 26, 2018, Pilcher entered into an confrontation with Elsayed during the franchisee monthly meeting and shouted to Elsayed, "you better get out of my shit." Pilcher was upset that Elsayed attended the meeting instead of Salamah. Elsayed then informed Barnes of Pilchers' wrongdoing.

121. As retaliation to the confrontation with Elsayed, on August 8, 2018, the store was falsely declared short in inventory for the amount of $5,979.32 during the monthly audit count.

122. Franchisor's bad faith began when Salamah went back to school and obtained a Masters' degree in teaching (MAT), and started working. Franchisor acquired for the name of the school Salamah works at, her exact position and job details, and the hours she put forth into the school. In October of 2018, Barnes visited the Plaintiff's store location. Instead of discussing the business with Salamah, Barnes was only concerned with Salamah's work schedule at the school and Salamah's husband's current admission in law school.

123. There is only one computer and one login username and password for the bookkeeping system (Storetrak) in the store's location which allows everyone, including franchisor and their representatives, franchisee, and their employees to log in under the same account. Username is "398", and the password is "store398". This allows unlimited amount of users to access the system to modify, add, and/or delete any information to Storetrak. The username and password is accessible for anyone who engaged in any activities with the Defendants. When visiting the store each day, Pilcher logged into Storetrak using the same username and password. Plaintiffs can not assert who modified, added or deleted to the bookkeeping records. Plaintiffs were incapable of rejecting Pilcher access into their bookkeeping records. The username and password was posted on the walls in the store's office before Plaintiffs came in June of 2012, and remained there the entire time the Plaintiffs operated the store.

124. On November 30, 2018, Pilcher falsely accused Salamah of lottery ticket theft for alleged grounds to terminate Salamah.

## NON PEACEABLE SELF HELP EVICTION AND REPOSSESSION

125. In November of 2013, Salamah entered into a lease agreement with Fowler. The rent of $334 drafted monthly from Plaintiff's bank account on the same day that the commission pay was dispersed into the Plaintiff's account.

126. On November 30, 2018, the day of termination, Pilcher deceptively visited the store early in the morning to repossess the safe key, $2,030 in cash from the desk in the office and about $300 of loose change money.

127. On the day of termination, Pilcher ordered the inventory audit counters to processes an inventory audit at the store without Plaintiffs' knowledge or consent.

128. On the day of the termination around 4 O'clock, Pilcher handed Salamah a letter of termination as soon as she walked into the store. Salamah requested that a court injunction order be admitted before she surrendered the store, however she was denied by Pilcher and was told to leave immediately. Salamah requested time to consult with her lawyer, and was once again denied by Pilcher any legal counsel.

129. On the day of termination, Pilcher threatened Salamah that he would remove Salamah by force if she did not leave the store, thereon placing Salamah in an apprehensive

state. Later, Pilcher was advised by the Franchisor to call the police to assist with removing Salamah from the premises and to allow the locksmith to change the locks.

130.    On the day of termination, Pilcher and the cashier clerk slightly pushed each other physically to take control of the cash register.

131.    On the day of termination, Pilcher shouted to Elsayed, "Get out of my shit," and the police officer who was present at the time had to break up the confrontation.

132.    On the day of termination, Pilcher stated to the police officer that he holds a higher position in the company than Salamah, and she was "terminated because Salamah stole about $11,000 of lottery from the franchisor."

133.    Defendants failed to provide adequate notice of default prior to re-entry into the store. Defendant's willful, wanton, and malicious conduct in breaching the agreement, and converting the lessees' property to their own possession.

134.    As a result of the termination/eviction, the morning after the termination, on December 1, 2018, Elsayed suffered from a severe anxiety attack which led him to the emergency room that night.

## COUNT I: VIOLATION OF FLSA, NCWHA

135.    All preceding paragraphs are incorporated by reference.

136.    Family Fare purposefully and illegally mischaracterizes the parties' relationship as that of franchisor and independent contractor/franchisee in its franchise agreement.

137.    Family Fare has been covertly foisting an undisclosed employment relationship upon its franchisees for its own benefit for many years, and during this entire time period, cheated the plaintiffs throughout its system out of basic benefits, and ultimately, their livelihood, requiring corrective action immediately.

