IN THE UNITED STATES DISTRICT COURT FOR
THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| AMRO ELSAYED and | ) | |
| LOLA SALAMAH (H/W), | ) | |
| | ) | |
| Plaintiffs, | ) | CIVIL ACTION NO. 1:18-CV-01045 |
| | ) | |
| v. | ) | |
| | ) | |
| FAMILY FARE LLC, and | ) | |
| M.M. FOWLER, INC., and | ) | |
| LEE BARNES, JR., individually and | ) | |
| as President of FAMILY FARE LLC, | ) | |
| and M.M. FOWLER, INC., and | ) | |
| DONALD PILCHER, individually, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## DEFENDANTS' MEMORANDUM IN SUPPORT OF
## MOTION FOR SUMMARY JUDGMENT

Defendants Family Fare, LLC ("Family Fare"), M.M. Fowler, Inc. ("Fowler"), Lee Barnes, Jr. ("Barnes") and Donald Pilcher ("Pilcher") (collectively "Defendants"), through undersigned counsel and pursuant to Local Rules 7.2, 7.3 and 56.1, submit this memorandum of law in support of their Motion for Summary Judgment [D.E. 48].

## STATEMENT OF THE CASE

Plaintiffs' claims consist almost entirely of conclusory factual statements and legal conclusions, with said statements and conclusions asserted repeatedly and inconsistently. As of the time of this Motion, the Court has not yet ruled on Defendants' Partial Motion for Judgment on the Pleadings ["MJOP"]. [D.E. 16]. Nevertheless, it is evident, after the close of discovery, that any of Plaintiffs' claims which may survive Defendants' MJOP

1

must be dismissed because there is no genuine issue of material fact and Defendants are entitled to judgment as a matter of law.

## STATEMENT OF FACTS

### A.    The Franchise Relationship.

Fowler entered into a written contract operator agreement with Almy, LLC ("Almy") on June 29, 2012, permitting Almy to operate a Family Fare convenience store at 3836 Reynolda Road in Winston-Salem ("Reynolda Store").  [Complaint ¶7 (D.E. 1); Answer ¶7 & Ex. A (D.E. 8)].  In late 2013, Almy was offered a franchise agreement for a Family Fare franchise.  [Complaint ¶8; Answer ¶8].

Family Fare provided Almy and Salamah with a copy of the required franchise disclosure document ["FDD"] on November 13, 2013.  [Salamah (Motion Ex. 1) 27(2)-28(23) & Ex. 15 (Motion Ex. 2); Barnes Declaration (Motion Ex. 3) ¶4][1].  Salamah signed the FDD receipt acknowledging receipt of the FDD on November 13, 2013. [Salamah 23(19)-26(21), 33(6-15) & Ex. 14 (Motion Ex. 4); Barnes Declaration ¶4].  The FDD always includes a copy of the Family Fare Franchise Agreement.   [Barnes Declaration ¶¶3,5].

As customary, Family Fare provided Salamah with the FDD in a binder that also included copies of the Inventory Consignment Agreement ("Inventory Agreement") [D.E. 8-4], the Equipment Promissory Note and Security Agreement ("Equipment Note")

---

[1] Citations to depositions throughout are as follows: ["Deponent Name" "page #" ("beginning line #") - "page #" ("ending line #")].  All cited deposition exhibits are cited as "Deponent Name" "Ex. #" and are attached to the Motion and are identified in the first instance cited herein as "(Motion Ex. #)".

[D.E. 8-5], the Initial Franchise Fee Promissory Note and Security Agreement ("Franchise Fee Note") [D.E. 23-1] and the Lease Agreement [D.E. 8-7]. [Salamah 26(2)-29(20), 33(6-15); Barnes Declaration ¶¶3-4]. Salamah maintains a copy of the binder with all of these contractual documents, including the FDD, in her possession today. [Salamah 36(6)-37(21)]. It is Salamah's normal practice to review all documents before signing. [Salamah 22(9-13)].

Salamah signed the Statement of Prospective Franchisees and the Franchise Agreement in early December 2013. [Salamah 29(24)-32(10), 25(16)-36(4); Salamah Ex. 16 (Motion Ex. 5)]. The Franchise Agreement signed by Salamah is the same as the copy attached to the FDD which was included in the binder. [Barnes Declaration ¶5; *Compare* Salamah Exs. 15 & 17(Motion Ex. 6)]. The Inventory Agreement, the Equipment Note, the Franchise Fee Note and the Lease Agreement were all signed by Salamah contemporaneously with the Franchise Agreement. [Salamah 48(13)-50(15); Barnes Declaration ¶6]. The Franchise Agreement and Inventory Agreement are the two primary documents which govern daily business for Almy's franchise. [Barnes Declaration ¶7; Elsayed (Motion Ex. 7) 104(11)-105(15); Salamah 67(14-24), 68(16)-70(12)]. In addition, the Equipment Note governs Almy's purchase of certain equipment used in the Reynolda Store including the time clock, gondolas, and a computer and also gives Fowler a security interest in that equipment for amounts owed by Almy to Fowler. [Barnes Declaration ¶7]. The Lease Agreement governs the relationship between Almy, as tenant, and Fowler, as landlord. [*Id.*].

