IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| AMRO ELSAYED and LOLA SALAMAH (H/W), | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | 1:18-cv-1045 |
| | ) | |
| FAMILY FARE LLC, and M.M. FOWLER, INC. | ) | |
| and LEE BARNES, JR., individually and as | ) | |
| President of Family Fare LLC, and M.M. | ) | |
| Fowler, Inc. and DONALD PILCHER, individually, | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

LORETTA C. BIGGS, District Judge.

Plaintiffs initiated this action on December 26, 2018, alleging that Defendants misclassified them as franchisees rather than employees in violation of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 203, and terminated their franchise agreement because they are Arab Americans in violation of the Civil Rights Act of 1866, 42 U.S.C. §1981, along with several violations of North Carolina law. (ECF No. 1.) Before the Court are Defendants' Motion for Partial Judgment on the Pleadings, (ECF No. 16), and Plaintiffs' Motion for Leave to File Supplemental Pleading, (ECF Nos. 21; 22). For the reasons stated below, Defendants' motion will be granted in part and denied in part and Plaintiffs' motion will be denied with prejudice as to Defendant Pilcher and without prejudice as to the other Defendants.

## I. BACKGROUND

In the summer of 2012, Plaintiffs Lola Salamah and Amro Elsayed, a married couple, moved to North Carolina to start operating a convenience store attached to a gas station. (*See* ECF No. 20 at 1–2.) To open the store, Salamah formed Almy, LLC ("Almy"). (*Id.* at 8.) Salamah acts as the President and Guarantor of Almy. (ECF No. 8-3 at 48.) On June 29, 2012, Almy entered into a contract operator agreement with Defendant M.M. Fowler, Inc., ("M.M. Fowler"), the owner of "certain proprietary and property rights in and to the 'Family Fare'" brand of gas station convenience stores. (*See* ECF Nos. 8-1 at 5; 8-3 at 5.) The contract permitted Almy to operate a Family Fare convenience store located at 3836 Reynolda Road in Winston-Salem. (ECF No. 8-1 at 5.) On December 11, 2013, Almy and Defendant Family Fare, LLC ("Family Fare"), an affiliate of M.M. Fowler that licenses from M.M. Fowler the right to franchise the Family Fare brand, entered into a franchise agreement in which Almy became the franchisee of the Reynolda Road store, with Family Fare acting as Franchisor, and M.M. Fowler acting as landlord. (ECF No. 8-3 at 5, 8.) This franchise agreement ran for five years and was renewed on May 10, 2018 for a second five-year term. (ECF No. 8-8 at 2.) On November 30, 2018, Family Fare and M.M. Fowler terminated the franchise agreement with Almy, alleging that it had "repeatedly skimmed from lottery funds collected at [the Reynolda Road location]," resulting in a cash deposit deficiency of at least $10,651. (ECF No. 8-6 at 2.) Plaintiffs then filed this suit. (*See* ECF No. 1.)

Plaintiffs allege that they were employees of Family Fare and that Defendants failed to pay them overtime. (ECF No. 1 ¶¶ 6, 61, 160.) Plaintiffs further allege that Defendants terminated their franchise agreement because of their bias against Arab Americans. (*See id.* ¶¶

71–88, 206.)  Specifically, Plaintiffs in their complaint allege eight claims as follows: (1) violation of the overtime provisions of the FLSA and the North Carolina Wage and Hour Act ("NCWHA"); (2) an unlawful salary deduction in violation of the NCWHA; (3) national origin discrimination in violation of 42 U.S.C. § 1981; (4) termination of a contract in violation of public policy as defined by N.C. Gen. Stat. § 75B-2; (5) common law claims including breach of the covenant of good faith and fair dealing, unfair and deceptive trade practices, and fraud; (6) violation of the North Carolina Business Opportunity Sales Act, N.C. Gen. Stat. § 66-99; (7) termination in bad faith and breach of contract; and (8) wrongful forcible self-help eviction. (ECF No. 1 ¶¶ 135–214.)  In addition, on July 31, 2019, Plaintiffs filed a motion to add a ninth claim alleging that Elsayed was fired because of his national origin in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2.  (ECF Nos. 21; 21-1; 22.)

Defendants now move pursuant to Federal Rule of Civil Procedure 12(c) for partial judgment on the pleadings and for the dismissal of counts one, two, four, five, and six in Plaintiffs' complaint.  (ECF No. 16 at 2.)  They also oppose Plaintiffs' motion to add the Title VII claim.  (ECF No. 24 at 7.)

## II.    STANDARD OF REVIEW

Under Rule 12(c) of the Federal Rules of Civil Procedure, "[a]fter the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings."  Fed. R. Civ. P. 12(c).  "Judgment on the pleadings is appropriate where the case turns on a legal question and the pleadings demonstrate that the moving party is entitled to judgment as a matter of law."  *Fed. Ins. Co. v. S. Lithoplate, Inc.*, 7 F. Supp. 3d 579, 583 (E.D.N.C. 2014).  Such a motion is generally analyzed "under the same standards as a motion to dismiss

under Rule 12(b)(6)." *Occupy Columbia v. Haley*, 738 F.3d 107, 115 (4th Cir. 2013). "The court assumes the facts alleged by the nonmoving party are true" and draws all reasonable inferences in favor of the nonmoving party. *Lithoplate*, 7 F. Supp. 3d at 583. Like a Rule 12(b)(6) motion, a "Rule 12(c) motion tests only the sufficiency of the complaint and does not resolve the merits of the plaintiff's claims or any disputes of fact." *Drager v. PLIVA USA, Inc.*, 741 F.3d 470, 474 (4th Cir. 2014). However, unlike when deciding a Rule 12(b)(6) motion to dismiss, the Court, when deciding a motion for judgment on the pleadings, may consider the Answer. *Alexander v. City of Greensboro*, 801 F. Supp. 2d 429, 433 (M.D.N.C. 2011). The factual allegations contained in the Answer "are taken as true only where and to the extent they have not been denied or do not conflict with the complaint." *Jadoff v. Gleason*, 140 F.R.D. 330, 331 (M.D.N.C. 1991). Because the plaintiff is not required to reply to the Answer, "all allegations in the answer are deemed denied." *Id.* at 332. The defendant cannot therefore "rely on allegations of fact contained only in the answer, including affirmative defenses, which contradict Plaintiffs' complaint." *Id.*

When considering a motion for judgment on the pleadings, "a [district] court evaluates the complaint in its entirety, as well as documents attached [to] or incorporated into the complaint." *Vincent v. Vick*, 1:17CV762, 2018 WL 3827636, at *2 (M.D.N.C. Aug. 10, 2018) (quoting *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 448 (4th Cir. 2011)). A district court may also "consider a document submitted by the movant that was not attached to or expressly incorporated in a complaint, so long as the document was integral to the complaint and there is no dispute about the document's authenticity." *Id.* (quoting *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 166 (4th Cir. 2016)). However, going "beyond these

documents . . . converts the motion into one for summary judgment," and "[s]uch conversion is not appropriate where the parties have not had an opportunity for reasonable discovery." *Id.* (quoting *E.I. du Pont de Nemours & Co.*, 637 F.3d at 448).

A court should grant a motion for judgment on the pleadings "only . . . if, after accepting all well-pleaded allegations in the plaintiff's complaint as true and drawing all reasonable factual inferences from those facts in the plaintiff's favor, it appears certain that the plaintiff cannot prove any set of facts in support of his claim entitling him to relief." *Edwards v. City of Goldsboro*, 178 F.3d 231, 243–44 (4th Cir. 1999) (applying the 12(b)(6) standard to a motion for judgment on the pleadings).

## III.    DEFENDANTS' MOTION

In their motion for partial judgment on the pleadings, Defendants argue that five of Plaintiffs' claims fail as a matter of law: count one (violation of federal and state wage and hour provisions); count two (violation of the NCWHA); count four (termination of a contract in violation of public policy); count five (common law claims); and count six (violation of the North Carolina Business Opportunity Sales Act). (*See* ECF Nos. 1 ¶¶ 135–214; 16 at 1.) The Court will examine each of these claims.