138.    In actuality, and pursuant to the "economic reality" test in which an employer's classification of employees is measured under the FLSA, Family Fare imposes an employment relationship with the Plaintiffs. The plaintiffs day-to-day activities were aggressively micromanaged and controlled by Pilcher, Plaintiffs had no actual discretion or independent decision-making authority in running their franchise location. "Economic reality" contains a list of six factors are considered when deciding whether it is economically realistic to view a

21

relationship as one of employment or not. The ultimate focus of the economic realities test is whether, as a matter of economic reality, the individuals are dependent upon the business to which they render service, and the six factors considered when assessing the "economic reality" of dependence or independence are: (a) the degree of the alleged employer's right to control the manner in which the work is to be performed; (b) the alleged employee's opportunity for profit or loss depending upon his or her managerial skill; (c) the alleged employee's investment in equipment or materials required for his or her task, or his or her employment of helpers; (d) whether the service rendered requires a special skill; (e) the degree of permanence of the working relationship; and (f) whether the service rendered is an integral part of the alleged employer's business.

### a. Factor No. 1: Right to Control

139.    Family Fare exercised absolute dominion over revenues generated by the franchise store. Family Fare received all money and decided who gets paid when, including that Family Fare always was paid first before store workers, store vendors and the plaintiffs. Family Fare exclusively handled and unilaterally resolved all accounting issues associated with handling money as security to insure payment of any obligation that Family Fare determined is owed by the plaintiffs. The plaintiffs were prohibited from using any of its assets to secure financing from any other source.

140.    Family Fare controlled virtually every aspect of what and how goods and services were sold in a franchisee store. The plaintiffs were afforded minimal discretion as to what goods may be offered for sale in a franchisee store, and no discretion for services offered for sale in a franchise store. Vendor supply sources for most goods and services offered for sale were severely restricted by Family Fare's operational rules. All of the goods and services offered for sale must be entirely purchased from vendors dictated by Family Fare. The advertising, packaging, and display of goods and services for sale in the store were virtually 100% controlled by Family Fare. Family Fare, not the plaintiffs, totally controlled how store space is used.

141.    Family Fare dictated virtually all activities associated with administering the operation of the business. The plaintiffs were required to operate its store 19-22 hours per day, 7 days a week, and 365 days per year without fail. Throughout this year long, every day, many hour operation, the franchisee was required to work full time and devote best efforts. The

workers hired to maintain the year round operation, according to Family Fare, must satisfy Family Fare's appearance and manner standards, and wear clothing mandated by Family Fare. The plaintiffs' hiring and firing practices were commanded by Family Fare. Family Fare, not the plaintiffs, maintained control of all payroll for store workers, paid for by Plaintiffs. Family Fare, not the plaintiffs, also maintained custody over all payroll records for all store workers. The plaintiffs were obligated to cut twice monthly checks for themselves for a set amount of $1,841.67, federal withholding of $150, and state tax withholding of $100, even if the franchisee did not work for any reason, i.e., time off, sickness or vacation. This amount was determined by Family Fare, not the Plaintiffs, and subject to change at any time, without warning, by Family Fare.

### b. Factor No. 2: Opportunity for Profit or Loss Based Upon Managerial Skill

142.   The massive controls imposed by Family Fare and their implied conduct, offered no opportunity for the plaintiffs to exercise any managerial skills beyond Defendants control.

143.   Managerial skills have no impact on profitability, because most store workers rarely command more than minimum wage and product and pricing is dictated in material respects by competitor pricing and the cost of goods, which are materially controlled by Family Fare's contractually mandated vendor requirements, which is not controlled by the Plaintiffs. More specifically, Plaintiffs cannot feasibly change Family Fare's pricing system and they have no control over cost of goods, because Family Fare, in virtually all material respects, dictates where and from whom products and services must be obtained.

### c. Factor No. 3: Relative Investment in Equipment, Materials and Helpers

144.   Family Fare obligated Plaintiffs, upon converting the operation into franchise, to purchase worthless store equipment (i.e. gondolas, old computer and printer) and pay the property tax on the equipment. Nonetheless, the franchisor denied the plaintiff all equipment upon termination. While the plaintiffs hire employees, there is no choice in the matter, because no one person (or even two or three people) can realistically operate a 19-22 hour, 365 day a year business by themselves.