3

There are numerous provisions of the Franchise Agreement which disclaim any employment relationship between Defendants and Almy, Salamah or employees of Almy or Salamah, including Sections 13 and 18. [D.E. 8-3]. Nevertheless, Plaintiffs contend there was an employment relationship between Defendants and Almy's employees. Salamah admits she was a franchise owner. [Salamah 67(14-24)].

What is undisputed, however, is Salamah admits she was a franchise owner. [Salamah 67(14-24)]. Salamah also believed the persons working in the Reynolda Store were her employees. The Complaint is replete with allegations in which Salamah admits the persons working in the Reynolda Store were her employees. [*See* D.E. 23 at 3-4].

There is also documentary evidence in which Salamah clearly identifies the Reynolda store workers as her employees. [Pilcher Exs. 3 (Motion Ex. 8) (EL 266, 271) & 4 (Motion Ex. 9) (EL 122, 224)]. The record evidence also demonstrates that at the time of the termination of the Franchise Agreement and the repossession of the Reynolda Store, Salamah and Elsayed stated to the Winston-Salem police officer onsite that Salamah was the owner of the franchise and the employees at the Reynolda Store were Salamah's employees. [Sykes Declaration (Motion Ex. 10) ¶4 (DVD recording (Motion Ex. 11) "Civil_Matter-3.mp4" at 00:50-01:25, 06:30-06:41; "Civil_Matter-4.mp4" at 25:40-26:20 (time)]. Elsayed also admitted that if the Court determines there is a franchise agreement in existence then there is no employment contract between himself and Salamah and Defendants, "because at that time, it could or will be a family-owned business that owned by me and Ms. Salamah." [Elsayed 104(11)-105(12)].

4

Even in the face of Salamah's attempts to downplay her role as the franchisee/owner of the Reynolda Store, there are many examples of her control over the operations of the Reynolda Store and its employees. This control included at least the following:

- Sets schedules Reynolda Store employees [Salamah 59(6)-60(11); Pilcher Ex. 4 (EL 107-108)].

- Maintained personnel files for Reynolda Store employees [Salamah 70(13-25)].

- Hired and fired Reynolda Store employees [Pilcher Exs. 3 (EL 271) & 4 (EL 4, 39, 53, 69, 197); Salamah 79(20)-80(9); 98(9-12); Elsayed 187(24)-188(18)].

- Selected whether to sell certain inventory in store. [Barnes Declaration ¶19 & Ex. B].

- Assisted Pilcher in monitoring area gas prices to maintain competitive prices at her store [*See, e.g*., Pilcher Ex. 4 (EL 3, 5, 9, 14, 54].

- Trained employees [*Id.* (EL 89, 169)].

Finally, the Franchise Agreement and Inventory Agreement contain provisions relating to and describing payment of royalties by Almy as well as the terms and conditions relating to revenue from the franchised business to which Almy is entitled. [Franchise Agreement §5; Inventory Agreement § 2-5].

5

## B. Termination of the Franchise Agreement.

Family Fare terminated the Franchise Agreement on November 30, 2018 for the reasons set forth in the Termination Letter. [D.E. 8-6]. Family Fare's President, Lee Barnes, made the decision to terminate the Franchise Agreement as a result of significant lottery shortages. [Barnes Declaration ¶15; Franchise Agreement §27]. The "End of Period Financial Reconciliation" documents indicate lottery shortages over a period of August 8, 2018 through November 5, 2018 in the total amount of $14,727.00. [Barnes Declaration ¶17; Elsayed Ex. 10 (Motion Ex. 12)]. These shortages occurred only five months after Family Fare sent Salamah a letter warning her of problematic lottery shortages for November 2017 through early February 2018. [Barnes Declaration ¶18 & Ex. A].

Plaintiffs admit these shortages related to a theft of lottery tickets by two Almy employees more than three years prior to the termination, but also admit that they developed a secretive scheme to actively conceal the theft and the scope of the theft from Family Fare because they knew and were concerned that if Family Fare learned the extent of the theft and the resulting shortage that the Franchise Agreement would be terminated. [Elsayed 165(22)-169(1); 173(9)-177(22); 210(7)-211(10); 221(6)-227(11); Salamah 85(18)-92(9)]. As Salamah and Elsayed feared, the Franchise Agreement was terminated when the lottery shortages became evident to Barnes and others within Family Fare in 2018. [Barnes Declaration ¶16]. Barnes was the only person who had the authority to terminate the Franchise Agreement. [*Id.*]. Pilcher had no authority to terminate the Franchise Agreement and if he knew of the extent of the lottery shortages (which he

6

denies), he never reported the extent of the shortages to Barnes. [*Id.*; Pilcher (Motion Ex. 13) 105(11)-106(15)].

## QUESTIONS PRESENTED

I.  Are Plaintiffs' FLSA and NCWHA claims barred on the grounds that the record fails to support that the Defendants are joint employers?

II.  Are Defendants entitled to summary judgment on Plaintiffs' claims for violation of the FLSA and the NCWHA?

III.  Are Defendants entitled to summary judgment on Plaintiffs' claims for violation of 42 U.S.C. §1981?

IV.  Are Defendants entitled to summary judgment on Plaintiffs' claims for fraud, breach of covenant of fair dealing, rescission and unfair and deceptive trade practices?