### A. *Plaintiffs' FLSA Claim*

Defendants argue that Plaintiffs' FLSA claim is barred as a matter of law because the parties' relationship is governed by contractual agreements between Defendants and Almy that expressly provide that "Defendants are not the employers of Almy's employees for any purpose." (*See* ECF No. 17 at 8.) Plaintiffs contend, on the other hand, that they were employees of Defendants and so were owed overtime pay under the FLSA. (ECF No. 1 ¶

160.)  Thus, to determine whether Plaintiffs have stated a claim in their complaint under the FLSA, the Court must resolve whether Plaintiffs have adequately pled (1) that Defendants and Almy were Plaintiffs' joint employers and (2) that Plaintiffs were employees and not independent contractors.  As explained below, the Court concludes that Plaintiffs have made an adequate showing as to both inquiries.  Thus, Defendants' motion for judgment on the pleadings will be denied as to Plaintiffs' FLSA claim.

"Congress enacted the FLSA in 1938 to ensure that the nation's workers received 'a fair day's pay for a fair day's work.'"  *Kenter v. Branch Banking & Tr. Co.*, 143 F. Supp. 3d 370, 374 (M.D.N.C. 2015) (quoting *A.H. Phillips, Inc. v. Walling*, 324 U.S. 490, 493 (1945)).  The "FLSA establishes federal minimum-wage, maximum-hour, and overtime guarantees that cannot be modified by contract."  *Genesis Healthcare Corp. v. Symczyk*, 569 U.S. 66, 69 (2013).  The Act requires that employers pay their employees at least the federal minimum wage and provide them overtime in the amount of one and a half times their regular rate of pay for each hour worked beyond forty hours in a given work week.  29 U.S.C. §§ 206(a)(1), 207(a)(1).

In enacting the FLSA, Congress chose to define "employ," "employee," and "employer" broadly to better effectuate the "'remedial and humanitarian' purpose" of the Act.  *See Salinas v. Commercial Interiors, Inc.*, 848 F.3d 125, 133 (4th Cir. 2017) (quoting *Tenn. Coal, Iron & R.R. Co. v. Muscoda Local No. 123*, 321 U.S. 590, 597 (1944)).  The law defines "employ" as "to suffer or permit to work."  29 U.S.C. § 203(g).  An "employee" is "any individual employed by an employer."  *Id.* § 203(e)(1).  Finally, an "employer" is "any person acting directly or indirectly in the interest of an employer in relation to an employee."  *Id.* § 203(d).

Despite the breadth of these definitions, the FLSA "provides little guidance as to what constitutes an employer-employee relationship." *Benshoff v. City of Va. Beach*, 180 F.3d 136, 140 (4th Cir. 1999). In light of this deficit, the Fourth Circuit in *Schultz v. Capital International Security, Inc.*, "explained the process for properly analyzing allegations of an employer-employee relationship." *Luna-Reyes v. RFI Constr., LLC*, 109 F. Supp. 3d 744, 749 (M.D.N.C. 2015) (citing *Schultz*, 466 F.3d 298 (4th Cir. 2006)). First, "the established facts must be reviewed to identify the putative employer or employers." *Schultz*, 466 F.3d at 305; *Luna-Reyes*, 109 F. Supp. 3d at 749. Second, the court should determine if the worker is an employee covered by the FLSA or a non-covered independent contractor by looking at "the economic realities of the relationship between the worker and the putative employer." *See Schultz*, 466 F.3d at 304 (internal quotations omitted); *Luna-Reyes*, 109 F. 3d Supp. 3d at 749.

The Fourth Circuit does not appear to have spoken as to how, if at all, the existence of a franchisor-franchisee relationship might change the *Schultz* two-step. However, district courts in this circuit have recognized that joint employer relationships can exist between a franchisor and a franchisee so that employees of the franchisee can recover against the franchisor for FLSA violations. *See, e.g., Lora v. Ledo Pizza Sys., Inc.*, No. DKC 16-4002, 2017 WL 3189406, at *6 (D. Md. July 27, 2017) (denying franchisor's motion to dismiss plaintiff's FLSA claim when plaintiffs adequately plead that the franchisor "had at least some power to control and supervise workers and to hire, fire, and modify conditions of employment" at the franchise store). For example, in *Shupe v. DBJ Enterprises, LLC*, this Court denied a motion to dismiss where the plaintiff, the general manager at a Denny's restaurant, alleged that the franchisors who owned the Denny's had "significant control over day-to-day operations" at

the restaurant through the "'Guiding Principles' and 'Code of Conduct' that [defendants] required all franchisees and franchisee employees to follow." No. 1:14CV308, 2015 WL 790451 at *4 (M.D.N.C. Feb. 25, 2015). Furthermore, at least one court has found that a franchisee herself can qualify as an employee of a franchisor. *Fernandez v. JaniKing Int'l, Inc.*, No. H-17-1401, 2018 WL 539364, at *3 (S.D. Tex. Jan. 8, 2018) (explaining that "[th]e mere fact that parties to an FLSA case are also parties to a franchise agreement does not render a plaintiff's FLSA minimum wage and overtime claims not plausible"). Defendants have, however, drawn the Court's attention to a line of cases that emphasizes that franchisors can exercise substantial control over franchisees without becoming employers of the franchisee's employees. (ECF No. 17 at 9–10.) For instance, in *Jacobson v. Comcast Corp.*, the district court noted that "[c]ourts evaluating franchise relationship[s] for joint employment have routinely concluded that a franchisor's expansive control over a franchisee does not create a joint employment relationship." 740 F. Supp. 2d 683, 690 n.6 (D. Md. 2010). In light of this discussion, the Court will now consider whether Plaintiffs have stated a valid claim under the FLSA.

   i.   *Joint employment test*

   The first step of the *Schultz* inquiry often calls for the court to determine "whether two entities should be treated as joint employers." *Salinas*, 848 F.3d at 139–140. As the Fourth Circuit recently explained, joint employment exists "when both (1) two or more persons or entities share, agree to allocate responsibility for, or otherwise codetermine the essential terms and conditions of a worker's employment and (2) the worker is an 'employee' within the meaning of the FLSA." *Id.* at 140 n.8. This inquiry boils down to "one fundamental question:

whether two or more persons or entities are not completely disassociated with respect to a worker such that the persons or entities share, agree to allocate responsibility for, or otherwise codetermine—formally or informally, directly or indirectly—the essential terms and conditions of the worker's employment." *Id.* at 141 (internal quotations omitted).[1] To answer this key question, courts "should consider six factors." *Id.* The factors are:

> (1) Whether, formally or as a matter of practice, the putative joint employers jointly determine, share, or allocate the power to direct, control, or supervise the worker, whether by direct or indirect means; (2) Whether, formally or as a matter of practice, the putative joint employers jointly determine, share, or allocate the power to—directly or indirectly—hire or fire the worker or modify the terms or conditions of the worker's employment; (3) The degree of permanency and duration of the relationship between the putative joint employers; (4) Whether, through shared management or a direct or indirect ownership interest, one putative joint employer controls, is controlled by, or is under common control with the other putative joint employer; (5) Whether the work is performed on a premises owned or controlled by one or more of the putative joint employers, independently or in connection with one another; and (6) Whether, formally or as a matter of practice, the putative joint employers jointly determine, share, or allocate responsibility over functions ordinarily carried out by an employer, such as handling payroll; providing workers' compensation insurance; paying payroll taxes; or providing the facilities, equipment, tools, or materials necessary to complete the work.