### d. Factor No. 4: Special Skill for Services Rendered

145.   Plaintiffs used no "special skill" beyond the "people skills" required for any employee in the store. Those skills required no special education and no training other than

23

those associated with complying with Family Fare's requirements for managing a convenience store.

### e. Factor No. 5: Permanence of the Working Relationship

146.    Generally speaking, and assuming no breach of onerous termination provisions, Family Fare has a 5-year renewable term. Permanence of the relationship suggests an employee relationship, because a true independent contractor is not impeded from moving project to project and does not continuously work for the same entity. Defendants retained terminatination at their will easy and reachable; taking over the store required just a few minutes. Defendants retained all utilities, alarm services and license of operation kept under Fowler's account name. In severing, there was no difference between terminating the plaintiff and firing a store manager in a corporate store. On the day of termination, it only cost the defendants a few hours (due to Plaintiffs' resistance to surrender), to repossess and reassign the store.

### f. Factor No. 6: Whether Services Performed Are An Integral Part of Employer's Business

147.    Plaintiffs are integral to Defendant's business and that this factor weighs in favor of classifying Plaintiffs as employees. It is unclear how Defendant could run their business at all without its franchisees. Plaintiffs perform an integral part by performing the primary type of work that the employer needs for his customers or clients, and to be successful. Direction and control are present and integrated into the business operation by Family Fare.

### Economic reality test

148.    Section 207 of the FLSA requires "employers" to pay their "employees" overtime compensation for those who work more than forty hours in a given workweek. The FLSA defines the term "employee" as "any individual employed by an employer." The FLSA defines the term "employ" to include "to suffer or permit to work." According to the United States Supreme Court, a broader or more comprehensive coverage of the terms employee and employer would be difficult to frame.

149.    According to the United States Supreme Court, the test of employment under the FLSA is one of "economic reality." And, according to the Wage and Hour Division of the United States Department of Labor, the "economic realities" test demands focus on whether the worker is "economically dependent" on an employer.

150.    The FLSA's six-factor analysis is designed as a tool to assess whether there is economic dependence between Defendant and its franchisees. Plaintiffs were controlled and dominated by Defendant in every material respect that works to Defendant's benefit, Plaintiffs were integral to Defendant's core business, and plaintiffs were completely incapable of operating without, and inescapably dependent upon Defendants for their continued viability and existence.

**Under Common Law**

151.    Defendant is an employer of the plaintiffs because Family Fare has the "right to control" the manner and means by which, i.e., the details, the plaintiffs accomplishes the work of managing the Family Fare store assigned. The so-called "control of details" test is the principal measure for determining a common law employment relationship, because whether a common law employer-employee relationship exists turns foremost on the degree of a hirer's "right to control how the end result is achieved." What matters is whether the hirer "retains all necessary control" over its operations; the fact that a certain amount of freedom of action is inherent in the nature of the work does not change the character of the employment, where the employer has general supervision and control over it.

152.    Defendants were the employers of Plaintiffs because it exercised control over the Plaintiffs' wages, hours and working conditions.

153.    Defendant's' "right to control" how a franchisee accomplishes his/her work is illustrated by Defendants' control over: (a) the store the franchisee will be assigned to operate; (b) the product and services that can be sold; (c) the sources that may be used to acquire product and services to be sold; (d) how and where product and services are advertised, promoted and sold; (e) quality assurance standards for products and services sold; (f) use and ownership of information generated from store operations; (g) how and by whom operational equipment is maintained; (h) training to perform franchisee work, including the nature and amount of training for the franchisee and store workers and whether it was satisfactorily completed; (i) how essential business functions are conducted, including the equipment that must be used in carrying out those functions; and (j) how to train, instruct and pay store workers, including controls over hiring and firing practices, language, dress, appearance, customer interactions and

25

wage payments. Failure to comply with Defendants' extensive system of controls gives rise to Defendants right to terminate Plaintiffs.