V.  Are Defendants entitled to summary judgment on Plaintiffs' claims for violation of the North Carolina Business Opportunity Act?

VI.  Are Defendants entitled to summary judgment on Plaintiffs' claims for termination in bad faith and breach of contract?

VII.  Are Defendants entitled to summary judgement on Plaintiffs' claims for wrongful self-help eviction and breach of the peace?

7

## ARGUMENT

**I.  Defendants are entitled to summary judgment on Plaintiffs' FLSA and NCHWA claims because Defendants are not a joint employer.**

The business relationship between Almy and Salamah on the one hand and Family Fare and Fowler on the other is governed, in part, by the Franchise Agreement, the Inventory Agreement and the Lease Agreement.  Pursuant to these agreements, Salamah and Almy are franchisees and tenants, not employees.  [See p. 3 above].

Now, in discovery, there is further evidence that Salamah and Elsayed considered the persons working at the Reynolda Store to be their employees.  [See p. 4 above].  Thus, Plaintiffs' FLSA and NCWHA claims fail as a matter of law because Plaintiffs cannot demonstrate that Defendants "share[] or codetermine[] the essential terms and conditions of [Almy's] workers['] employment."  *Salinas v. Commercial Interiors, Inc.*, 848 F.3d 125, 142 (4th Cir. 2017).

As noted in Defendants' pending MJOP and supporting memorandum [D.E. 16 & 17], nearly all of the Plaintiffs' allegations of "control" relate to control of brand standards, trademarks, trade name and goodwill and seek to maintaining a consistent customer experience in the franchise locations. [Barnes Declaration ¶15].  Courts have routinely recognized this type of "control" in the franchise context as permissive control, even if expansive, which does not arise to the level of a joint employment relationship. *See Jacobson v. Comcast Corp*., 740 F. Supp. 2d 683, 690, & n.6 (D. Md. 2010); *Chen v. Domino's Pizza, Inc.,* No. 09-107, 2009 U.S. Dist. LEXIS 96362, at *10 (D.N.J. Oct. 16,

2009)("Courts have consistently held that the franchisor/franchisee relationship does not create an employment relationship between a franchisor and a franchisee's employees").

No evidence has been developed by Plaintiffs through discovery to expand on their allegations of control beyond the commonly found "control" elements in all franchise systems. Indeed, the evidence, even in the light most favorable to Plaintiffs, demonstrates that the few conclusory allegations in the Complaint that might relate to the "essential terms" of Almy's employees' are unfounded:

- Defendants do not exercise veto power over personnel decisions made by franchisee but only need to know of new hires in order to obtain branded name tags and neck ties to comply with brand standards. [*Compare* Complaint ¶27 to Salamah 79(2)-80(9), 98(9-12); Pilcher 25(5-14), 30(9-15), 33(25)-34(2)].

- Plaintiffs, not Defendants, terminated store employees. [*Compare* Complaint ¶¶31, 63(1) to record cites a p. 5 above].

- Salamah, not Defendants, controlled work schedules. [*Compare* Complaint ¶63(3) to record cites at p. 5 above].

- Salamah, not Pilcher, controlled employee pay. [*Compare* Complaint ¶63(4) to Pilcher 23(18-23), 36(18-24)].

- Salamah, not Defendants, maintained employment records. [*Compare* Complaint ¶63(6) to Salamah 70(13-25)].

The record evidence also demonstrates other alleged contentions of Defendants' control do not relate to influence over the essential terms and conditions of Almy's

9

workers' employment, but relate to brand standards to maintain consistency and quality of service throughout Family Fare stores and assure the safety of customers. [Barnes Declaration ¶15]. Defendants are not the joint employers of Almy's employees and Plaintiffs' claims for violation of the FLSA and the NCWHA should be dismissed.

## II. Plaintiffs cannot demonstrate violations of the FLSA and NCWHA.

Even if it is determined that there exists a genuine issue of material fact as to whether Almy and Salamah on the one hand and Defendants on the other hand are joint employers (which is expressly denied), Plaintiffs' claims against Defendants for violations of the FLSA and NCWHA still fail as a matter of law because Plaintiffs have failed to establish essential elements of claims under those statutes.

### A. Plaintiffs have failed to establish claims for overtime wages.

#### (i) Salamah is exempt pursuant to the executive exemption.

Salamah has admitted that she signed the Franchise Agreement, Inventory Agreement, the Equipment Note, the Franchise Fee Note and the Lease Agreement. [*See* p. 3 above]. Furthermore, in the Complaint and in discovery she has admitted on numerous occasions that she was the owner of the Reynolda Store. [*See* p. 4 above]. Based on this evidence, the FLSA and NCWHA should not even apply to Salamah. [2]

However, even in her most dire efforts to describe herself as an employee of Defendants, she still describes herself as the "store manager." [*See, e.g.*, Complaint ¶184; Salamah 103(25)-104(16)]. It cannot be disputed when viewing the present record

---

[2] If an employee is covered by the FLSA it is exempt from the NCWHA. *Spencer v. Hyde*, 959 F. Supp. 721, 728 (E.D.N.C. 1997).

that, at the very least, Salamah was the person in charge of the Reynolda Store on a daily basis.