---

[1] The Court is aware of a pending final rule issued by the Department of Labor that may conflict with the Fourth Circuit's ruling in *Salinas*. *See generally* Joint Employer Status Under the Fair Labor Standards Act, 85 Fed. Reg. 2820 (Jan. 16, 2020) (to be codified as 29 C.F.R. pt. 791), *available at* https://www.govinfo.gov/content/pkg/FR-2020-01-16/pdf/2019-28343.pdf). The rule, which is slated to take effect on March 16, 2020, adopts the test for determining when two or more employers can be considered joint employers articulated in the Ninth Circuit case *Bonnette v. California Health & Welfare Agency*. *Id.* at 2820. The test primarily weighs four factors: whether the putative second employer "(1) [h]ires or fires the employee; (2) supervises and controls the employee's work schedule or conditions of employment to a substantial degree; (3) determines the employee's rate and method of payment; and (4) maintains the employee's employment records." *See id.* Furthermore, the pending rule criticizes *Salinas* for adopting a "broad[ ]" rather than a "fair" reading of the FLSA. *See id.* at 2824. However, as the rule is yet to go into effect and as the Court lacks the guidance of briefing from the parties regarding how—if at all—the rule should impact the joint employment analysis at issue here, the Court will continue applying the test set forth in *Salinas*.

*Id.* at 141–42. A court need not find that most of these factors favor a finding of joint employment in order to conclude that a joint employment relationship exists. *Id.* at 146.

Here, Plaintiffs appear to argue that they were employees only of Defendants, not of Almy, an entity they depict as a shell under the "sole control" of M.M. Fowler and existing "only for the purpose" of allowing M.M. Fowler to misrepresent itself as a franchisor. (*See* ECF No. 20 at 8.) Defendants object to this characterization and point to language in the franchise agreement between Family Fare and Almy to argue that "Defendants are not the employers of Almy's employees for any purpose." (ECF No. 17 at 8.) In relevant part, the franchise agreement provides that "[Almy] shall be an independent Franchisee and shall . . . exercise complete control over and have responsibility for all labor relations and the conduct of [Almy's] agents and employees and the day-to-day operations of the Store Location." (ECF No. 8-3 at 24.) The agreement also assumes that Almy will hire employees distinct from its principal, Salamah. (*Id.* at 19.) Given this clear contractual language making Almy an employer of the workers at the Reynolda Road store, the Court cannot agree with Plaintiffs that this case does not implicate the doctrine of joint employment. (*See* ECF No. 20 at 4, 7–9.) This, however, is not fatal to Plaintiffs' claim. In fact, Department of Labor regulations contemplate the very scenario Plaintiffs allege here: a joint employment relationship exists where "one employer," here, the Defendants, "controls . . . the other employer," here, Almy. *See* 29 C.F.R. § 791.2(b)(3). Thus, the putative employers at issue are both Almy and the Defendants. The Court will now consider whether a joint employment relationship existed between Almy and Defendants such that Defendants could be held liable for non-payment of overtime to Plaintiffs.

In evaluating the first factor, courts consider whether "the putative joint employers jointly determine, share, or allocate the power to direct, control, or supervise the worker." *Salinas*, 848 F.3d at 141. Here, Plaintiffs allege that Defendants made every decision of importance at the Reynolda Road store, including determining what was sold, the price of the sale, and how to advertise. (ECF No. 1 ¶¶ 20, 21, 33.) Plaintiffs offer several examples of the ways in which they were allegedly forced to obey Defendants. For example, Plaintiffs state Salamah wished to sell Little Debbies, the popular snacks, but was not permitted to do so. (*Id.* ¶ 21.) Similarly, Plaintiffs allege Defendants ordered Salamah to breach an arrangement she established with a devoted customer by which he would occasionally receive complimentary coffee. (*Id.* ¶ 62.) While this kind of close supervision over the operation of the Reynolda Road store may be consistent with a franchisor-franchisee relationship, viewing the facts in the light most favorable to Plaintiffs and resolving inferences in their favor, the Court finds that these allegations likewise support a joint-employer relationship between Defendants and Almy as alleged by Plaintiffs.

The second factor—hiring, firing, or modifying the terms and conditions of employment—does not cut strongly in either direction. *See Salinas*, 848 F.3d at 141. Plaintiffs allege that Defendants "maintained and exercised veto power over personnel decisions," and hired and fired store employees. (ECF No. 1 ¶¶ 27, 31, 61.) These allegations are not, however, supported by specific examples and so resemble the "unadorned, the-defendant-unlawfully-harmed-me accusation[s]" that fail to meet the pleading standard set forth in *Bell Atlantic Corp. v. Twombly* and *Ashcroft v. Iqbal*. *See Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. 544, 555 (2007)). Thus, if Plaintiffs could offer no more concrete examples of

Defendants controlling hiring, firing, or the terms and conditions of their employment, this factor would not weigh in their favor. Plaintiffs do, however, offer more. They allege that Defendant Pilcher, an employee of M.M. Fowler, held himself out as their employer, once telling Elsayed to "[j]ust follow my orders and stop arguing [and] learn how to obey." (*See* ECF No. 1 ¶ 49.) Furthermore, Plaintiffs allege Pilcher "constantly" threatened to fire Salamah and, on the day Defendants terminated the franchise agreement, informed Salamah "[w]hether you accept it or [not], I am your boss." (*Id.* ¶¶ 50, 60.) Furthermore, Plaintiffs allege that Defendants determined the terms and conditions of their employment, dictating, for example, when the store opened and closed, and mandating that workers wore uniforms. (*Id.* ¶¶ 24, 26.) Collectively, these allegations support Plaintiffs' claim of a joint employment relationship.

The first two factors focus on the substantial control Defendants allegedly exercised over Plaintiffs through Almy. As such, they are highly instructive as to the fourth factor— whether one putative employer controls the other. *See Salinas*, 848 F.3d at 141. As discussed above, Plaintiffs have alleged Defendants exercised substantial control over them, essentially co-opting Almy and depriving it of any independent managerial or decision-making capability. "Learn how to obey" is not generally the modus operandi of an independent franchisee.

The third factor looks to the "degree of permanency and duration of the relationship between the putative joint employers." *Id.* Here, the putative joint employers had a stable, long-term relationship governed by two five-year franchise agreements. (ECF No. 8-8 at 2.) This supports a joint-employment relationship.

Likewise, the fifth factor, whether "the work is performed on a premises owned or controlled by one or more of the putative joint employers," militates in favor of finding a joint-employment relationship. *See Salinas*, 848 F.3d at 141. The work at issue in this case occurred at the Reynolda Road location, which is owned by Defendant M.M. Fowler. (*See* ECF No. 8-6 at 2.)

The sixth and final factor in this inquiry asks whether "the putative joint employers jointly determine, share, or allocate responsibility over functions ordinarily carried out by an employer, such as handling payroll; providing workers' compensation insurance; paying payroll taxes; or providing the facilities, equipment, tools, or materials necessary to complete the work." *Salinas*, 848 F.3d at 141–42. This factor appears to favor Defendants' characterization of the relationship. Though Plaintiffs do allege they were forced to buy equipment from Defendants and that Defendants "monitored" the payroll system, (ECF No. 1 ¶¶ 47, 63), the complaint is otherwise devoid of facts or allegations suggesting that Defendants carried out ordinary employer functions at the store. (*See* ECF No. 1.)

Based on these factors, the Court finds that Plaintiffs have plead sufficient facts to allege the existence of a joint-employer relationship between Defendants and Almy.[2]

---

[2] The Court may well have come to a different conclusion if the pending Department of Labor ("DOL") final rule on joint employer status was already in place. Once again, the new rule will determine whether a putative second employer is a joint employer by looking at whether the putative second employer: "(1) [h]ires or fires the employee; (2) supervises and controls the employee's work schedule or conditions of employment to a substantial degree; (3) determines the employee's rate and method of payment; and (4) maintains the employee's employment records." *See* Joint Employer Status Under the Fair Labor Standards Act, 85 Fed. Reg. at 2820. Here, Plaintiffs have alleged that Defendants had the power to hire and fire them and that Defendants controlled their work schedule and conditions of employment to a substantial degree. This suggests Defendants and Almy were joint employers of Plaintiffs. On the other hand, Plaintiffs' complaint does not allege in more than cursory terms that Defendants controlled their rate or method of payment—for instance, by paying them an hourly wage—or maintained employment records for them. (*See* ECF No. 1 ¶ 63 (failing to plead

*ii.   Employment Classification Test*

Once the first step of the *Schultz* inquiry is complete and any potential employer or employers are identified, the court must then determine whether the worker is an employee or an independent contractor.  *See* 466 F.3d at 307.  In cases of potential joint employment, the key question is "whether, as a matter of economic reality, the [workers are] dependent on the joint employers or whether they [are] in business for themselves."  *See id.*  Once again, six (similar) factors are particularly relevant:

> (1) the degree of control that the putative employer has over the manner in which the work is performed; (2) the worker's opportunities for profit or loss dependent on his managerial skill; (3) the worker's investment in equipment or material, or his employment of other workers; (4) the degree of skill required for the work; (5) the permanence of the working relationship; and (6) the degree to which the services rendered are an integral part of the putative employer's business.