154.    Although the "control of details" common law test is the principal measure in assessing whether an employment relationship exists, it is not necessarily the only consideration. For example, the right to discharge at will and without cause provides strong evidence in support of an employment relationship. Defendants manipulated the terms of the franchise agreement to exercise power to terminate Plaintiffs at will and without justification or cause. Defendants, under the manipulated terms of their franchise agreement, claimed the right to terminate for a shortage as small as $300 a month in inventory or cash. This type of shortage is regular within the scope of this type of business. For instance, in a convenience store, there is a regular shortage of cash and inventory due to customer theft, clerk counting mistakes, counterfeits bills etc.. The right of an employee to terminate on such short, or no notice, is indicative of the plaintiffs employee status, because an employee may quit or be terminated at will, but an independent contractor is legally obligated to complete his contract. Pilcher's consistent threats to Salamah of termination at his will, also favor to prove the existence of an employment relationship between the parties.

**Violation of NCWHA**

155.    Defendants violated Plaintiffs' rights under the NCWHA by failing to pay Plaintiffs overtime compensation for hours worked in excess of forty (40) hours for each workweek that Plaintiffs worked during the last (3) three years.

156.    Plaintiffs were entitled to all the rights and protections of the NCWHA and Defendant's failure to pay Plaintiffs overtime was in violation of the NCWHA.

157.    Defendants acted willfully and with reckless disregard for Plaintiffs' rights under the NCWHA.

158.    Plaintiffs are entitled to back pay for all overtime hours worked during their employment with Defendants in an amount equal to one and one-half times their regular rate of pay.

159.    As a result of Defendants' willful and reckless actions, Plaintiffs are entitled to recover liquidated damages pursuant to N.C. Gen. Stat. § 95-25.22.

**Personal Liability**

160.    Plaintiff argues that Defendants face personal liability and are proper defendants in this action because they are employers under the FLSA and NCWHA. Under the FLSA, the "employer" is liable for an employee's unpaid minimum wage and overtime wages, liquidated damages, costs, and reasonable attorney's fees, and in the case of retaliatory discharge, legal and equitable relief including back pay and liquidated damages. 29 U.S.C. § 216(b). Under the NCWHA, the "employer" is liable for an employee's unpaid wages, liquidated damages, costs, and reasonable attorney's fees. N.C. Gen.Stat. § 95–25.22. An "employer" includes any person acting directly or indirectly in the interest of an employer in relation to an employee" ... N.C. Gen.Stat. § 95–25.2(5); 29 U.S.C. § 203(d). Under both the FLSA and NCWHA an individual can be an "employer" and therefore be personally liable for wages and damages.

**WHEREFORE** Plaintiffs seek the following:

An Order declaring and adjudging that Plaintiffs situated are de facto employees as defined under the FLSA, which has been incorporated into NCWHA, and are afforded protections under the FLSA 29 U.S.C. section 216(b), NCWHA, and any other available benefits under state law;

Compensatory Damages;

Recoupment of overtime benefits for the three (3) years preceding the filing of the Complaint in this matter;

Recoupment for all benefits previously withheld from Plaintiffs for the three (3) years preceding the filing of the Complaint in this matter;

Punitive Damages;

Any other relief this court deems equitable and just.

## COUNT II:VIOLATION OF NCWHA (WRONGFUL SALARY DEDUCTION)

161.    Plaintiffs incorporate paragraphs 66-70 above and further allege that Defendants wrongfully and deceptively deducted unauthorized amounts from Plaintiffs' commission

payment. As a result of Defendants' willful and reckless actions, Plaintiffs are entitled to recover wrongful deduction pursuant to N.C. Gen. Stat. § 95-25.13.

**WHEREFORE** Plaintiffs seek any relief this court deems equitable and just.

## <u>COUNT III: NATIONAL ORIGIN/ RACE BASED DISCRIMINATION AND WRONGFUL TERMINATION IN VIOLATION OF 42 U.S.C. SECTION 1981</u>

162.    Plaintiffs incorporate paragraphs 71-88 above and further allege that Defendant, Pilcher had several discrimination conducts against Salamah, Elsayed and other members from the same class.

163.    Plaintiffs are among protected class members because they are Arab Americans and their "national origin" is Egyptian, which is a Middle Eastern and Arabic nation.