Courts have consistently and repeatedly granted summary judgment to employers dismissing claims by "store managers" because they are exempt from FLSA overtime requirements. *See, e.g.*, *Grace v. Family Dollar Stores, Inc*., 637 F.3d 508, 518 (4th Cir. 2011); *Jones v. Va. Oil Co., Inc.*, 69 F. App'x 633, 639 (4th Cir. 2003); *Thomas v. Speedway SuperAmerica, LLC*, 506 F.3d 496, 508 (6th Cir. 2007).

In order to establish the executive exemption an employer must demonstrate the employee (1) is paid at least $455 per week, (2) has management as a primary duty, (3) customarily and regularly directs the work of two or more employees, and (4) has authority to hire or fire other employees or her suggestions and recommendations are given particular weight. *Grace*, 637 F.3d at 513.

Here, elements one and three are easily demonstrated. The payroll records and Salamah's own admissions demonstrate that at all times she was paid more than $455 per week (and was the highest compensated person at the Reynolda Store). [Salamah 102(14-22); Elsayed Dep. Ex. 5 (Motion Ex. 14)]. The same payroll records and Elsayed's testimony demonstrate there were always more than two workers employed at the Reynolda Store. [Elsayed 56(14-16)].

Similarly, elements two and four are easily demonstrated. With respect to element two, Salamah was undisputedly the person in charge of the Reynolda Store on a daily basis. Examples of her management work include setting employee work schedules, making changes to employee work schedules, maintaining personnel records, training

11

employees, selecting and hiring employees, establishing pay rates and making suggestions and giving input for products in the store. [See p. 5 above]. She also maintained the appearance and cleanliness of store and had incentives to maximize store sales (entitled to receive 50% of gross sales). [Pilcher 26(12)-27(3); Salamah 67(14)-68(8)]. Further, Salamah and Pilcher discussed store performance, sales and promotions, and monitored area fuel prices together on a regular basis. [Pilcher Ex. 4].

Salamah was in charge of all aspects of operation of the Reynolda Store in much the same ways as the store managers in the aforementioned cases. *Grace*, 637 F.3d at 510-11 (exempt store manager was highest level employee at store, income depended on success of store, managed employees and recommended employees for hire); *Jones*, 69 F. App'x at 637 (exempt convenience store manager supervised employees, handled customer complaints, met vendors, completed daily paperwork); *Thomas*, 506 F.3d at 505 (exempt manager's duties included "hiring employees, training employees, assigning weekly work schedule"); *Smith v. AutoZone, Inc.*, No. 7:15-CV-183, 2016 U.S. Dist. LEXIS 63900, at *23-24 (W.D. Va. May 13, 2016)(exempt store manager duties included, among other things, acting "as the eyes and ears for his superiors on personnel issues").

What is more, the fact that Pilcher played an active role does not establish a genuine issue of material fact. In each of the cases cited herein the active involvement of a district manager did not change the fact that the store managers were in charge of the daily operations. *See, e.g.*, *Thomas*, 506 F.3d at 506-07 (acknowledging as "a matter of law, that 'active supervision and periodic visits by a [district] manager do not eliminate

12

the day-to-day discretion of the on-site store manager'") (quoting *Murray v. Stuckey's Inc. (Murray II)*, 50 F.3d 564, 570 (8th Cir. 1995)).[3]

Indeed, the Eighth Circuit's analysis in *Murray I* is particularly instructive because the reality is that "the manager of a local store in a modern multi-store organization has management as his or her primary duty even though the discretion usually associated with management may be limited by the company's desire for standardization and uniformity." *Murray v. Stucky's. Inc. (Murray I)*, 939 F.2d 614, 619 (8th Cir. 1991). For these reasons, even if Salamah is an employee store manager (which is denied), she is exempt from overtime and her FLSA and NCWHA claims should be dismissed.

### (ii)     Defendants had no knowledge of Elsayed's alleged overtime work.

Even if Elsayed were Defendants' employee (which is denied), to establish a claim for violation of FLSA overtime requirements he must prove Defendants had actual or constructive knowledge of his uncompensated overtime work. *See Bailey v. Cty. of Georgetown*, 94 F.3d 152, 157 (4th Cir. 1996).

If Elsayed worked overtime then Defendants had no knowledge, actual or constructive, because Elsayed admittedly did not accurately report his alleged hours worked to the payroll vendor, Prime Pay. [Elsayed 64(7-15), 77(24)-78(1), 81(22)-82(8);

---

[3] It is noteworthy that in the Complaint [¶184], Plaintiffs compare their alleged "employment" to the exempt store managers at Speedway stores.

13

Barnes Declaration ¶13].[4]  When, as here, there was a method for imputing work time (time clock), the burden to prove an employer's knowledge of overtime worked is "squarely upon the plaintiff."  *Pforr v. Food Lion, Inc.*, 851 F.2d 106, 109 (4th Cir. 1988). Elsayed cannot meet this burden.