*Id.* at 304–05.  A plaintiff need not show that all six factors weigh in their favor; indeed, one factor alone may suffice to demonstrate an employee classification.  *Shupe*, 2015 WL 790451 at *4 (denying motion to dismiss when one factor indicated an employer-employee relationship).

Upon reviewing the six factors the Fourth Circuit considers to distinguish employees from independent contractors, and cognizant of the fact that a plaintiff need not show that all factors weigh in their favor to state a claim, the Court concludes that Plaintiffs have adequately pled that they were employees of Defendants.  *See Schultz*, 466 F.3d at 304–05 (laying out six

---

facts making these cursory allegations plausible).)  This indicates Defendants did not jointly employ Plaintiffs.  Defendants have now filed a motion for summary judgment.  (ECF No. 48.)  The parties may request leave of the Court to file supplemental briefing addressing how—if at all—the DOL's pending final rule should impact the Court's analysis of Defendants' summary judgment motion.

factors); *Shupe*, 2015 WL 790451, at *4 (denying motion to dismiss when one factor indicated an employer-employee relationship). At least the first, fifth, and sixth factors weigh in favor of finding Plaintiffs were employees. The first factor looks to the putative employer's control over the way work was performed. *Schultz*, 466 F.3d at 304–305. As discussed above, Plaintiffs have alleged Defendants exercised substantial control over how their work was performed, alleging, for example, control over how merchandise was promoted, displayed, and sold. (*See* ECF No. 1 ¶¶ 21, 33, 49, 62.) "The fifth factor is the degree of permanency of the working relationship." *Schultz*, 466 F.3d at 308. "The more permanent the relationship, the more likely the worker is to be an employee." *Id.* at 309. Here, the relationship between Plaintiffs and Defendants lasted for over five years, indicating a long-term employer-employee relationship. (*See* ECF 8-8 at 2.) The sixth factor "is the extent to which the service rendered by the worker is an integral part of the putative employer's business." *Schultz*, 466 F.3d at 309. As Plaintiffs argue in their complaint, "it is unclear how Defendant[s] could run their business at all without [their] franchisees." (ECF No. 1 ¶ 147.) The Court agrees.

As for the three remaining factors, the Court believes they either cannot be determined or suggest a traditional franchisor-franchisee relationship. *See Schultz*, 466 F.3d at 304–305. At this stage of the inquiry, it is difficult for the Court to determine whether Plaintiffs' opportunity for profit or loss was dependent on their managerial skill (factor two) or whether skill was required in Plaintiffs' work (factor four). *See id.* at 305. Thus, these two factors do not operate in favor of or against Plaintiffs. Finally, the third factor—"the worker's investment in equipment or material, or his employment of other workers"—weighs against Plaintiffs because Salamah at least hired other employees. *Id.*; (ECF No. 1 ¶ 144).

In sum, Plaintiffs have plead facts sufficient to withstand Defendants' motion for judgment on the pleadings regarding Plaintiffs' FLSA claim. This Court, taking all facts alleged in the complaint as true and drawing all reasonable inferences in Plaintiffs' favor, cannot conclude that Plaintiffs will be unable to prove any set of facts establishing their FLSA claim.

B. *Plaintiffs' NCWHA Claims Fails as a Matter of Law*

Plaintiffs also seek to recover for unpaid overtime under the NCWHA. (ECF No. 1 ¶¶ 155–59.) Like the FLSA, the NCWHA provides for time and a half and allows employees to recover against their employer for these unpaid wages. N.C. Gen. Stat. §§ 95-25.22; 95.25.4. However, unlike the FLSA, the NCWHA states that "[n]either a franchisee nor a franchisee's employee shall be deemed to be an employee of the franchisor for any purposes." N.C. Gen. Stat. § 95-25.24A. This preclusive language only became effective on May 4, 2017. *Id.* Thus, it only applies to the portion of Plaintiffs' claim arising before that date if it is to be applied retroactively.

In North Carolina, "[a] clarifying amendment does not alter the original meaning of the statute and, thus, applies retroactively." *Hampton v. KPM LLC*, No. 5:18-CV-485-D, 2019 WL 5618772, at *4 (E.D.N.C. Oct. 30, 2019). In contrast, "altering amendment[s]" only apply prospectively. *Id.* "Whether an amendment is altering or clarifying is a question of law for the court." *Id.* Here, the Court is persuaded that the amendment to the NCWHA adding the language above was meant to be clarifying. According to a legislative analysis prepared by the North Carolina House of Representatives, the amendment "would *clarify* that a franchisor is not the employer of a franchisee or employees of a franchisee . . . . *The clarifying language* is in response to a decision by the National Labor Relations Board." (*See* ECF No. 17-1 at 2

(emphasis added).) Thus, this Amendment is best read to mean that franchisors, like Defendants, are not and have never been employers under the NCWHA. Relatedly, in their second count, Plaintiffs have also alleged that "Defendants wrongfully and deceptively deducted unauthorized amounts from Plaintiffs' commission payment" in violation of another provision of the NCWHA, N.C. Gen. Stat. § 95-25.13(4). (ECF No. 1 ¶ 161.) Like the overtime provision, this portion of the NCWHA applies only to employees which, under the statute, Plaintiffs are not. *See* N.C. Gen. Stat. § 95-25.13(4). Thus, Defendant's motion for judgment on the pleadings will be granted as to claim two and as to the portion of claim one that was made pursuant to the NCWHA.

### C. *Plaintiffs' Wrongful Discharge in Violation of Public Policy Claim Fails*

Next, Defendants seek dismissal of Plaintiffs' fourth claim, which appears to argue that Plaintiffs were terminated on the basis of their national origin or race in violation of N.C. Gen. Stat. § 75B-2. (ECF No. 1 ¶¶ 174–177 ("Defendants intentionally violated North Carolina public policy by [terminating] Plaintiffs' position.").) "The discharge of an employee at will generally does not support an action for wrongful discharge" in North Carolina. *Considine v. Compass Grp. USA, Inc.*, 551 S.E.2d 179, 181 (N.C. Ct. App. 2001). However, North Carolina recognizes an exception to the at-will employment doctrine that "applies when the employee was terminated for reasons that would violate the public policy of [the] State." *Gillis v. Montgomery Cty. Sheriff's Dep't*, 663 S.E.2d 447, 450 (N.C. Ct. App. 2008). Such claims "must be plead with specificity." *Id.* at 449. This requires a plaintiff to identify a "specific expression of North Carolina public policy" that is violated by their termination. *See Considine*, 551 S.E.2d at 184; *Gillis*, 663 S.E.2d at 450 (dismissing a wrongful termination in violation of public policy

claim because it failed to allege the violation of an "explicit statutory or constitutional provision"). Here, Plaintiffs have alleged the violation of an explicit provision, N.C. Gen. Stat. § 75B-2, but it is of no help to them as it relates only to discrimination resulting from dealings with foreign governments, persons, or organizations. *See* N.C. Gen. Stat. § 75B-2. The Court is mindful of the fact that Plaintiffs were representing themselves at the time of this filing and that such filings must be "liberally construed," *see Erickson v. Pardus*, 551 U.S. 89, 94 (2007), however, it would be a step too far for this Court to replace the public policy named by Plaintiffs with a different, more applicable policy. Accordingly, Plaintiffs have failed to plead a termination in violation of public policy with sufficient specificity. Thus, Defendants' motion for judgment on the pleadings must be granted as to Plaintiffs' fourth claim.