164.    Defendants treated Plaintiffs less favorably with regard to the allegedly discriminatory act than Defendants treated other similarly situated members out of the class.

165.    The termination of the Plaintiffs' franchise was motivated by national origin/ race discrimination and because it was owned by Arab-American owners, constituting intentional discrimination which violates the Civil Rights Act of 1991, 42 U.S.C. Section 1981.

166.    Family Fare  knowingly and intentionally terminated Salamah because of her race (Middle Eastern), in violation of her rights under 42 U.S.C. § 1981.

167.    Family Fare's wrongful termination of the franchise agreement for discriminatory reasons and due to national origin/racial animus and intentional discrimination was willful and intentional, was inspired by national origin/racial animus, and was committed with an intentional, malicious and reckless disregard for the rights of Salamah and Elsayed.

168.    Family Fare has a history of discrimination against minorities. Fowler deprived several minorities from direct employment. Defendants rely mainly on the caucasian/white race on its direct employment and only a couple of African American employees are hired, excluding any other race such Hispanic, Asian or Indian. Fowler has a history of  disrespect to individual's beliefs or religion.  see <u>Saund v. M.M. Fowler, Inc.,</u> 5:2010 cv 00391 (refusal to enter into an employment contract based on Mr. Saund's racial and religious identity as a Sikh).

28

169.   As a direct and proximate result of Defendants' conduct, Plaintiffs have suffered, and continues to suffer, monetary losses including, but not limited to, loss of salary and loss of benefits, together with interest thereon, all in an amount to be proved at trial.

170.   As a direct and proximate result of Defendants' conduct, as alleged herein, Plaintiffs have suffered emotional pain, suffering, embarrassment, inconvenience and mental anguish, and Plaintiffs are accordingly entitled to recover compensatory damages in an amount to be proved at trial.

171.   Defendants acted with malice or reckless indifference to Plaintiffs' civil rights, thereby entitling him to punitive damages, in an amount to be proved at trial.

172.   Recovery of attorneys' fees (when is applicable), the imposition of punitive damages, the recovery of actual damages, and reinstatement of the wrongfully terminated contract all are authorized remedies for violations of 42 U.S.C. Section 1981.

173.   In addition to the irrevocable and irreparable harm discussed in Paragraphs 71 through 88, Family Fare's improper national origin-based termination based or national origin animus and intentional discrimination generates and inflicts psychic and reputational harm which is irreparable and irrevocable and for which there is no adequate remedy at law.

**WHEREFORE**, Salamah seeks damages in the amount of at least $120,000 for the wrongful purported termination of its franchise agreement in breach of the terms of its franchise agreement. In addition and not in the alternative, Salamah and Elsayed seek to recover their Attorneys' fees (when is applicable), expert witness fees, and paralegal fees, and punitive damages in the amount of $1.2 million, or approximately ten times the minimum value of their franchise as a going concern and ongoing business. Furthermore, Salamah and Elsayed seek any alternative or additional relief which the Court deems just and proper or which the interests of justice may require.

## COUNT IV: CONTRACT IN VIOLATION OF NC PUBLIC POLICY.

174.   Plaintiffs incorporate paragraphs 71-88 above and further allege that Defendant, Pilcher had several discrimination conducts against Salamah, Elsayed and other members from the same class.

29

175.    N.C. Gen. Stat. § 75B-2 expresses North Carolina's public policy prohibiting any business from termination a contractual relationship or employment with another person because of that person's national origin/race.

176.    Defendants intentionally violated North Carolina public policy by termination Plaintiffs' position.

177.    Under North Carolina law, Plaintiffs are entitled to recover their damages including, but not limited to, back wages and benefits (and interest thereon), front wages and benefits and compensatory damages, in an amount to be proved at trial.

**WHEREFORE**, Plaintiffs seek an award of punitive damages against Fowler pursuant to N.C. Gen. Stat. § 1D-1, et seq., in an amount to be proved at trial.