First, Elsayed contends that Defendants told him he could not report his hours worked in the store, [Elsayed 99(1)-100(21); 102(2-9)], yet has produced no evidence whatsoever other than his self-serving testimony that this is factually accurate and the evidence is to the contrary.  There is no such requirement in any written contractual documents regarding the Reynolda Store.  [Barnes Declaration ¶12].  Perhaps most importantly, the sworn testimony of Teresa Colon (another Family Fare franchisee) is clear that she reports all hours worked by employees at her store, including the hours worked by her husband Andrew Colon, and none of the Defendants ever told her not to report all time worked. [T. Colon (Motion Ex. 15) 35(19)-39(5)].  Defendants also never told her that she had to report a limited number of hours worked for her and her husband. [*Id*.].

Elsayed's only other purported evidence that Defendants knew he was working overtime is his self-serving testimony that Pilcher watched the store's video camera and could have determined how many hours he was working.  [Elsayed 50(11-24), 63(5-11)]. This evidence is insufficient.   Pilcher testified that he did not watch on any regular basis

---

[4]  In discovery Elsayed produced a spreadsheet he purportedly maintained contemporaneously with the time he worked, but admitted he never gave this spreadsheet to anyone associated with Defendants.  [Elsayed 49(24)-50(13), 76(21)-78(1)].  This spreadsheet is irrelevant to Defendants' knowledge.

14

[Pilcher 33(4-23)] and there logically is no way to watch the time clock for more than 40 hours per week to try and determine if Elsayed was working overtime. Such an argument is untenable. In addition, such speculative evidence is insufficient as a matter of law. *See, e.g.*, *Bailey*, 94 F.3d at 157 (evidence of other employees' knowledge of potential sporadic overtime work insufficient); *Davis v. Food Lion, Inc.*, 792 F.2d 1274, 1277 (4th Cir. 1986)(testimony that employer should have known employee was working overtime because of the pressure put on employee to meet certain job tasks insufficient).

## B. Plaintiffs have failed to establish wrongful salary deductions under the NCWHA.

Plaintiffs contend Defendants violated N.C. Gen. Stat. §95-25.13 by "deduct[ing] unauthorized amounts from Plaintiffs' commission payment." [Complaint ¶161]. This claim only applies to Salamah. In discovery it became clear that what Plaintiffs term "commission" refers to the monthly gross sales payment to Salamah. [*See, e.g.*, Elsayed 53(14)-54(19); Complaint ¶¶66-70]. What Salamah received was not "commission." Family Fare was paid royalties from the gross sales and then it paid Almy 50% of gross sales pursuant to the Franchise Agreement. Salamah's wrongful deduction claim should be dismissed on this basis alone.

However, even if Salamah were an employee of Defendants (which is expressly denied) the record evidence is clear that Salamah was notified of all deductions from her "commission" in a manner which would fully comply with the requirements of N.C. Gen. Stat. §95-25.13. The Franchise Agreement and Inventory Agreement signed by Salamah constitute written notice of "commission" deductions which would satisfy the

15

requirements of N.C. Gen. Stat. §95-25.13(1) through (3). Similarly, Family Fare provided Salamah with a written itemized statement of all deductions from her commission on a monthly basis in the form of documents captioned "End of Period Financial Reconciliation" which comply with N.C. Gen. Stat. §95-25.13(4). [Barnes Declaration ¶17; Elsayed 151(1-7)]. Thus, even if Defendants were Salamah's employer, Salamah cannot prove a violation of the statute.

### III. Defendants are entitled to summary judgment on Plaintiffs' 42 U.S.C. §1981 Discrimination claim.

Plaintiffs contend that Defendants' termination of the Franchise Agreement was "motived by national origin/race discrimination." [Complaint ¶165]. In order to prove §1981 discrimination the Plaintiffs must either present direct evidence of intentional discrimination or evidence to satisfy the *McDonnell Douglas* burden-shifting framework.[5] *See, e.g.*, *Williams v. Staples, Inc.*, 372 F.3d 662, 667 (4th Cir. 2004).

In order to prove direct discrimination Plaintiffs must introduce evidence directly linking a discriminatory statement or attitude to the contested employment decision. *Warch v. Ohio Cas. Ins.*, 435 F.3d 510, 520 (4th Cir. 2006). Even if there is alleged evidence of a discriminatory attitude, it "must have a nexus with the adverse employment action." *Id.* There is no evidence in the record of direct discrimination relating to the termination of the Franchise Agreement.

---

[5] To the extent Plaintiffs' §1981 claims are based on alleged national origin discrimination those claims must be dismissed as a matter of law because claims of national origin discrimination are not cognizable under §1981. *See Jadeli v. Alamance Reg'l. Med. Ctr.*, 399 F. Supp. 2d 675, 682 (M.D.N.C. 2005), *aff'd* 167 F. App'x 961 (4th Cir. 2006).

16

Having established no record evidence of direct discrimination, Plaintiffs must establish a *prima facie* case of discrimination by showing they: (i) are members of a protected class, (ii) had a contractual relationship with Defendants, (iii) met Defendants' ordinary contractual requirements and (iv) were denied a contract opportunity. *Williams*, 372 F.3d at 667. If Plaintiffs establish a *prima facie* case, then the burden shifts to Defendants to set forth evidence of a legitimate, non-discriminatory reason for the termination of the Franchise Agreement. *Id*. If Defendants rebut the presumption of discrimination then Plaintiffs must demonstrate Defendants' proffered reason for termination of the Franchise Agreement was pre-textual. *Id*. at 669.