### D. *Plaintiffs' Common Law Claims*

In the fifth count of their complaint, Plaintiffs seek to recover against Defendants for the common law claims of breach of the covenant of good faith and fair dealing and fraud.[3] (ECF No. 1 ¶¶ 178–94.) As explained below, the Court will grant Defendants' motion for judgment as to both claims.

### i. *Breach of the covenant of good faith and fair dealing*

Defendants argue that Plaintiffs' good faith and fair dealing claim fails as it was filed after the close of the contractual and statutory window for filing such claims. (*See* ECF No. 17 at 16.) As the Court agrees with Defendants that North Carolina law renders Plaintiffs'

---

[3] This portion of the complaint also mentions "rescission," but Plaintiffs subsequently clarified that this was not meant to state a claim against Defendants. (ECF Nos. 1 at 30; 20 at 17.) Furthermore, Plaintiffs claim Defendants violated North Carolina's Unfair and Deceptive Trade Practices Act, N.C. Gen. Stat. § 75-1.1. (ECF No. 1 ¶¶ 189–192, 194.) Defendants do not, however, seek a judgment on the pleadings as to this claim. (*See* ECF No. 17 at 15–18.)

claim untimely, it will not reach Defendants' argument that its franchise agreement with Almy also makes Plaintiffs' claim untimely. (*See id.* at 15–16.)

Under North Carolina law, "every contract carries an implied covenant of good faith and fair dealing that neither party will do anything which injures the right of the other to receive the benefits of the agreement." *Guessford v. Pa. Nat'l Mut. Cas. Ins. Co.*, 918 F. Supp. 2d 453, 460 (M.D.N.C. 2013) (citing *Bicycle Transit Auth., Inc. v. Bell*, 333 S.E.2d 299, 305 (N.C. 1985)). Such claims must be brought within three years of when they accrue. *Ussery v. Branch Banking & Tr. Co.*, 777 S.E.2d 272, 277 n.5 (N.C. 2015) (citing N.C. Gen. Stat. § 1-52). As claims for the breach of covenant are based in contract, this three-year clock starts "when the breach occurs." *Jackson v. Minn. Life Ins. Co.*, 275 F. Supp. 3d 712, 728 (E.D.N.C. 2017) ("A cause of action for breach of contract accrues when the breach occurs."). Furthermore, at least one court has held that when the alleged breach of the covenant stems from the defendant franchisor's failure to abide by the terms of a franchise agreement or from the failure of the franchisor to make necessary disclosures to the franchisee, the breach occurs "at the time defendant enter[s] the [franchise] agreement[ ] with [the] plaintiff[ ]." *Rich Food Servs. v. Rich Plan Corp.*, No. 5:99-CV-677-BR, 2001 U.S. Dist. LEXIS 25955, at *13-14 (E.D.N.C. Nov. 20, 2001).

Here, it is difficult to determine exactly what Plaintiffs are arguing. They first state that "Defendants have breached [their] implied covenant of good faith and fair dealing by and through numerous acts that have harmed Plaintiffs' ability to operate their Family Fare Franchise." (ECF No. 1 ¶ 181.) They then complain of several wrongs allegedly committed by Defendants, some of which appear to go to their other common law claims for fraud and

unfair and deceptive trade practices. (*Id.* ¶¶ 183–194.) Plaintiffs' two most concrete allegations appear to argue that Defendants violated the implied covenant by (1) refusing to provide Salamah with a signed copy of the franchise agreement and (2) by coercing Salamah into entering into the franchise agreement in the first place. (*See id.* ¶¶ 183, 188.) Both alleged breaches of the covenant would have occurred on or shortly after December 11, 2013 when Salamah entered into the franchise agreement with Plaintiffs. *See Rich Food*, 2001 U.S. Dist. LEXIS 25955, at *13–14. Accordingly, they are long since barred by the three-year statute of limitations. To the extent that Plaintiffs seek to raise claims for the breach of the covenant of good faith and fair dealing not encompassed by these two events, the Court finds that these claims lack enough specific factual support to allow the Court "to draw the reasonable inference that [Defendants are] liable for the misconduct alleged," and so must be dismissed. *See Iqbal*, 556 U.S. at 678. In sum, Defendants are entitled to judgment on Plaintiffs' claim for breach of the covenant of good faith and fair dealing as Plaintiffs' claims are either time-barred or pled with insufficient specificity.

### ii.  Fraud

Defendants argue that Plaintiffs' fraud claim is impermissibly vague and barred by North Carolina's statute of limitations. (ECF No. 17 at 17–18.) The Court agrees that Plaintiffs' fraud claim is time-barred and so will not reach Defendants' vagueness argument.

Under North Carolina law, the statute of limitations for a fraud claim is three years starting from the time of "discovery by the aggrieved party of the facts constituting the fraud." *Piles v. Allstate Ins. Co.*, 653 S.E.2d 181, 185 (N.C. Ct. App. 2007) (quoting N.C. Gen. Stat. § 1-52(9)). North Carolina courts define discovery as "actual discovery or the time when the fraud

should have been discovered in the exercise of due diligence." *Id.* (quoting *Spears v. Moore*, 551 S.E.2d 483, 485 (N.C. Ct. App. 2001)). Whether a cause of action is blocked by the statute of limitations is an issue for the jury only if there is enough evidence "to support an inference that the limitations period has not expired." *See id.* at 183.

Here, Plaintiffs claim that Defendants defrauded them by misrepresenting what was, in reality, an employer-employee relationship as a franchisor-franchisee relationship.[4] (*See* ECF Nos. 1 ¶ 193; 20 at 17.) The statute of limitations on this claim therefore began to run at the time Plaintiffs discovered or should have discovered that they were employees and not franchisees. *See Piles*, 653 S.E.2d at 185. Nothing in the Plaintiffs' complaint suggests that the nature of their relationship with Defendants changed over time. Therefore, Plaintiffs should have become aware of the alleged fraud shortly after Salamah signed the franchise agreement on December 11, 2013. (*See* ECF No. 8-3 at 5.) Yet Plaintiffs did not initiate this suit until December 26, 2018, approximately five years after they should have discovered the fraud at issue. (*See* ECF No. 1 at 37.) Thus, Plaintiffs' fraud claim is barred by the statute of limitations, and the Court must grant Defendants' motion for judgment on the pleadings.

E. *Violation of the North Carolina Business Opportunity Sales Act*

Finally, Defendants seek judgment on Plaintiffs' claim that they violated the North Carolina Business Opportunity Sales Act, N.C. Gen. Stat. § 66-99. (ECF No. 1 ¶¶ 195–201.)

---

[4] Plaintiffs also argue for the first time in their briefing that Defendants committed fraud by falsely claiming to provide Plaintiffs with the "best deals" on the goods sold to Plaintiffs. (*See* ECF No. 20 at 17.) The Court will disregard this allegation as a complaint cannot be amended by a brief. *See, e.g., S. Walk at Broadlands Homeowner's Ass'n v. Openband at Broadlands, LLC*, 713 F.3d 175, 184 (4th Cir. 2013) ("It is well-established that parties cannot amend their complaints through briefing or oral advocacy."); *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1107 (7th Cir. 1984) ("[I]t is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss.").

Defendants contend that this claim too is untimely and that Plaintiffs fail to allege facts placing themselves within the ambit of the law. (ECF No. 17 at 18–19.) The Court agrees with Defendants that Plaintiffs are not protected by the Business Opportunity Sales Act and so will not decide whether Plaintiffs' claim is untimely.