## COUNT V: BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING, UNFAIR AND DECEPTIVE TRADE PRACTICES, RESCISSION, AND FRAUD

178.    Plaintiffs incorporate by reference all Paragraphs 89 to 113 to this claim as expressly set forth herein.

179.    Defendants, at all relevant times, had the obligation to act in good faith in order to maximize the best interests of Plaintiffs under the franchise agreements.

180.    Every contract imposes upon all parties an implied duty of good faith and fair dealing. That burden requires that the parties do everything that the contract presupposed they will do to accomplish its purpose and to avoid doing anything that would injure the right of the other to receive the benefits of the agreement. Here, Defendants demonstrate a failure and refusal to discharge contractual responsibilities, and is accompanied by a conscious, deliberate act that frustrates the common purpose of the agreement.

181.    Defendants have breached its implied covenant of good faith and fair dealing by and through numerous acts that have harmed Plaintiffs' ability to operate their Family Fare franchise.

182.    As a direct and proximate result of Defendant's repeated breaches of the covenant of good faith and fair dealing, Plaintiffs have sustained and continue to sustain substantial

hardship and considerable monetary damage. Plaintiffs herein seek a declaration that Family Fare acted in bad faith in connection with its obligation under the Franchise Agreements.

183.    It is a most disingenuous thing for Defendants to consummate a business transaction and refuse to provide a copy of a signed contract. Defendants' refusal conduct is intentional for a solely protection of their interest, negligent any interest or remedies to the Plaintiffs. Salamah can not assert if the non signed franchise disclosure, that was given to her prior to signing the franchise agreement, is identical to the one she has signed.

184.    While Store Operators at Quality Mart and Speedway perform the same functions and duties as the Family Fare store managers and are properly classified as employees, Family Fare operators, intentionally misclassified as franchisees, in order to increase corporate profits and avoid paying FICA and other employer taxes, benefit and deduct from them any losses or damages.

185.    Plaintiffs allege that Defendants deceptively used a monetary balance, that they are not entitled to, for other business activities and deprived Plaintiffs from any profits or interest.

186.    Plaintiffs argue that all amendments signed after entering into the franchise agreement were signed under threat, and without consideration.

187.    By applying an objective standard, a reasonable person would actually assert and believe that Salamah signed the agreement under financial pressure and duress.

188.    All documents that have been signed by Salamah from the franchisor's request (such as amendments to the franchise) were signed under economic duress because: (1) Plaintiffs are victims of a threat; (2) such act or threat of losing her sole source of income deprived Plaintiffs of their unfettered will; (3) as a direct result, Plaintiffs compelled to make a disproportionate exchange of values and gave up something for nothing; (4) any amendment made solely for the purposes of protecting Defendants business and interests, and; (5) Plaintiffs has no adequate legal remedy at that time.

189.    Defendants engage in commerce, offers goods and services for sale, and advertises goods and services for sale within the State of North Carolina. As such, Defendant has a duty to comply with the provisions of the Unfair and Deceptive Business Practices Act, G.S. 75-1.1, which Act prohibits, inter alia, unlawful, unfair business acts or practices and unfair, deceptive, untrue, or misleading advertising within the jurisdiction of the State of North Carolina

31

190.    By violating the FLSA and NCWHA as alleged above, and by failing to take immediate and appropriate measures to address these violations, Defendants' acts constitute unfair business practices under Defendants' foregoing violations of the FLSA and NCWHA and by extension, North Carolina Business Opportunity Act constitute an unfair business and deceptive practice because the acts have been done repeatedly over a significant period of time throughout the State of North Carolina, and in a systematic manner to the detriment of Plaintiffs.

191.    Plaintiffs allege that Defendants committed unfair or deceptive practices when they: (1) misrepresented an employment opportunity as a franchise opportunity; (2) misrepresented the franchise terms; (3) falsely accused Plaintiffs of a cause to be terminated; (4) mislabeled and manipulated the rules for their sole interest; (4) purposely neglected any interest or benefits for Plaintiffs; (5) deceptively repossessed Plaintiffs properties; (6) falsified an equipment sale transaction; (7) falsified an investment transaction; (8) termination threats to Plaintiffs upon requesting signing any document; (9) wrongful fraud deduction from Plaintiffs' pay commission to maximize their profit, and; (10) falsified Plaintiffs income and pay.