Plaintiffs cannot establish a prima facie case because the record evidence clearly demonstrates there were significant lottery shortages – <u>which Plaintiffs intentionally tried to hide from Family Fare for three years</u> – so they were not meeting Family Fare's ordinary contractual requirements, an essential element of this claim. [See discussion at pp. 6-7 above]. What is more, even if Plaintiffs meet the elements of a *prima facie* case, Defendants have demonstrated Family Fare had a legitimate, non-discriminatory reason for terminating the Franchise Agreement and Plaintiffs have not put forth any record evidence to demonstrate the reason for termination was pre-textual. [*Id*.].

Salamah and Elsayed both testified that they knew that if Family Fare learned of the lottery shortages the franchise might be terminated. [Salamah 91(6)-92(9); Elsayed 207(14)-211(19), 225(9)-227(11)]. This is exactly what happened.

Family Fare first became aware of the significant lottery shortages in October 2018 after shortages in the September EOP and the October EOP which followed the

written warning relating, in part, to lottery shortages earlier in the year. [Barnes Declaration ¶16]. Once Family Fare learned of the lottery shortage, Salamah sent a letter to Family Fare pleading not to be terminated. [Salamah 91(6)-92(9) & Ex. 25 (Motion Ex. 16)]. Family Fare made the business decision to terminate the franchise agreement as Salamah and Elsayed had feared would happen.

Having established a legitimate business reason for terminating the franchise, the burden shifts to Plaintiffs to prove pre-text. Plaintiffs have not introduced any such evidence of pre-text and their alleged employment discrimination claims must be dismissed.

## IV. Plaintiffs' multitude of claims set forth in Count V should be dismissed.

In Count V, Plaintiffs purport to bring claims for breach of the covenant of good faith and fair dealing, rescission, fraud and unfair and deceptive trade practices. These claims are convoluted and difficult to pinpoint. However, in his deposition, Elsayed clarified that the claims relating to fraud, breach of the covenant of good faith and fair dealing and unfair and deceptive trade practices in Count V all arise from the same facts. [Elsayed 118(14)-119(2)].[6]

### A. The claims are time-barred.

The Franchise Agreement is governed by North Carolina law and has a one-year (contractual) statute of limitations period. [Franchise Agreement 33(b), (d)]. North

---

[6] Plaintiffs have failed to allege all elements of a claim for contract rescission and indeed have not even alleged which contract they wish to rescind. Salamah entered into four agreements with Family Fare and/or Fowler. Plaintiffs' claim for rescission should be dismissed in its entirety as no allegations supporting rescission have been alleged.

Carolina courts have routinely upheld contractual limitations periods. *See, e.g., Boyd v. Bankers & Shippers Ins.*, 245 N.C. 503, 515-16, 96 S.E.2d 703, 712 (1957)(upholding twelve month contractual limitation period in insurance contract); *Hawks v. Arstark & Co.*, No. COA 07-678, 2007 N.C. App. LEXIS 2514, at *9 (N.C. Ct. App. Dec. 18, 2007)(upholding one-year contractual limitations period in house inspection agreement); *See also Badgett v. Fed. Express Corp.*, 378 F. Supp. 2d 613, 623 (M.D.N.C. 2005)(citing various NC cases and upholding one-year contractual limitations in employment agreement).

Based on the deposition testimony, it is clear that the facts supporting the alleged (but denied) fraudulent actions by Defendants arose shortly after Salamah's execution of the Franchise Agreement in December 2013. [Elsayed Dep. 108(22)-116(3)]. Therefore, Plaintiffs' claims for fraud, breach of the covenant of good faith and fair dealing and unfair and deceptive trade practices all accrued in 2014 or 2015, making Plaintiffs' filing of this claim long after the expiration of the one-year statute of limitations period in the Franchise Agreement and should be dismissed as a matter of law.[7]

19

### B. Plaintiffs have no proof of damages.

Plaintiffs' fraud claim and Chapter 75 claim require a showing of actual damage. *See Piedmont Inst. of Pain Mgmt. v. Staton Found.*, 157 N.C. App. 577, 589-90, 594, 596, 581 S.E.2d 68, 76, 79-80 (2003) (affirming summary judgment on claims due to failure to forecast evidence of actual damage). Plaintiffs must prove actual damages and to survive summary judgment they must "show that the amount of damages is based upon a standard that will allow the finder of fact to calculate the amount of damages with reasonable certainty." *Compton v. Kirby*, 157 N.C. App. 1, 17, 577 S.E.2d 905, 915 (2003). Here, Plaintiffs fail to present evidence of damages that is "sufficiently specific and complete to permit the jury to arrive at a reasonable conclusion." *Id.* Defendants are entitled to summary judgment on this basis. Plaintiffs claim that their damages are the income they could have received in other professions. [Elsayed Dep. 121(8)-125(6), 128(6)-129(15), 131(19)-133(20); Salamah Dep. 93(17)-97(20)]. The *only* evidence Plaintiffs provide to support their alleged damages are two government website printouts showing salary information or their own independent (and unsupported analysis) without