The North Carolina Business Opportunity Sales Act requires that "[e]very business opportunity contract shall be in writing and a copy shall be given to the purchaser at the time [she] signs the contract." N.C. Gen. Stat. § 66-99(a). The Act permits "[a]ny purchaser injured by a violation of [the Act]" to sue for damages. *Id.* § 66-100(b). The statute applies only to "the sale or lease of any products, equipment, supplies or services for the purpose of enabling the purchaser to start a business" in which the seller makes one of four enumerated representations to the buyer. *See id.* § 66-94. One of those promises is that the seller "*guarantees* that the purchaser will derive income from the business opportunity which exceeds the price paid for the business opportunity." *Id.* § 66-94(3) (emphasis added). The question of whether "particular representations do guarantee income" can be decided by the court as a matter of law. *See Martin v. Pilot Indus.*, 632 F.2d 271, 275 (4th Cir. 1980). While the statute does not define the term, "[t]here is no reason to interpret the word[ ] 'guarantees' . . . as used in this statute in other than [its] ordinary, plain meaning[ ]." *Id.* In ordinary language, a "guarantee" is "an assurance for the fulfillment of a condition." Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/guarantee (last visited Feb. 10, 2020). To determine if such an assurance has been made, courts look to the objective meanings of the communications between the would-be buyer and seller. *Martin*, 632 F.2d at 275. For instance, in *Martin v. Pilot*, a seller, through an advertisement and promotional literature,

guaranteed income to a buyer by "insur[ing] minimum gross sales" and a certain annual profit, and by reassuring the buyer that the seller would not make the sale if it harbored "reasonable doubts" about fulfilling its promised sales and profit figures. *Id.* at 273, 275.

Here, Plaintiffs allege that Defendants "refused to provide Salamah a copy of the franchise agreement upon signing." (ECF No. 1 ¶ 89.) This would violate the requirement that the purchaser be given a copy of her signed contract. *See* N.C. Gen. Stat. § 66-99(a). Plaintiffs have not, however, alleged facts sufficient to show that Defendants made one of the four representations necessary to create the sale of a business opportunity, as defined by the statute. *See id.* at § 66-94. Plaintiffs appear to base their claim on the third representation enumerated in the statute—they seem to allege that Defendants guaranteed the Reynolda Road store would generate income in excess of the price paid for the business opportunity. (*See* ECF Nos. 1 ¶ 90; 20 at 19.) Specifically, Plaintiffs point to an email Pilcher wrote Salamah on June 14, 2012 stating:

> Average for 2011-Monthly Inside sales: $54,250.66, Gas gallons: 78,007, Lotto sales: $9,731.00, and Lottery sales: $9,844.00 That would put the monthly commission average to Operator before payroll/expenses: $7,681.32 Sales during summer last year averaged over $57,458.00 which would put check at $8,066.20. Even spending $4,000.00 on labor would leave you with very good income.

(ECF No. 1 ¶ 90.) The Court holds that this email alone does not amount to an assurance or a guarantee of income. Unlike in *Martin v. Pilot*, there are no promises of minimum sales or minimum profits; indeed, there are no promises of any kind. *See Martin*, 632 F.2d at 273. Instead, the email speaks of averages, saying that average sales would "leave [Salamah] with [a] very good income." (ECF No. 1 ¶ 90.) Accordingly, Plaintiffs have not alleged facts sufficient

to show that they are protected by the North Carolina Business Opportunity Sales Act. Judgment must therefore be entered for Defendants on this claim.

## IV.    PLANTIFF'S MOTION FOR LEAVE TO AMEND

Also, before the Court is a motion for leave to file a supplemental pleading brought by Elsayed.[5]  (ECF Nos. 21; 22.)  Elsayed seeks to add a claim alleging that Defendants Family Fare, M.M. Fowler, and Donald Pilcher discriminated against him because of his national origin in violation of Title VII.  (*See* ECF No. 21-1 ¶¶ 1, 27–32.)  For the reasons stated below, his motion will be denied without prejudice, except as to Defendant Pilcher.  Elsayed's motion related to Pilcher shall be denied with prejudice.

### A.  Standard of Review

The decision whether to grant or deny a motion to amend a pleading lies within the sound discretion of the district court.  *Foman v. Davis*, 371 U.S. 178, 182 (1962); *Deasy v. Hill*, 833 F.2d 38, 40 (4th Cir. 1987).  Courts should freely grant leave to amend a pleading "when justice so requires."  Fed. R. Civ. P. 15(a)(2).  Thus, a request for "leave to amend a pleading should be denied only when the amendment would be prejudicial to the opposing party, there has been bad faith on the part of the moving party, or the amendment would be futile."  *Johnson v. Oroweat Foods Co.*, 785 F.2d 503, 509 (4th Cir. 1986) (citing *Foman*, 371 U.S. at 182).  A plaintiff's request to amend a complaint is futile if the amended complaint clearly could not satisfy the appropriate requirements of the Federal Rules of Civil Procedure.  *See U.S. ex rel.*

---

[5] Plaintiff filed a motion for leave to file a supplemental pleading on July 31, 2019, (ECF No. 21), and a substantially similar motion later that day, (ECF No. 22).  Plaintiff attached several exhibits to his initial filing that he did not attach to his later filing.  (*See, e.g.*, ECF Nos. 21-1; 21-6.)  As Plaintiff appeared *pro se* at the time and as no prejudice to Defendants will result from reading these two motions in tandem, the Court will treat Plaintiff's filings as one unified motion.

*Wilson v. Kellogg Brown & Root, Inc.*, 525 F.3d 370, 376 (4th Cir. 2008); *Johnson*, 785 F.2d at 510 (explaining that "[l]eave to amend . . . should only be denied on the ground of futility when the proposed amendment is clearly insufficient or frivolous on its face"). A proposed amended claim would thus be futile if it failed to satisfy Rule 12's requirement that a complaint contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *See Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570).

B. *Elsayed's Proposed Amendment Fails to Allege that Defendants Employ Fifteen or More Employees*

Defendants argue that it would be futile to allow Elsayed to add his Title VII claim as it suffers from fatal flaws, the most straightforward of which is that Plaintiff fails to allege that any of the Defendants employ fifteen or more people. (ECF No. 24 at 13–14.) Title VII forbids "an employer" from "discharg[ing] any individual, or otherwise [discriminating] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race . . . or national origin." 42 U.S.C § 2000e-2(a). This ban on employment discrimination only applies to employers who have "fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year." *See Walters v. Metro. Educ. Enters., Inc.*, 519 U.S. 202, 204 (1997) (quoting 42 U.S.C. § 2000e(b)). Thus, district courts in this circuit have dismissed complaints that fail to allege that the defendant employs fifteen or more people, but have done so without prejudice, giving the plaintiff an opportunity to refile their claim. *See, e.g., Evans v. Larchmont Baptist Church Infant Care Ctr., Inc.*, No. 2:11cv306, 2012 WL 699529, at *3, 6 (E.D. Va. Feb. 29, 2012); *Coles v. Deltaville Boatyard, LLC*, No. 3:10cv491-DWD, 2011 WL 666050, at *7 (E.D. Va. Feb. 14, 2011). Here, Plaintiff failed to plead that Defendants employ fifteen or more

individuals.  (*See* ECF Nos. 1; 21-1.)  Therefore, the Court will deny Plaintiff's motion to amend.  However, to determine whether Plaintiff's motion should be denied with or without prejudice, the Court must address Defendants' three remaining objections to Plaintiff's Title VII claim: (1) that Plaintiff's complaint is either time-barred or beyond the scope of his Equal Employment Opportunity Commission ("EEOC") charge; (2) that Defendants are not "employers" under Title VII; and (3) that Plaintiff's claim against Pilcher at least is barred as "there is no individual liability under Title VII."  (ECF No. 24 at 9–22.)  To the extent that these arguments are correct, it would be futile to permit Elsayed to amend his supplemental pleading.

### C. Plaintiff's Claim is not Time-Barred or Beyond the Scope of his EEOC Charge and States a Plausible Claim for Relief

Defendants first argue that "Elsayed's Title VII claim is futile because he fails to allege discrimination within the Title VII time limitation."  (*Id.* at 9.)  Defendants further contend that the aspect of Plaintiff's claim that is timely is beyond the scope of his EEOC charge.  (*See id.* at 11–12.)  For the reasons stated below, the Court disagrees, finding Plaintiff's claim timely, within the scope of his EEOC complaint, and plausibly pled.