192.    Defendants committed unfair or deceptive acts and practices, wherefore the actions in question were affecting commerce, and the act proximately caused injury to Plaintiffs.

193.    Plaintiffs allege that Defendant committed fraud by: (1) a false representation and concealment of franchise; which was (2) reasonably calculated to deceive; (3) made with intent to deceive; (4) did in fact deceive; and (5) resulted in damage to the injured Plaintiffs.

194.    It is clear, obvious, unfair and deceptive trade practice, for the purposeful and intentional misrepresentation of: employment opportunity as a business opportunity; law manipulation instead of compliance; deprivation of several rights to a natural citizen which are enacted by the U.S. Congress and the NC State Assembly; development of such opportunity to be repossessed at any time at the mere will of the Defendants, then; withholding two months of commission payment to Plaintiffs' and; commission payments were only offered in the exchange of Plaintiffs' waiver to all legal rights which may be remedied under justice.

**WHEREFORE**, Plaintiffs seek relief against Defendant by way of an entry of an Order awarding:

(a) Compensatory damages;

(b) Punitive damages;

32

(c) Consequential damages;

(d) Attorneys' fees when applicable and costs of suit; and

(e) Any other relief this Court deems equitable and just.

## COUNT VI: VIOLATION TO NC BUSINESS OPPORTUNITY ACT

195.   Plaintiffs incorporate by reference all Paragraphs to this claim as expressly set forth herein.

196.   Plaintiffs allege that Defendants failed to illustrate any proper business plan for profit and loss.

197.   Plaintiffs allege that Defendants failed to declare any advertisement plan, activity, cost or expenses.

198.   Plaintiffs argue that all amendments signed after entering into the franchise agreement were signed under threat of termination, holding of commission payment, and without consideration.

199.   By applying an objective standard, a reasonable person would actually assert and believe that Salamah signed the agreement under financial pressure and duress.

200.   Defendants represented the franchise sale as a "business opportunity," thereon, Under NC Business Opportunity Act, Defendants are a seller of such opportunity and Plaintiffs are purchaser. "Business opportunity contract" which shall be in writing and a copy shall be given to the purchaser at the time he signs the contract N.C.Gen. Stat. § 66-99

201.   Defendants refusal to supply Plaintiff with a copy of a signed contracts, amendments and threat Plaintiffs to sign such agreement under financial distress violate  N.C. Gen. Stat. § 66-99. Pursuant N.C. Gen. Stat. § 66-100. Such violation is also a violation of Unfair and Deceptive Trade Act.

**WHEREFORE**, Plaintiffs seek relief against Defendant by way of an entry of an Order awarding:

(a) Compensatory damages;

(b) Punitive damages;

(c) Consequential damages;

(d) Attorneys' fees when applicable and costs of suit; and

33

(e) Any other relief this Court deems equitable and just.

## COUNT VII: TERMINATION IN BAD FAITH AND BREACH OF CONTRACT

202.    Plaintiffs incorporate by reference all Paragraphs to this claim as expressly set forth herein.

203.    Defendants retained all utilities, license, permits and all operation necessary elements under their control to make termination accessible at any time at the will of the Defendants.

204.    Plaintiffs allege that the franchise termination was planned for a long period of time; it was not a spur of the moment decision. Defendants waited until the time of termination to accumulate a sufficient balance so Defendants can negotiate waiving Plaintiffs' rights.

205.    Defendants "good cause" for termination were false and manipulated to solely serve Defendants' interests. Defendants established the "good cause" from an incident that occured three (3) years prior to the termination, then manipulated such incident to rule in their favor. Deceitfully, Pilcher denied knowledge of such incident on the day of termination, even though Pilcher had discussed the lottery theft incident with Plaintiffs several times throughout the past three (3) years, and most recently, a week before termination.

206.    Plaintiffs repeatedly allege that termination was motivated by Defendants by national origin/racial discrimination and Salamah's new position as a school teacher. Plaintiffs repeatedly allege that Defendants' false claim of "good cause" are irrelevant.