---

[7] Based on Elsayed's deposition testimony, the claims arose as early as 2014 and into 2015, thus, even if the Court decides the one year statute of limitations in the Franchise Agreement is not applicable, Plaintiffs claims would still be barred by the three year limitation applicable to fraud and breach of covenant of good faith and fair dealing and the four year limitations for unfair and deceptive trade practice claims. *See, e.g., Ussery v. Branch Banking & Trust Co.*, 368 N.C. 325, 333, 777 S.E.2d 272, 277 (2015)(statute of limitations for a breach of the covenant of good faith and fair dealing is three years); *Piles v. Allstate Ins.*, 187 N.C. App. 399, 405, 653 S.E.2d 181, 185-86, (2007)(breach of the covenant of good faith and fair dealing accrues at the time of the occurrence of the other related actions about which plaintiff complains); *Hunter v. Guardian Life Ins.*, 162 N.C. App. 477, 485, 593 S.E.2d 595, 601 (2004) (three year statute of limitations for fraud "begins to run from the discovery of the fraud"); N.C. Gen. Stat. §75-16.2 (unfair and deceptive trade practices statute of limitations is four years).

expert assistance. [*Id*.]. Such evidence is wholly speculative and is not specific or complete to allow a jury to determine the extent of Plaintiffs' alleged harm.

### V. Plaintiffs' Claim for violation of North Carolina Business Opportunity Act should be dismissed.

In order for a violation of the N.C. Business Opportunity Act to apply there must be a "sale" falling under the statute and a promise falling under one of the four categories set forth in N.C. Gen. Stat. §66-94. There is no genuine issue of material fact to support Plaintiffs' claims in Count VI because there is no record evidence that Defendants made any of the promises set forth in §66-94. In fact, Defendants have intentionally not made any of the promises set forth in §66-94 and their franchise agreements do not fall under the North Carolina Business Opportunity Act. [Barnes Declaration ¶22]. A review of the FDD given to Salamah clearly disclaims any such representations. [Salamah Ex. 15 at p. 49]. There is no record evidence of Defendants guaranteeing a certain amount of income to Salamah in violation of §66-94 and to the extent Family Fare offers any marketing programs, they are only run in conjunction with Family Fare's trademark. [Barnes Declaration ¶22].

What is more, the claims for breach of the North Carolina Business Opportunity Act, even if true, would have accrued at the time Salamah signed the Franchise Agreement in December 2013. Courts across the country have held that claims relating to a franchisee's allegations against a franchisor for disclosure violations <u>accrue at the time of the alleged failure to timely disclose or execution of the franchise agreement</u>. *See, e.g., Rich Food Servs. v. Rich Plan Corp*., No. 5:99-CV-677 2001 U.S. Dist. LEXIS

21

25955, at *14 & 16-17 (E.D.N.C. Nov. 19, 2001)(breach of contract claim arising out of failure to make required disclosures pursuant to FTC Franchise Rule, 16 C.F.R. §§ 436.1 *et. seq.*, accrued at time defendant entered into franchise agreement); *see also Long John Silver's Inc. v. Nickleson*, 923 F. Supp. 2d 1004, 1013 (W.D. Ky. 2013)(claim under Minnesota Franchise Act for failure to timely register the required FDD accrued at time of first email sent by defendant offering franchise opportunity); *Ellering v. Sellstate Realty Sys. Network, Inc.*, 801 F. Supp. 2d 834, 840 (D. Minn. 2011)(same); *Robinson v. Wingate Inns Int'l, Inc.*, No. 13-cv-2468, 2013 U.S. Dist. LEXIS 179997, at *8 (D.N.J. Dec. 20, 2013)(fraud in the inducement claim arising out of representations made in FDD accrued on date of execution of franchise agreement).

Similarly, any claim arising out of the North Carolina Business Opportunity Sales Act would have arisen at the time of Family Fare's disclosure misrepresentation of the FDD in November 2013, or at the latest at the time of Salamah's signing of the Franchise Agreement in December 2013, and the claims are therefore barred by the contractual and statutory limitations periods. [*See* Elsayed 119(14-22)].

## VI. Plaintiffs' Breach of Contract and Bad Faith Termination claims should be dismissed.

Plaintiffs' claims in Count VII should be dismissed for the same reasons that their claims in Count III should be dismissed. [*See* Section III above]. Family Fare terminated the Franchise Agreement because of lottery shortages. Based on the undisputed record evidence the lottery shortages did in fact exist and Plaintiffs have admitted to trying to cover up the extent of the shortages for fear of termination.

22

## VII. Plaintiffs' claims in Count VIII should be dismissed.

North Carolina law is limited in regard to whether or not self-help evictions in commercial leases are permitted and when a self-help eviction becomes non-peaceable. The only case that addresses this issue in the commercial lease context is a case dealing with two alleged non-peaceable residential evictions. In *dicta*, the Court indicates that non-peaceable, self-help evictions are not permitted in the commercial context. *Spinks v. Taylor*, 303 N.C. 256, 261, 278 S.E.2d 501, 504 (1981).

However, even if an impermissible, non-peaceable self-help eviction occurred here, Plaintiffs have not provided any evidence of legally recognizable damages. *Spinks* recognizes that a claim for conversion may arise if a landlord engages in wrongful self-help, non-peaceable eviction. 303 N.C. at 264-65, 278 S.E.2d at 506.