Generally, a Title VII plaintiff must file a charge with the EEOC within 180 days of when "the alleged unlawful employment practice occurred."  *See Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 104–05 (2002) (quoting 42 U.S.C. § 2000e-5(e)(1)).  This analysis is "eas[y]," for "discrete retaliatory or discriminatory act[s]," which are considered to "'occur[ ] on the day that [they] "happen[ ]."'"  *Id.* at 110.

Once a plaintiff files an EEOC charge, that charge does not "strictly limit[ ]" the "scope of [their] Title VII action."  *Fulmore v. City of Greensboro*, 834 F. Supp. 2d 396, 422 (M.D.N.C.

2011).  "[R]ather, the suit is 'confined only by the scope of the administrative investigation that can reasonably be expected to follow the charge of discrimination.'"  *Id.* (quoting *Chisholm v. U.S. Postal Serv..*, 665 F.2d 482, 491 (4th Cir. 1981)).  In deciding whether a Title VII suit is reasonably related to the EEOC complaint that preceded it, it is important that courts are not "hyper-technical."  *See Zuzul v. McDonald*, 98 F. Supp. 3d 852, 865–66 (M.D.N.C. 2015).  As the Fourth Circuit has explained, the requirement that Title VII plaintiffs exhaust their administrative remedies "should not become a tripwire for hapless plaintiffs."  *Sydnor v. Fairfax Cty., Va.*, 681 F.3d 591, 594 (4th Cir. 2012).

Defendants argue that the events Plaintiff relies on in his putative Title VII claim are either untimely or outside the scope of his EEOC charge.  (ECF No. 24 at 9–13.)  According to Defendants, the only alleged act of discrimination to have occurred within 180 days of the filing of Elsayed's EEOC complaint was the termination of the franchise agreement on November 30, 2018.  (*Id.* at 11–12.)  Defendants further argue that the termination of the franchise agreement cannot be the basis for Title VII liability as Elsayed allegedly "made no assertion in the [EEOC] Charge that this event was discriminatory."  (*Id.* at 12–13.)  Thus, according to Defendants, Elsayed has failed to properly allege any discriminatory conduct by Defendants.  (*See id.* at 13.)

Elsayed, however, is not suing to recover for any discrete act of discrimination that occurred more than 180 days before he filed his EEOC charge on December 21, 2018.  (*See* ECF Nos. 21-1; 24-1 at 1.)  Rather, he appears to allege that he was illegally terminated because

of his national origin, an event that occurred just weeks prior to December 21, 2018.[6]  (*See* ECF No. 21-1 ¶¶ 7–9, 27–32.)  In seeking to establish that he was fired because of his national origin, Elsayed is free to rely upon "prior acts [of discrimination] as background evidence in support of a timely claim."  *Morgan*, 536 U.S. at 113.  Furthermore, Elsayed's claim that he was fired because of his national origin is within the scope of his EEOC charge.  Elsayed reported to the EEOC that he suffered national origin discrimination and described the abuse allegedly directed against him because of his ancestry.  (ECF No. 24-1 at 2.)  He then stated, "I believe I was discriminated against because of my National Origin, (Arab/Middle Eastern), and retaliated against and discharged for complaining about a protected activity, in violation of Title VII."  (*Id.* at 3.)  The Court finds that this charge read in its entirety, was sufficient to put Defendants on notice that the EEOC would likely investigate the termination of the franchise agreement.  Accordingly, Elsayed's claim that he was fired because of his national origin is not beyond the scope of his EEOC charge.

Having concluded that Elsayed's EEOC charge was timely and that his Title VII suit is not beyond the scope of that charge, the Court will briefly address an issue not explicitly briefed by Defendants: whether Elsayed states a plausible claim for relief.  As the Fourth Circuit recently clarified in *Woods v. City of Greensboro*, to state a claim for relief, a Title VII plaintiff "need not plead facts sufficient to establish a prima facie case of . . . discrimination." 855 F.3d 639, 648 (4th Cir. 2017).  Rather, they must meet the familiar plausibility standard

---

[6] To the extent that Elsayed intended to state a separate claim for a hostile work environment, (*see* ECF No. 21-1 ¶ 31), this claim would also not be barred by the 180-day limitation as "an act contributing to that hostile environment," here, the allegedly pretextual discharge, "[took] place within the statutory time period."  *See Morgan* 536 U.S. at 105.

set forth in *Twombly* and *Iqbal*. *Id.* An employee meets this standard unless their employer's proffered, non-discriminatory explanation of an adverse employment action "is so obviously an irrefutably sound and unambiguously nondiscriminatory and non-pretextual explanation that it renders [the employee's] claim . . . implausible." *See id.* at 649. Here, Defendants argue that the franchise agreement was terminated for the reasons set forth in the termination letter. (*See* ECF No. 24 at 12–13.) Plaintiff claims these reasons were pretextual and that he was fired because of his national origin. (*See, e.g.*, ECF No. 21-1 ¶ 8.) To substantiate his claim, Elsayed pled allegations that make his claim plausible including, for example, that Pilcher regularly made derogatory comments about Arabs, such as "I am done with Arabs," (ECF No. 1 ¶¶ 73–74, 77–80), that Pilcher told Plaintiffs not to speak Arabic, lest they "terrify" customers, (*id.* ¶ 82), and that Family Fare used to have many Arab franchisees but now has very few, (*id.* ¶ 72). While these allegations may well prove inadequate for Elsayed to prevail on the merits, for now, they indicate that he can state a plausible claim for relief, and therefore the Court should permit him to amend his original supplemental pleading.

### D. Plaintiff's Claim That He is an Employee Under Title VII is Plausible

Next, Defendants argue that Elsayed should not be able to amend his pleading to add his employment discrimination claim because he was not Defendants' employee under Title VII. (ECF No. 24 at 13–22.) This analysis is different than the FLSA analysis performed above because Title VII's definition of "employee" is narrower. *See Butler v. Drive Auto. Indus. of Am.*, 793 F.3d 404, 412 n.10 (4th Cir. 2015). Thus, to determine if Elsayed should be able to amend his supplemental pleading, the Court must consider (1) whether Elsayed was an

employee or an independent contractor for Title VII purposes and (2) whether Defendants were joint employers for Title VII purposes.

As discussed above, under Title VII, an "employer" is a "person . . . who has fifteen or more employees during a specified period of time." *Cilecek v. Inova Health Sys. Servs.*, 115 F.3d 256, 259 (4th Cir. 1997) (internal quotations omitted). An "employee" is "an individual employed by an employer." 42 U.S.C. § 2000e(f). "In adopting this circular definition, Congress has left the term 'employee' essentially undefined insofar as an employee is to be distinguished from an independent contractor." *Cilecek*, 115 F.3d at 259. To aid in this differentiation, the Fourth Circuit adopted the eleven "*Spirides* factors" to distinguish employees from independent contractors. *See Butler*, 793 F.3d at 412–13 (approving of the Fourth Circuit's adoption of the *Spirides* factors in *Garrett v. Phillips Mills, Inc.*, 721 F.2d 979, 981–82 (4th Cir. 1983)). These factors are:

> (1) the kind of occupation, with reference to whether the work usually is done under the direction of a supervisor or is done by a specialist without supervision; (2) the skill required in the particular occupation; (3) whether the "employer" or the individual in question furnishes the equipment used and the place of work; (4) the length of time during which the individual has worked; (5) the method of payment, whether by time or by the job; (6) the manner in which the work relationship is terminated; *i.e.*, by one or both parties, with or without notice and explanation; (7) whether annual leave is afforded; (8) whether the work is an integral part of the business of the "employer"; (9) whether the worker accumulates retirement benefits; (10) whether the "employer" pays social security taxes; and (11) the intention of the parties.