207.    As a direct and proximate result of Defendants breach of the covenant of good faith and fair dealing, Plaintiffs have sustained and continue to sustain substantial hardship and considerable monetary damage. Plaintiffs herein seek a declaration that Defendants have acted in bad faith in connection with their obligations under the Franchise Agreements.

**WHEREFORE**, Plaintiffs seek relief against Defendant by way of an entry of an Order awarding:

(a) Compensatory damages;

(b) Punitive damage;

34

(c) Consequential damages;

(d) Attorneys' fees when applicable and costs of suit; and

(e) Any other relief this Court deems equitable and just.

## COUNT VIII: WRONGFUL FORCIBLE SELF HELP EVICTION, UNLAWFUL FORCIBLE SELF HELP REPOSSESSION, BREACH OF THE PEACE

208.    Plaintiffs incorporate by reference all Paragraphs to this claim as expressly set forth herein.

209.    Plaintiffs allege that Defendants' actions in breaching the lease/franchise agreement and seizing their property were deceitful, malicious, and willful. Plaintiffs set forth facts to support unfair and deceptive trade practices, conversion, and punitive damages claims. Plaintiffs allege that Defendants failed to provide adequate notice of default prior to reentry into the store. Defendant's willful, wanton, and malicious conduct in breaching the agreement, and converting the lessees' property supported a claim for punitive damages under N.C. Gen. Stat. § 1D-15(a).

210.    Plaintiffs argue that they have superior right of possession to exercise dominion and control over the cash and inventory in the store. However, Defendants deceptively deprived Plaintiffs from such right upon the day of eviction.

211.    Defendant Pilcher unlawfully and deceptively repossessed the cash and safe key right before the termination took place, without authorization or acknowledgement of Plaintiffs.

212.    Plaintiffs allege that Defendants forcibly self-help ejected Plaintiffs on the day of termination. According to the "forcible self-help" definition of North Carolina Court of Appeals, while a landlord is permitted to use peaceful means to re-enter and take possession of leased premises subject to forfeiture, Defendants should not do so against the will of the tenant; an objection by the tenant elevates the reentry to a forceful one, and the landlord's sole lawful recourse at that time is to the courts. Plaintiffs requested Pilcher to obtain a court injunction for them before eviction. Pilcher denied the request, and immediately had the locks replaced while Plaintiffs were in the store.

213.    Defendants breached the peace upon eviction and violated North Carolina's public policy interest in maintaining public peace and the common law lessee rights by forcible entry and detainer. Furthermore, there was confrontation; and there is evidence that deception

was used in repossessing Plaintiffs' property. Self-help repossession must be exercised without provoking a breach of the peace according to North Carolina Court of Appeals. Public policy favors peaceful, non-trespassory repossessions when the secured party has a free right of entry. Pilcher placed Salamah in actual and reasonable apprehension by shouting, "I will have to remove you by force then." Additionally, Pilcher and the cashier clerk slightly pushed each other physically to take control of the cash register. Pilcher shouted to Elsayed, "Get out of my shit," and the police officer who was present at the time had to break up the confrontation.

214. Plaintiffs argue that Defendant falsified a "good cause" of termination/eviction which is willful and wanton conduct by defendants in breaching the franchise/lease agreement and in converting Plaintiffs' property. Defendant refused to allow Plaintiffs, even after several attempts over a few hours, any time to consult an attorney or seek for preliminary injunction. Plaintiffs argue that Defendants chose the termination/eviction on a Friday evening to deprive Plaintiffs access to any legal help or justice by a court.

**WHEREFORE** pursuant to N.C.G.S. Chapter 75-16, Plaintiffs seek an award of triple damages and attorney fees (when is applicable) against Defendants.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury of all issues so triable.

## CERTIFICATION AND CLOSING

Under Federal Rule of Civil Procedure 11, by signing below, we certify to the best of our knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

We agree to provide the Clerk's Office with any changes to address where case–related papers may be served. We understand that failure to keep a current address on file with the Clerk's Office may result in the dismissal of our case.

This is the _____ 26th _____ day of December, 2018.

Amro Elsayed, Pro Se
2615 Wyman Road
Winston Salem, NC 27106
949.735.3153

Lola Salamah, Pro Se
2615 Wyman Road
Winston Salem, NC 27106
949.735.3184_