Consistent with *Spinks*, Plaintiffs claim damages for conversion as a result of the alleged non-peaceable eviction. [Elsayed 181(1-15); Elsayed Ex. 7 (Motion Ex. 17)]. Plaintiffs contend they were damaged because Defendants unlawfully converted "loss of business, loss of goods, loss of equipment and loss of other things that belong to us."[8]

However, in the circumstances that exist here, neither loss of business, nor loss of goods or loss of equipment support Plaintiffs' claim for conversion. The law in North Carolina is clear that conversion is "an unauthorized assumption and exercise of the right of ownership over goods or personal chattels belonging to another, to the alteration of

---

[8] The discussion will focus solely on alleged loss of business, loss of goods and loss of equipment. There is no evidence in the record that Plaintiffs left any personal property in the Reynolda Store that is not otherwise considered as alleged loss of business, loss of goods and loss of equipment.

their condition or the exclusion of an owner's rights." *Norman v. Nash Johnson & Sons' Farms, Inc.*, 140 N.C. App. 390, 414, 537 S.E.2d 248, 264 (2000)(emphasis omitted).

A conversion claim for loss of business is not recognizable under North Carolina law. According to Elsayed, the loss of business claim is based on "the loss of business that we had a business of who's going to generate money." [Elsayed 186(2-4)]. As stated in *Norman*, "intangible interests such as business opportunities and expectancy interests [are not] subject to a conversion claim." 140 N.C. App. at 414, 537 S.E.2d at 264. Plaintiffs' claim for conversion based on loss of their future expectation interest in their franchise business fails a matter of law.

Similarly, Plaintiffs' claims for conversion of the consigned goods in the Reynolda Store and the equipment fail as a matter of law. Elsayed admitted that Plaintiffs had no ownership interest in the consigned goods. [Elsayed 181(21)-182(1), 183(13-24); 185(3-5)]. Elsayed's testimony is consistent with the express terms of the Inventory Agreement which provides that ownership of the consigned goods remains in Fowler. [Inventory Agreement §1]. Plaintiffs cannot assert a conversion claim with respect to property they did not own.

Finally, Defendants offered to return the equipment including a computer, gondolas and the time clocks but received no response from Plaintiffs [Barnes Declaration ¶22-24]. Defendants sold the time clock, gondolas and a computer to Almy pursuant to the Equipment Note. [*Id.*]. Although Plaintiffs had completed paying for this equipment pursuant to Equipment Note prior to the date of the termination of the Franchise Agreement, Defendants still retained a security interest in the equipment. [*Id.*].

24

At the time of the termination of the Franchise Agreement Plaintiffs owed Defendants $1,847.23 for the final month financial reconciliation and rent. [*Id.*]. After concluding the final accounting in early April 2019, Fowler proposed two options, one including the delivery of the equipment to Almy in exchange for payment to Fowler for the difference in the value of the equipment and the amount owed or an option to permit Fowler to keep the equipment and pay Almy the difference between the amount owed and the value of the equipment. [*Id.*]. Almy never responded and Fowler's security interest remains on the equipment.

## CONCLUSION

For the reasons set forth and based on the pleadings and other matters of record all of Plaintiffs' claims against Defendants should be dismissed in their entirety. There is no genuine issue of material fact that Defendants are entitled to judgment as a matter of law on Plaintiffs' claims.

Respectfully submitted this the 2nd day of December, 2019.

/s/William S. Cherry III
William S. Cherry III, NCSB # 33860
Jessica B. Vickers, NCSB # 44873
MANNING, FULTON & SKINNER, P.A.
  *Attorneys for All Defendants*
3605 Glenwood Avenue - Suite 500
Post Office Box 20389
Raleigh, North Carolina  27619
Telephone:    (919) 787-8880
Facsimile:    (919) 325-4604
cherry@manningfulton.com
vickers@manningfulton.com

25

## CERTIFICATE OF COMPLIANCE WITH WORD LIMIT

Pursuant to L.R. 7.3(d)(1), the undersigned counsel certifies that, as reported by word processing software, the foregoing Memorandum of Law complies with the applicable word limitation and does not exceed 6,250 words.

Date: December 2, 2019

/s/William S. Cherry III

## **CERTIFICATE OF SERVICE**

This is to certify that a copy of the ***Defendants' Memorandum in Support of Motion for Summary Judgment*** has been filed electronically with the Clerk of Court using the CM/ECF system which will send electronic notification of such filing, addressed as follows:

Roberta King Latham
King Latham Law, PLLC
615 St. George Square Court, Suite 300
Winston-Salem, NC 27103
Telephone: (336) 419-1151
Facsimile:   (336) 770-2803
roberta@kinglatham.com
*Attorney for Plaintiffs*

This the 2nd day of December, 2019.

/s/William S. Cherry III_____
William S. Cherry III, NCSB # 33860
MANNING, FULTON & SKINNER, P.A.
 *Attorneys for All Defendants*
3605 Glenwood Avenue - Suite 500
Post Office Box 20389
Raleigh, North Carolina  27619
Telephone:   (919) 787-8880
Facsimile:     (919) 325-4604
cherry@manningfulton.com

27