*Spirides v. Reinhardt*, 613 F.2d 826, 832 (D.C. Cir. 1979); *Butler*, 793 F.3d at 413.

Neither Plaintiff nor Defendants have briefed these factors. (*See* ECF Nos. 24 at 13–22; 25 at 11–13.) As such, the Court lacks the information necessary to analyze many of the *Spirides* factors. Absent this information, the Court cannot conclude at this time that Plaintiff

is an independent contractor as argued by Defendants such that it would be futile to allow Elsayed to amend his pleading. Thus, the Court will turn to whether Defendants and Almy were joint employers of Elsayed.

In *Butler v. Drive Automotive Industries of America, Inc.*, the Fourth Circuit adopted a nine factor test to determine whether a Title VII plaintiff "is jointly employed by two or more entities." 793 F.3d at 414. These factors are:

> (1) authority to hire and fire the individual; (2) day-to-day supervision of the individual, including employee discipline; (3) whether the putative employer furnishes the equipment used and the place of work; (4) possession of and responsibility over the individual's employment records, including payroll, insurance, and taxes; (5) the length of time during which the individual has worked for the putative employer; (6) whether the putative employer provides the individual with formal or informal training; (7) whether the individual's duties are akin to a regular employee's duties; (8) whether the individual is assigned solely to the putative employer; and (9) whether the individual and putative employer intended to enter into an employment relationship.

*Id.* The court in *Butler* also clarified that, generally, the first three of these factors will be "most important;" that "courts can modify the factors to the specific industry context;" and that the ninth factor will generally be "of minimal consequence." *Id.* at 414–15, 414 n.12.

Turning to the application of the *Butler* factors in this case, the Court finds that Elsayed has alleged facts, when viewed in the light most favorable to Plaintiff, supporting that Defendants and Almy were his joint employers. As discussed above in the FLSA context, Elsayed has alleged Defendants had the authority to hire and fire him (factor one), and to control his work (factor two). Furthermore, Plaintiff has alleged that he worked for Defendants in a work location furnished by Defendants (factor three).[7] Thus, the three "most

---

[7] Citing *Wright v. Mountain View Lawn Care, LLC*, No. 7:15-cv-00224, 2016 WL 1060341, (W.D. Va. Mar. 11, 2016), Defendants argue that the third factor, whether the putative employer furnishes the

important" factors all support a plausible joint-employment relationship between Almy on one hand and Defendants on the other. (*See Butler*, 793 F.3d at 414–415.) Conversely, factors four and six appear to weigh against finding a joint-employment relationship. As Defendants argue in their brief, Plaintiffs' complaint indicates that Salamah is responsible for the employment records of the Reynolda Road workers. (ECF Nos. 1 ¶ 34; 24 at 21.) Likewise, Elsayed has failed to allege any formal or informal training provided to him by Defendants beyond his cursory allegation that "Defendants required . . . store employees [to] attend training programs provided by Family Fare." (*See* ECF No. 1 ¶ 28.) Thus, after reviewing all relevant factors, the *Butler* analysis supports that it is plausible that Elsayed is an employee jointly employed by Defendants and Almy.[8] It would not, therefore, be futile to allow Plaintiff to amend his Title VII claim.

In sum, the Court concludes that Elsayed's motion for leave to file a Title VII claim against Defendants must be denied because he failed to allege that Defendants employ more than fifteen employees. However, the Court has also concluded that it would not be futile to

---

equipment used and the place of work, cuts against a plaintiff employed by a franchisee when the franchisee leases its place of work from a defendant franchisor. (ECF No. 24 at 19–20.) However, in *Wright*, the franchisee leased its workshop from a third party. *See Wright*, 2016 WL 1060341 at *5. Here, by contrast, Almy leased its storefront from M.M. Fowler, one of the defendants. (ECF No. 8-6 at 2.) Thus, *Wright* is inapplicable to this analysis.

[8] Four of these *Butler* factors, five, seven, eight, and nine, are not well-suited for a joint employment analysis in the franchise context. The fifth factor, "is of little assistance in the instant analysis, as the fundamental question to be answered is whether [Elsayed] was, in fact, ever employed by [Defendants]." *Wright*, 2016 WL 1060341, at *5. Factors seven and eight appear designed to address employment by temporary staffing agencies, as was the case in *Butler*. *See* 793 F.3d at 406. The ninth factor—the subjective intent of the parties—cuts mildly in Defendants' favor as its franchise agreement with Almy disclaimed any employer-employee relationship, but the weight of this factor is negligible where, as here, the main thrust of the worker's argument is that his formal employment status was a sham. *Cf. id.* at 414 n.12.

allow Plaintiff to amend his Title VII claim. His claim is not time-bared or beyond the scope of his EEOC charge, and he states a plausible claim for relief. Furthermore, taking Plaintiff's allegations as true, it is plausible that he is an employee jointly employed by Almy and Defendants. Thus, it would not be futile to allow Plaintiff to amend his original supplemental pleading, at least as against the corporate Defendants. Accordingly, the Court's denial of Plaintiff's motion shall be without prejudice, giving him the opportunity to refile such claim. The Court will now turn to Defendants' final argument: that Plaintiff's claim against Defendant Pilcher is barred "because there is no individual liability under Title VII." (ECF No. 24 at 22.)

### E. *Pilcher's Liability Under Title VII*

Defendant Pilcher is an employee of M.M. Fowler. (ECF No. 8 ¶ 9.) "Employees, even supervisory ones, are not liable in their individual capacities for . . . Title VII violations." *Blakney v. N.C. A&T State Univ.*, No. 1:17CV874, 2019 WL 1284006, at *7 (M.D.N.C. Mar. 20, 2019) (citing *Lissau v. S. Food Serv., Inc.*, 159 F.3d 177, 178 (4th Cir. 1998)); *Williams v. Guilford Tech. Cmty. Coll. Bd. of Trs.*, 117 F. Supp. 3d 708, 716 (M.D.N.C. 2015). Thus, should Elsayed choose to amend his Title VII claim, he cannot sue Pilcher or any other employee in their individual capacities.

## V. CONCLUSION

Based on the preceding discussion, the Court concludes the following: (1) that Defendant's motion for judgment on the pleadings with respect to Plaintiffs' FLSA overtime claim should be denied because, taking all facts alleged in the complaint as true and drawing all reasonable inferences in Plaintiffs' favor, Plaintiffs may be able to prove facts establishing

their FLSA claim; and (2) that Defendant's motion for judgment on the pleadings should be allowed as to Plaintiffs' NCWHA, wrongful discharge, breach of the covenant of good faith and fair dealing, fraud, and Business Opportunity Sales Act claims, all of which failed as a matter of law. Further, as it relates to Plaintiff's motion for leave to file a supplemental pleading, the Court concludes that while the Court should deny Elsayed's motion to add a Title VII claim as he failed to plead that Defendants employ fifteen or more people, the Court should do so without prejudice since allowing such amendment would not be futile. Finally, because Elsayed cannot as a matter of law sustain a claim against Defendant Pilcher, the Court will deny Elsayed's claim against him with prejudice.

The Court therefore enters the following order:

**[ORDER TO FOLLOW]**

# ORDER

IT IS THEREFORE ORDERED that Defendants' Motion for Partial Judgment on the Pleadings, (ECF No. 16), is GRANTED as to (1) Plaintiffs' NCWHA claims in counts one and two; (2) count four; (3) the breach of the covenant of good faith and fair dealing and fraud claims in count five; and (4) count six.

IT IS FURTHER ORDERED that Defendants' motion is DENIED as to Plaintiffs' FLSA claim in count one.

IT IS FURTHER ORDERED that Plaintiff's Motion for Leave to Amend is DENIED without prejudice as it relates to all Defendants except said motion shall be denied with prejudice as to Defendant Donald Pilcher. Should Plaintiff choose to file an amended pleading to add a Title VII claim, he must do so within ten days of the issuance of this Order.

This, the 18th day of February 2020.

/s/Loretta C. Biggs
United States District Judge