IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| AMRO ELSAYED and LOLA SALAMAH (H/W), | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | 1:18-cv-1045 |
| | ) | |
| FAMILY FARE LLC, and M.M. FOWLER, INC. | ) | |
| and LEE BARNES, JR., individually and as | ) | |
| President of Family Fare LLC, and M.M. | ) | |
| Fowler, Inc. and DONALD PILCHER, individually, | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

LORETTA C. BIGGS, District Judge.

On February 18, 2020, the Court entered an Order granting in part and denying in part Defendants' Motion for Partial Judgment on the Pleadings. (ECF No. 62 at 35.) The prior Order also permitted Plaintiff Amro Elsayed to file an amended Title VII claim. (*Id.*) Presently before the Court are Defendants' motions for summary judgment as to all of the remaining claims in Plaintiffs' complaints. (ECF Nos. 48; 87.) In their remaining claims, Plaintiffs principally allege that Defendants misclassified them as franchisees rather than employees in violation of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 203, and terminated their franchise agreement because they are Arab Americans in violation of the Civil Rights Acts of 1866, 42 U.S.C. § 1981, and 1964, 42 U.S.C. § 2000e *et seq.* (*See* ECF Nos. 1; 64.) Plaintiffs also allege several violations of state law. (ECF No. 1.) For the reasons that follow, Defendants' motions for summary judgment will be granted in part and denied in part.

## I.    BACKGROUND

In 2012, Plaintiffs Lola Salamah and Amro Elsayed, a married couple, moved to North Carolina to operate a gas station and convenience store. (ECF No. 57-1 at 2.) To open the business, Salamah formed Almy, LLC ("Almy"). (*See* ECF No. 20 at 8.) Salamah served as President and Guarantor of Almy. (ECF Nos. 8-3 at 48; 89-1 at 4.) On June 29, 2012, Almy entered into a contract operator agreement with Defendant M.M. Fowler, Inc., ("M.M. Fowler"), the owner of "certain proprietary and property rights in and to the 'Family Fare'" brand of gas station convenience stores. (*See* ECF Nos. 8-1 at 5; 8-3 at 5.) The contract permitted Almy to operate a Family Fare convenience store located at 3836 Reynolda Road in Winston-Salem. (ECF No. 8-1 at 5.)

On December 11, 2013, Almy and Defendant Family Fare, LLC ("Family Fare"),[1] entered into a franchise agreement in which Almy became the franchisee of the Reynolda Road store, with Family Fare acting as Franchisor, and M.M. Fowler acting as landlord. (ECF No. 8-3 at 5, 8.) The agreement provided that Almy and Family Fare each received fifty percent of the store's gross profits. (*See id.* at 9.) Almy was to "employ and provide personnel" to operate the store and was to "assume[ ] full responsibility for such employees." (*See id.* at 19.) The agreement further provided that "neither [Almy] nor any other person performing any act in connection with the operation of [the] business . . . shall be deemed to be an employee or agent of Family Fare." (*Id.* at 24.) The agreement was for a five-year term and was renewed on May 10, 2018 for a second five-year term. (ECF No. 8-8 at 2.)

---

[1] Family Fare is an affiliate of M.M. Fowler that licenses from M.M. Fowler the right to franchise the Family Fare brand. (ECF No. 8-3 at 5.)

Case 1:18-cv-01045-LCB-LPA   Document 97   Filed 08/10/20   Page 2 of 38

In September of 2015, Salamah and Defendant Donald Pilcher—a "[b]usiness consultant" for M.M. Fowler who served as Defendants' day-to-day liaison with Plaintiffs—discovered that an employee named B.P.[2] was stealing lottery tickets from the Reynolda Road store. (*See* ECF Nos. 57 at 7; 57-1 at 7; 57-2 at 12–13, 104–05.) In all, B.P. stole approximately $22,800 from the store. (ECF No. 48-16 at 2.) Generally, when employees of a Family Fare franchisee stole from their store, the franchisee was responsible for paying for the full amount of the theft by the end of the month. (*See* ECF No. 57-6 at 17–19 (describing how another franchisee repaid Defendants for lottery tickets stolen by her employee).) However, in this case, after instructing Salamah to fire B.P., Pilcher told her to "mark the stolen lottery tickets as sold as [Plaintiffs] paid for the loss through monthly increments." (*See* ECF Nos. 48-1 at 36; 57-1 at 7.) Following Pilcher's instructions, Salamah effectively purchased the stolen lottery tickets over time by placing her own money in the store's cash register and then marking a portion of the stolen tickets as sold. (*See* ECF No. 57-5 at 215–16.) Plaintiffs were able to reduce the amount that they owed Defendants to approximately $10,000. (*Id.* at 216.)

By the fall of 2018, Salamah was struggling to repay the lottery debt. (*See* ECF No. 94-1 at 4.) Pilcher advised her to contact higher management in Family Fare to "ask for help." (*See* ECF Nos. 48-1 at 39; 48-16 at 2.) In late October, Salamah called and wrote Danny Bass, a Family Fare executive, to explore the possibility of "splitting the [remaining] shortage." (ECF Nos. 48-16 at 2; 57-3 at 320.) In her letter to Bass, Salamah explained that B.P. had stolen so many tickets that she still had not been able to pay back all her losses. (ECF No. 48-

---

[2] The Court, in its discretion, elects to abbreviate the name of the individual as he is accused of theft and is not a party in this action.

16 at 2.)  She then stated that the store was "of great importance to [her]" and that she did "not wish to lose [it]."  (*Id.*)  Salamah closed by requesting that Family Fare advance her the money to pay for her remaining debt.  (*Id.*)  The same day, Salamah called Lee Barnes, the President of Family Fare and M.M. Fowler, and explained that she "needed assistance with the shortage . . . besides what [she] had been doing with Pilcher."  (*See* ECF Nos. 89-1 at 2; 94-1 at 4.)  Barnes said he would get back in touch with her.  (ECF No. 94-1 at 4.)  This was the first time Salamah had informed Barnes of the theft.  (*See* ECF Nos. 48-3 at 6–7; 94-1 at 3.)  Plaintiffs did not inform anyone in Family Fare other than Pilcher of the theft before October 2018 and were concerned that their franchise agreement might be terminated if anyone else knew about it.[3]  (*See* ECF Nos. 48-1 at 39; 57-5 at 222–28; 94 at 9.)

Throughout November of 2018, Salamah waited to hear back from Barnes and Bass regarding her request for an advance.  (*See* ECF No. 57-3 at 321, 323.)  On November 30, 2018, Defendants terminated their franchise agreement and lease with Almy and Salamah.  (ECF No. 8-6 at 3.)  According to Defendants, Barnes decided to terminate his relationship with Salamah "as a result of [the] significant lottery shortages at the Reynolda Store."  (*See id.* at 2–3; 48-3 at 6; 50 at 6.)  That day, Pilcher entered the Reynolda Road store, confiscated the key to the store's safe, pushed a worker out of the way to take control of the cash register, and called Salamah to ask her to come to the store.  (ECF No. 57-8 at 6.)  Pilcher then called the police to come to the store.  (ECF No. 69 ¶ 21.)  When the officer arrived, Salamah explained that "she believed [Defendants] needed a court order to remove her from the property."  (ECF

---

[3] As discussed below, Defendants contend—and Plaintiffs have put forward no evidence rebutting—that Barnes "did not learn of the excessive lottery shortages until in or around October 2018."  (*See* ECF Nos. 48-3 at 6–7; 50 at 17–18.)

No. 57-4 at 7.)  The officer advised all parties present that he would not be evicting anyone and was present just to keep the peace.  (*Id.* at 7–8.)  During the hours the officer was present, a locksmith "changed the locks to the business at Mr. Pilcher's request."  (*Id.* at 9.)

In addition to their wage and hour related claims, Plaintiffs assert that their franchise agreement was terminated and Elsayed was fired because of Defendant Donald Pilcher's animus against Arab Americans.[4]  (*See, e.g.*, ECF Nos. 57 at 16; 64 ¶¶ 14, 16.)  Elsayed has testified that Pilcher behaved in a hostile and discriminatory manner toward Arab workers.[5] (*See* ECF No. 94-4 at 6; *see also* ECF No. 57-11 at 2–3.)  Pilcher allegedly displayed his animosity towards Arab Americans by, for example, instructing Arab workers at the Reynolda Road store not to speak Arabic, lest they "scare" customers.  (*See* ECF Nos. 57-8 at 5; 57-10 at 4; 94-1 at 6.)  He also "often called Arab individuals 'Arab crooks,'" (ECF Nos. 57-9 at 3; 57-11 at 3; 94-1 at 6), and generally "treated [non-Arabs] with more respect than Arab employees," (ECF No. 57-8 at 5).  According to a former worker at the store, this discriminatory behavior earned Pilcher a notorious reputation in Winston-Salem's Arab and Middle Eastern community. (ECF No. 57-11 at 2–3.)  Furthermore, Elsayed maintains that he had an altercation with Pilcher in May of 2018 while attending a meeting of area franchisees in Salamah's place that culminated in Pilcher telling Elsayed to "get out of my sh**."  (*See* ECF Nos. 94-4 at 7–8; 57-2 at 132.)  According to Elsayed, Pilcher "would not accept [his] attendance in place of

---

[4] "Salamah's father is Egyptian and her mother is Caucasian from California," and Elsayed is from Egypt and moved to the United States in 2002.  (*See* ECF Nos. 57-5 at 26–27; 94-4 at 5.)

[5] Defendants deny these allegations.  (*See generally* ECF No. 69.)  They have also introduced affidavits from people of Middle Eastern descent who have worked with Pilcher that testify that he never behaved in a discriminatory manner towards them or their families.  (*See* ECF Nos. 58-7 ¶¶ 2, 4, 8; 58-8 ¶¶ 2, 4–5.)

5

[Salamah's] because [he is] Middle Eastern/Arab" while she, though also an Arab, is an American citizen raised in the United States. (ECF No. 94-4 at 7.) According to Elsayed, "from that point on," he expected Pilcher would try to fire him. (ECF No. 94 at 6.)

## II. DISCUSSION

The Court will now address Defendants' motions for summary judgment as to each of Plaintiffs' claims, starting with Plaintiffs' contention that Defendants violated the FLSA by failing to pay them overtime. (*See* ECF No. 1 ¶ 61.)

### A. Plaintiffs' FLSA Claim

"Congress enacted [the] FLSA in 1938 to ensure that the nation's workers received 'a a fair day's pay for a fair day's work.'" *Kenter v. Branch Banking & Tr. Co.*, 143 F. Supp. 3d 370, 374 (M.D.N.C. 2015) (quoting *A.H. Phillips, Inc. v. Walling*, 324 U.S. 490, 493 (1945)). "The FLSA establishes federal minimum-wage, maximum-hour, and overtime guarantees that cannot be modified by contract." *Genesis Healthcare Corp. v. Symczyk*, 569 U.S. 66, 69 (2013). The Act requires that employers pay their employees at least the federal minimum wage and provide them overtime in the amount of one and a half times their regular rate of pay for each hour worked beyond forty hours in a given work week. 29 U.S.C. §§ 206(a)(1), 207(a)(1).

In enacting the FLSA, Congress chose to define "employ," "employee," and "employer" broadly to better effectuate the "'remedial and humanitarian' purpose" of the Act. *See Salinas v. Commercial Interiors, Inc.*, 848 F.3d 125, 133 (4th Cir. 2017) (quoting *Tenn. Coal, Iron & R.R. Co. v. Muscoda Local No. 123*, 321 U.S. 590, 597 (1944)). The law defines "employ" as "to suffer or permit to work." 29 U.S.C. § 203(g). An "employee" is "any individual employed

6

by an employer." *Id.* § 203(e)(1). Finally, an "employer" is "any person acting directly or indirectly in the interest of an employer in relation to an employee." *Id.* § 203(d).

Despite the breadth of these definitions, the FLSA "provides little guidance as to what constitutes an employer-employee relationship." *Benshoff v. City of Va. Beach*, 180 F.3d 136, 140 (4th Cir. 1999). In light of this deficit, the Fourth Circuit in *Schultz v. Capital International Security, Inc.* "explained the process for properly analyzing allegations of an employer-employee relationship." *Luna-Reyes v. RFI Constr., LLC*, 109 F. Supp. 3d 744, 749 (M.D.N.C. 2015) (citing *Schultz*, 466 F.3d 298 (4th Cir. 2006)). First, "the established facts must be reviewed to identify the putative employer or employers." *Schultz*, 466 F.3d at 305; *Luna-Reyes*, 109 F. Supp. 3d at 749. Second, the court should determine if the worker is an employee covered by the FLSA or a non-covered independent contractor by looking at "the economic realities of the relationship between the worker and the putative employer." *See Schultz*, 466 F.3d at 304; *Luna-Reyes*, 109 F. 3d Supp. 3d at 749.

Here, Defendants move for summary judgment on Plaintiffs' FLSA claim, primarily on the grounds that they were not Plaintiffs' employers, joint or otherwise. (*See, e.g.*, ECF No. 50 at 8–10.) Plaintiffs assert, on the other hand, that despite contractual language stating that Defendants did not employ Plaintiffs, "Defendants exercised control over Plaintiffs that far exceeded a franchisee/franchisor relationship," such that "Plaintiffs were employees of Defendants." (ECF No. 57 at 5, 11.) Further, according to Plaintiffs, because they were employees of Defendants, they were entitled to the FLSA's wage and hour protections. (*See id.* at 9–11.) As this Court explained in its prior Opinion, to the extent that Plaintiffs were Defendants' employees at all, Plaintiffs were jointly employed by Almy and by Defendants.

(*See* ECF No. 62 at 10 ("Given this clear contractual language making Almy an employer of the workers at the Reynolda Road store, the Court cannot agree with Plaintiffs that this case does not implicate the doctrine of joint employment.").) However, as set forth below, the Court concludes that Defendants and Almy did not jointly employ Plaintiffs and that Salamah was not an employee at all.[6] The Court will therefore grant Defendants' motion for summary judgment as to Plaintiffs' FLSA claim.[7]

> ### i. *Substantive law to be applied*

There is no dispute that Almy employed the workers at the Reynolda Road store. The question here is whether Plaintiffs were also employed by Defendants. In determining whether a joint employment relationship existed between Defendants and Almy, it is a given that the Court would generally look to the governing test articulated by the Fourth Circuit in *Salinas v. Commercial Interiors*. *See* 848 F.3d at 140 n.8. In *Salinas*, the Fourth Circuit explained that joint employment exists "when both (1) two or more persons or entities share, agree to allocate responsibility for, or otherwise codetermine the essential terms and conditions of a worker's employment and (2) the worker is an 'employee' within the meaning of the FLSA." *Id.* This inquiry boils down to "one fundamental question: whether two or more persons or entities are not completely disassociated with respect to a worker such that the persons or

---

[6] To clarify, the Court will occasionally refer to Almy and Salamah interchangeably as Salamah was the agent, president, shareholder, guarantor, and sole company official of Almy. (*See* ECF Nos. 8-3 at 48; 89-1 at 4.) However, the Court differentiates between Almy and Elsayed and refers only to Elsayed and Salamah as "Plaintiffs."

[7] The Court therefore need not address Defendants' alternative arguments for summary judgment: that Salamah, at bare minimum, was a store manager and so was exempt from the FLSA's wage and hour requirements, (*see* ECF No. 50 at 10–13), and that Defendants lacked actual or constructive knowledge of any overtime work performed by Elsayed, (*see id.* at 13–15).

Case 1:18-cv-01045-LCB-LPA   Document 97   Filed 08/10/20   Page 8 of 38

entities share, agree to allocate responsibility for, or otherwise codetermine—formally or informally, directly or indirectly—the essential terms and conditions of the worker's employment." *Id.* at 141. In reaching this conclusion, the Fourth Circuit was guided by the Department of Labor ("DOL's") then-current regulation implementing the FLSA, which "distinguish[ed] between 'separate' employment—when two persons or entities are 'entirely independent' with respect to a worker's employment—and 'joint' employment—when the two persons or entities are '*not completely dissociated*.'" *Id.* (quoting former 29 C.F.R. § 791.2(a)) (emphasis added). However, as of March 16, 2020 that regulation has been revised by the DOL in a manner that the Fourth Circuit specifically rejected in *Salinas*. As relevant here, the new Final Rule promulgated by the DOL eliminates the old "completely disassociated" language on which the Fourth Circuit relied in *Salinas* and instructs that "[t]he other person is the employee's joint employer only if that person is acting directly or indirectly in the interest of the employer in relation to the employee." *See* 29 C.F.R. § 791.2(a). The Final Rule also "adopt[ed] a four-factor balancing test," derived from the Ninth Circuit's decision in *Bonnette v. California Health & Welfare Agency*, to determine joint employer status.[8] *See* 85 Fed. Reg. 2820 at 2820 (Jan. 16, 2020); *Bonnette*, 704 F.2d 1465 (9th Cir. 1983).

Though, generally, courts defer to an agency's reasonable interpretation of an ambiguous statute, even when that interpretation conflicts with a court of appeal's prior precedential holding, s*ee Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967,

---

[8] The four factors are "whether the other person: (1) Hires or fires the employee; (2) supervises and controls the employee's work schedule or conditions of employment to a substantial degree; (3) determines the employee's rate and method of payment; and (4) maintains the employee's employment records." *See* 85 Fed. Reg. 2820 at 2820.

9

982 (2005) ("A court's prior judicial construction of a statute trumps an agency construction otherwise entitled to *Chevron* deference only if the prior court decision holds that its construction follows from the unambiguous terms of the statute and thus leaves no room for agency discretion."), this Court declines to do so here for several reasons. First, the Fourth Circuit expressly rejected *Bonnette's* four-factor test in *Salinas* and "admon[ished] that courts should no longer employ *Bonnette* or tests derived from *Bonnette* in the FLSA joint employment context." *See* 848 F.3d at 140. Thus, it is unclear whether the Fourth Circuit will defer to this new regulation. Second, at least eighteen states have sued the DOL to "vacate the Final Rule and enjoin its implementation" on the grounds that its "promulgation violate[d] the Administrative Procedure Act," and that litigation remains in its early stages. *See New York v. Scalia*,--F. Supp. 3d--, No. 1:20-cv-01689-GHW, 2020 WL 2857207, at *1, 5 (S.D.N.Y. June 1, 2020). Finally, this Court has determined that on the facts of this case, it would likely reach the same decision under both tests and thus finds it unnecessary to wade into whether the DOL's Final Rule is entitled to *Brand X* deference or whether the Final Rule is lawful under the APA. Accordingly, the Court will rely on established Fourth Circuit precedent here.

### ii. *Defendants and Almy were not joint employers*

As set forth in *Salinas*, there are six factors which the Court must consider in determining whether Defendants and Almy were operating under a joint employment arrangement. They are:

> (1) Whether, formally or as a matter of practice, the putative joint employers jointly determine, share, or allocate the power to direct, control, or supervise the worker, whether by direct or indirect means; (2) Whether, formally or as a matter of practice, the putative joint employers jointly determine, share, or allocate the power to—directly or indirectly—hire or fire the worker or modify the terms or conditions of the worker's employment; (3) The degree of

permanency and duration of the relationship between the putative joint employers; (4) Whether, through shared management or a direct or indirect ownership interest, one putative joint employer controls, is controlled by, or is under common control with the other putative joint employer; (5) Whether the work is performed on a premises owned or controlled by one or more of the putative joint employers, independently or in connection with one another; and (6) Whether, formally or as a matter of practice, the putative joint employers jointly determine, share, or allocate responsibility over functions ordinarily carried out by an employer, such as handling payroll; providing workers' compensation insurance; paying payroll taxes; or providing the facilities, equipment, tools, or materials necessary to complete the work.

*Salinas*, 848 F.3d at 141–42. A court need not find that most of these factors favor a finding of joint employment in order to conclude that a joint employment relationship exists. *Id.* at 146. Indeed, one factor alone can support a joint employer relationship so long as it is "supported by significant facts pointing to two or more entities' codetermination of the key terms and conditions of a worker's employment." *Id.* at 142 n.10. However, "the joint employment inquiry is a highly factual analysis" that must ultimately "be based upon the circumstances of the whole activity." *Id.* at 142 & n.10.

While the Fourth Circuit does not appear to have spoken as to how, if at all, the existence of a franchisor–franchisee relationship might affect the *Salinas* analysis, district courts in the Fourth Circuit and beyond have recognized that joint employer relationships can exist between a franchisor and a franchisee such that employees of the franchisee can recover against the franchisor for FLSA violations. *See, e.g.*, *Lora v. Ledo Pizza Sys., Inc.*, No. DKC 16-4002, 2017 WL 3189406, at *6 (D. Md. July 27, 2017); *Shupe v. DBJ Enters., LLC,* No. 1:14CV308, 2015 WL 790451, at *4 (M.D.N.C. Feb. 25, 2015); *Olvera v. Bareburger Grp. LLC,* 73 F. Supp. 3d 201, 206 (S.D.N.Y. 2014). Furthermore, at least one court has stated that a

11

franchisee herself could potentially qualify as an employee of her franchisor. *Fernandez v. JaniKing Int'l, Inc.*, No. H-17-1401, 2018 WL 539364, at *3 (S.D. Tex. Jan. 8, 2018).

However, as the Southern District of New York recently noted when surveying national case law, "the weight of authority indicates that plaintiffs face a hard road when seeking to impose joint employer liability on franchisors." *Acharya v. 7-Eleven, Inc.*, 1:18-cv-08010-PAC, 2019 WL 6830203, at *2 (S.D.N.Y. Dec. 13, 2019). In fact, Plaintiffs have not identified, and the Court has been unable to locate, "a single case in which a franchisor was held liable as a joint employer under [the] FLSA." *See In re Domino's Pizza Inc.*, 16-CV-2492 (AJN) (KNF), 2018 WL 4757944, at *4 (S.D.N.Y. Sept. 30, 2018). The Court finds this total absence of cases holding franchisors liable for the wage and hour violations of their franchisees to be persuasive, particularly as the FLSA is a decades-old and oft-litigated statute. *Cf. Bailey v. TitleMax of Ga., Inc.*, 776 F.3d 797, 803 (11th Cir. 2015) (rejecting defendant's FLSA argument, in part, because "[i]n the context of such a well-worn federal statute, the dearth of precedent supporting [its] novel argument [was] persuasive, if not conclusive, evidence that [the argument was] misguided"). In light of this discussion, the Court will now apply the six *Salinas* factors to determine whether Plaintiffs were jointly employed by Almy and Defendants.

The first *Salinas* factor examines the putative joint employer's power to "direct, control, or supervise" the worker. *See Salinas*, 848 F.3d at 141. When such supervision is "extensive" it is "indicative of an employment relationship." *See id.* at 148 (quoting *Zheng v. Liberty Apparel Co. Inc.*, 355 F.3d 61, 74–75 (2d Cir. 2003)). Conversely, "an entity does not become a joint employer by engaging in the oversight necessary to ensure that a contractor's services meet contractual standards of quality and timeliness." *Id.* Similarly, "[c]ourts evaluating franchise

Case 1:18-cv-01045-LCB-LPA   Document 97   Filed 08/10/20   Page 12 of 38

relationship[s] for joint employment have routinely concluded that a franchisor's expansive control over a franchisee does not create a joint employment relationship." *Jacobson v. Comcast Corp.*, 740 F. Supp. 2d 683, 690 n.6 (D. Md. 2010); *see also Salazar v. McDonald's Corp.*, 944 F.3d 1024, 1030 (9th Cir. 2019) ("McDonald's involvement in its franchises is central to modern franchising and to the company's ability to maintain brand standards, but does not represent control over wages, hours, or working conditions [under California law].") For example, in *In re Jimmy John's Overtime Litigation*, the court determined that a franchisor, Jimmy John's, did not jointly employ its franchisee's employees in spite of the fact that Jimmy John's exercised "pervasive" control over "systems, operations, and dress code" at its franchise locations such that "each franchise store [provided] an identical atmosphere, product, and customer service" experience. No. 14 C 5509, 2018 WL 3231273, at *1, 20–21 (N.D. Ill. June 14, 2018). As the court explained, such requirements for uniformity "in the context of quality control and brand uniformity do not manifest an employer-employee relationship." *Id.* at *20–21.

Here, Defendants argue that they exerted no control over Plaintiffs "beyond the commonly found 'control' elements in all franchise systems." (ECF No. 50 at 9.) Plaintiffs, however, contend that Defendants, acting primarily though Defendant Donald Pilcher, exercised excessive, "minute-to-minute control over Plaintiffs." (*See* ECF No. 73 at 6.) The evidence shows that while Pilcher exercised frequent control over Reynolda Road employees on his trips to the store, he did so only in the context of maintaining brand standards. For example, the record indicates that Pilcher endeavored to keep the employees of the Reynolda Road store in uniform, either by directly instructing them to change or by asking Salamah to speak with them about their appearance. (*See* ECF Nos. 57-3 at 99; 57-9 at 3.) Pilcher would

also give store employees tasks to complete related to upholding Defendants' standards for how their branches should operate, including, for instance, directing employees to clean the store's sink. (ECF No. 57-2 at 176–77.) Such efforts to maintain a consistent and pleasant customer experience across different branches of a given franchise do not amount to the kind of extensive control of a worker's daily experience that creates a joint-employer relationship. The first *Salinas* factor therefore weighs against a finding of joint employment.

The second *Salinas* factor asks whether the "putative joint employers jointly determine, share, or allocate the power to—directly or indirectly—hire or fire the worker or modify the terms or conditions of the worker's employment." *Salinas*, 848 F.3d at 141. As explained below, the record does not support Plaintiffs' allegation that "Defendants had the power to hire and fire Plaintiffs and other employees at the Reynolda Store." (*See* ECF No. 73 at 7.) Nor did Defendants modify the terms or conditions of employment of workers at the Reynolda Road store.

Regarding hiring, Plaintiffs contend that Defendant Pilcher exercised "final approval" over new hires at their store. (ECF No. 94-3 at 81.) By "final approval," however, Plaintiffs mean only that Pilcher would give new employees a name tag, tie, badge, and drug test. (*See* ECF Nos. 57-7 at 8; 94-3 at 99.) The record also establishes that Defendants required new hires to undergo a background check. (ECF No. 57-6 at 29.) These facts, taken together, do not demonstrate that Defendants actually hired employees at the Reynolda Road store. Rather, the record reveals that Salamah herself recruited and processed new employees, who were then, as a matter of course, given uniforms and identification by Pilcher, contingent on

14

their passage of a drug test.[9] (*See* ECF No. 94-3 at 80, 83, 101.) Furthermore, the mere fact that Defendants required any prospective employee to pass a background or drug test does not mean that new employees were "hired" by Defendants, as franchisors may set minimum qualifications for who can be hired by their franchisees without themselves deciding who to hire. *See, e.g., Domino's Pizza*, 2018 WL 4757944, at *5 (holding that a Domino's franchise did not take on the power to hire for its franchisee by "limiting eligible candidates [for employment at franchise stores] to those who pass[ed] background checks and [did] not work at another Domino's franchise"); *Jacobson*, 740 F. Supp. 2d at 689–90 (finding no joint employment relationship between a cable company and the instillation companies it contracted with where the installation companies were "free to hire anyone they chose to hire, provided that the applicants d[id] not have a criminal record [and passed] a drug test"). The Court therefore concludes that Defendants' limited role in the hiring of workers at the Reynolda Road store weighs against a finding of joint employment.

Similarly, with the possible exception of one isolated incident, Defendants did not control the firing of workers at the Reynolda Road store. Here, Plaintiffs allege that

---

[9] In a declaration submitted following her deposition, Salamah did allege, without further factual elaboration, that "[t]here were several occasions on which the Defendants halted the hiring process for new hires in their sole discretion without the new hire failing a drug test." (*See* ECF Nos. 57-1 at 11–12; 94-3 at 2.) This vague allegation, though made in a signed affidavit, is contradicted by Salamah's own deposition testimony and by her husband's sworn declaration, both of which limited Defendants' role in the hiring process to the "final approval" discussed above. (*See* ECF Nos. 57-7 at 8–9; 94-3 at 99.) Moreover, Salamah's declaration does not raise a genuine issue of material fact as to Defendants' role in the hiring process because it is unsupported by specific facts. *See Dash v. Mayweather*, 731 F.3d 303, 311 (4th Cir. 2013) ("[A] party opposing a properly supported motion for summary judgment must set forth specific facts showing that there is a genuine issue for trial."); *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 962 (4th Cir. 1996) ("[S]ummary judgment affidavits cannot be conclusory.").

Defendants played some role in firing four individuals at the store: Elsayed, Salamah, A.H.,[10] and B.P. (*See* ECF Nos. 57 at 7; 73 at 7–8.) As this small number suggests, the record provides no evidence that Defendants regularly discharged workers at the Reynolda Road store.[11] Even Plaintiffs' limited contention that Defendants fired these four individuals is undercut by the record evidence. For a start, Plaintiffs argue that Defendants fired them by terminating their franchise agreement with Almy. (*See* ECF No. 73 at 7.) However, in Elsayed's case, this would not constitute a termination because a franchisor's "ability to exercise a contractual right in terminating a franchise . . . does not amount to . . . having the power to terminate a franchisee's employees." *See Brunner v. Liautaud*, No. 14-c-5509, 2015 WL 1598106, at *4 (N.D. Ill. Apr. 8, 2015); *see also Singh v. 7-Eleven, Inc.*, No. C-05-04534 RMW, 2007 WL 715488, at *4 (N.D. Cal. Mar. 8, 2007) (finding that a franchisor's power to terminate its franchise agreement with its franchisee if the franchisee did not satisfy the franchisor's service standards did not evince a joint employment relationship). Furthermore, by arguing that Salamah was fired when Defendants terminated Almy's franchise agreement, Plaintiffs presuppose that Salamah was acting as an employee of Almy or Defendants which, as explained below, she was not. Next, the undisputed evidence in the record shows that Defendants did not terminate A.H. (*See* ECF No. 57-10 at 4.) The record demonstrates that Defendants believed A.H. was purchasing cigarettes from the store for underaged girls. (*See* ECF No. 57-2 at 97–99.) It was for this

---

[10] The Court again elects to abbreviate the name of this non-party accused of a criminal offense.

[11] In contrast, the record demonstrates that Salamah possessed and exercised the power to fire her employees. (*See* ECF No. 48-9 at 9, 12, 18.) For example, on January 24, 2018, Salamah texted Pilcher to inform him that she had fired an employee who had been ticketed the previous night by the Alcoholic Beverage Control Commission. (*Id.* at 18.)

16

reason that Pilcher told Plaintiffs to fire A.H. or he would call the police.  (*See* ECF Nos. 57-1 at 8; 57-2 at 99.)  However, rather than fire A.H., Salamah "asked [him] to take time off until she was able to work out the issue with Donald Pilcher."[12]  (ECF No. 57-10 at 4.)  This example is instructive as it shows that even if, as alleged, Defendant Pilcher demanded that Plaintiffs fire an employee, Plaintiffs were not compelled to comply.  Finally, Plaintiffs argue that Defendants were joint employers because they required Salamah to fire B.P., the employee who stole lottery tickets from the Reynolda Road store.  (*See* ECF Nos. 57 at 7; 57-1 at 7.)  However, as discussed above regarding drug tests and background checks, franchisors have the right to require that employees of their franchisees behave lawfully.  The Court therefore cannot conclude as a matter of law that requiring a franchisee to terminate an employee who steals from the company weighs in favor of finding that the franchisor was a joint employer.

The second *Salinas* factor also covers the putative joint employers' power to "modify the terms or conditions" of a worker's employment.  *Salinas*, 848 F.3d at 141.  Here, there is no evidence that Defendants modified the terms and conditions of employment at the Reynolda Road store by, for example, promoting, demoting, or otherwise rewarding or disciplining employees, changing their job responsibilities, or determining how much they were paid or when they worked.  This absence of evidence to support Defendants' ability to modify the key terms and conditions of employment in conjunction with the record evidence showing that Salamah, not Defendants, controlled hiring and firing, leads the Court to conclude that the second *Salinas* factor weighs strongly against a finding of joint employment.

---

[12] A.H. was still working at the store as of November 15, 2018, a mere two weeks before Defendants terminated their franchise agreement with Salamah.  (*See* ECF No. 57-3 at 324.)

Case 1:18-cv-01045-LCB-LPA   Document 97   Filed 08/10/20   Page 17 of 38

The third and fifth *Salinas* factors are more straightforward to apply. The third factor looks to the "degree of permanency and duration of the relationship between the putative joint employers." *Salinas*, 848 F.3d at 141. As the Court noted in its prior Opinion, Defendants and Almy had a "stable, long-term relationship governed by two five-year franchise agreements." (*See* ECF No. 62 at 12.) This supports a joint employment relationship. However, the Court agrees with Defendants that this factor should be given little to no weight in the franchisor–franchisee context. (ECF No. 68 at 9.) *Salinas* was a sub-contracting case, and in that field, sub-contractors may well work for many contractors at once or over the course of time, such that a sustained relationship between a contractor and a sub-contractor is suggestive of joint employment. However, franchise agreements are "typically . . . for a period of years," meaning that examining the duration of the relationship between Defendants and Almy is unilluminating in distinguishing a joint employment relationship from a typical franchisor–franchisee relationship. (*See id.*)

Likewise, the fifth factor, whether the work is performed on a premises owned or controlled by one or more of the putative joint employers, weighs in favor of finding a joint employment relationship because Defendant M.M. Fowler owned the Reynolda Road store. (*See* ECF No. 8-6 at 2.) However, the Court again agrees with Defendants that this factor should be given little weight in this setting. (*See* ECF No. 68 at 9.) In *Salinas*, the Fourth Circuit sought to determine whether the plaintiffs—employees of a subcontractor, J.I.—were also employed by a general contractor, Commercial Interiors. *See* 848 F.3d at 129–30. The fifth factor was highly instructive there because Commercial "controlled" the plaintiffs' work site, required plaintiffs to "sign in and out . . . with Commercial foremen," and supervised

them while they were on the job. *Id.* at 147. Here, by contrast, all workers at the Reynolda Road store worked in a location leased and primarily controlled by Almy, not Defendants. This factor thus tells the Court less about whether Defendants codetermined the essential terms and conditions of Plaintiffs' employment than it would if Defendants maintained exclusive or even primary control over the Reynolda Road location.

The fourth factor in the *Salinas* inquiry asks whether "through shared management or a direct or indirect ownership interest, one putative joint employer controls, is controlled by, or is under common control with the other putative joint employer." *See id.* at 141. This factor favors Defendants' position because Family Fare and M.M. Fowler do not own Almy or formally manage it. However, as it is Plaintiffs' allegation that this franchisor–franchisee structure was a sham and that Plaintiffs were truly employees controlled by Defendants, the Court assigns little weight to this factor and accordingly greater weight to the first two factors, which examine the degree to which Defendants controlled Plaintiffs.

The sixth and final factor in this inquiry asks whether "the putative joint employers jointly determine, share, or allocate responsibility over functions ordinarily carried out by an employer, such as handling payroll; providing workers' compensation insurance; paying payroll taxes; or providing the facilities, equipment, tools, or materials necessary to complete the work." *Id.* at 141–42. This factor weighs decidedly in Defendants' favor because Salamah handled payroll services, taxes, and business and workers insurance for the Reynolda Road store. (*See* ECF Nos. 1 ¶¶ 53–54; 8-3 at 21; 57 at 5.) Rather than dispute Salamah's role in carrying out these functions, Plaintiffs argue that they had to use firms of Defendants' designation to complete these tasks and that Defendants had access to employee payroll

19

records. (*See* ECF Nos. 57 at 6; 73 at 8.) However, Defendants correctly reply that a franchisor's ability to access a franchisee's employment records does not indicate the existence of a joint employment relationship. (*See* ECF No. 74 at 5); *Alford v. CNG Rests., LLC*, No. 3:18-cv-01225, 2020 U.S. Dist. LEXIS 107413, at *25 n.23 (M.D. Tenn. Apr. 21, 2020) ("[M]ere access to employment records is a fact other courts have appropriately found insufficient to support an inference that an entity is an employer."); *see also Jimmy John's*, 2018 WL 3231273, at *18 (same). Likewise, a franchisor may, consistent with its maintenance of uniform brand standards, require its franchisees to use its payroll systems without suggesting a joint-employment relationship. *See Gessele v. Jack in the Box, Inc.*, No. 3:14-CV-1092-BR, 2016 WL 7223324, at *13 (D. Or. Dec. 13, 2016) ("Providing a payroll service to a franchisee's employees does not in any manner create an indicia of control over labor relations sufficient to demonstrate that the franchisor is a joint employer."). Thus, Salamah, not Defendants, appears to have carried out most of the functions normally performed by an employer at the Reynolda Road store. The Court notes, however, that this factor does not weigh as heavily in Defendants' favor as it otherwise might because Defendants played at least a minor role in providing the equipment and materials needed for work at the franchise, a role normally played by an employer. *See Salinas*, 848 F.3d at 141–42. In one such instance, Pilcher once removed the printer from the Reynolda Road store and replaced it with a new one without "Salamah's consent or knowledge." (*See* ECF No. 57-8 at 4.)

To summarize, the Court has evaluated the six *Salinas* factors to consider whether Plaintiffs were jointly employed by Almy and Defendants. These factors are designed to reveal whether the putative joint employers collectively codetermine "the essential terms and

20

conditions of [Plaintiffs'] employment." *See Salinas*, 848 F.3d at 141. While there may be some evidence that is favorable to Plaintiff's position, this evidence is greatly outweighed by the evidence that Defendants played no role in determining the essential terms and conditions of employment at Reynolda Road. The Court therefore concludes Defendants were not Plaintiffs' joint employers and are therefore entitled to summary judgment on Plaintiffs' FLSA claim.

### iii. *Employment classification test: Salamah was not an employee*

Having concluded that Defendants were not Plaintiffs' joint employers, the Court need not consider Defendants' remaining arguments for summary judgment on Plaintiffs' FLSA claim. However, in its discretion, the Court will address an additional flaw in Plaintiffs' claim: only an employee is protected by the FLSA, and, based on the discussion below, Salamah was an independent contractor, not an employee.

To determine if a worker is an employee or an independent contractor, the Fourth Circuit examines the "*Silk* factors." *Schultz*, 466 F.3d at 304–05 (citing *United States v. Silk*, 331 U.S. 704 (1947)). They are:

> (1) the degree of control that the putative employer has over the manner in which the work is performed; (2) the worker's opportunities for profit or loss dependent on his managerial skill; (3) the worker's investment in equipment or material, or his employment of other workers; (4) the degree of skill required for the work; (5) the permanence of the working relationship; and (6) the degree to which the services rendered are an integral part of the putative employer's business.

*Id.*

Here, the weight of the evidence establishes that Salamah was an independent contractor, not an employee. Most of the *Silk* factors favor Defendants. Regarding factor

one, Salamah controlled important aspects of her own work by, for example, recruiting and processing new employees, (*see* ECF No. 94-3 at 80, 83), training them, (*see* ECF Nos. 48-9 at 13, 17; 57-3 at 136), and setting their work schedules (*see* ECF No. 94-3 at 60–61). Regarding factor two, she had the opportunity for profit and loss based on her managerial skill as it was within her power to take steps to increase the store's profitability. (*See, e.g.*, ECF Nos. 8-3 at 2; 48-16 at 2.) Similarly, factor four favors Defendants because Salamah's job—which called for her to manage five to seven employees at a time—required a good deal of skill. (*See* ECF No. 57-5 at 57.) Finally, the third *Silk* factor weighs heavily against Salamah and in favor of Defendants because, as discussed above, she hired for her store. She also indisputably considered herself the employer of her workers and frequently referred to them as her employees.[13] (*See, e.g.*, 48-16 at 2; 57-3 at 24; 57-4 at 7; 57-5 at 57.) Moreover, the factors that support classifying Salamah as an employee (factors five and six) are poor fits for distinguishing an employee from an independent contractor when the putative employee at issue is a franchisee because Salamah played an integral and long-standing role in Defendants' business model precisely because she exercised substantial control over the operation of her franchise. In conclusion, an examination of the *Silk* factors reveals that Salamah's FLSA claim must fail because she was not an employee.

### B. Elsayed's Title VII Claim

---

[13] This dynamic is best captured by statements Plaintiffs made to a police officer who responded to the Reynolda Road store on the day Salamah's franchise agreement was terminated. (*See* ECF Nos. 48-11.) On that day, Salamah stated to the officer: "I'm a franchise owner . . . *I'm not an employee.*" (*See id.* at Civil_Matter-3.mp4 at 00:50 through 01:25; (emphasis added); *see also id.* at 6:30 through 6:45 ("I'm not an employee").) Later that evening, Elsayed explained to the officer that Plaintiffs had their own company that leased the Reynolda Road premises from Defendants and that employees at the Reynolda Road store "work for our company . . . not for [Defendants]." (*See id.* at Civil_Matter-4.mp4 at 25:45 through 26:25.)

The corporate Defendants, M.M. Fowler and Family Fare, have also moved for summary judgment on Elsayed's Title VII claim.[14] (*See* ECF No. 88 at 1, 5–14.) Elsayed alleges that Defendants violated Title VII by firing him because of their "racial animus and hatred of persons from Middle Eastern countries." (ECF No. 64 ¶ 34.) Defendants reply that they are not liable under Title VII because they were not Elsayed's joint-employers and because they had a legitimate, non-pretextual reason for terminating their franchise agreement with Almy, namely the lottery shortages. (*See* ECF Nos. 88 at 5–14; 96 at 6.) The Court need not address each of Defendants' arguments for summary judgment because it concludes that Defendants were not Elsayed's joint employer under Title VII.

### i. Joint employment under Title VII

Title VII forbids employers from "discharg[ing] any individual, or otherwise [discriminating] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race . . . or national origin." 42 U.S.C § 2000e-2(a). "An entity can be held liable in a Title VII action only if it is an 'employer' of the complainant." *Butler v. Drive Auto. Indus. of Am.*, 793 F.3d 404, 408 (4th Cir. 2015). The Court must therefore determine if Defendants were Elsayed's employer under Title VII. This analysis is different than the analysis performed above in that Title VII's definition of "employee" is narrower than the definition of employee under the FLSA. *See Salinas*, 848 F.3d at 143; *Butler*, 793 F.3d at 412 n.10.

In *Butler v. Drive Automotive Industries of America, Inc.*, the Fourth Circuit held that "multiple entities may simultaneously be considered employers for the purposes of Title VII."

---

[14] Only Elsayed has brought the Title VII claim against these parties. (ECF No. 64 ¶ 7.)

793 F.3d at 410. As the court explained, "[t]he basis for the finding that two companies are 'joint employers' is that one employer while contracting in good faith with an otherwise independent company, has retained for itself sufficient control of the terms and conditions of employment of the employees who are employed by the other employer." *Id.* at 408. The court then adopted a nine factor test to determine whether a Title VII plaintiff "is jointly employed by two or more entities." *Id.* at 414. These factors are:

> (1) authority to hire and fire the individual; (2) day-to-day supervision of the individual, including employee discipline; (3) whether the putative employer furnishes the equipment used and the place of work; (4) possession of and responsibility over the individual's employment records, including payroll, insurance, and taxes; (5) the length of time during which the individual has worked for the putative employer; (6) whether the putative employer provides the individual with formal or informal training; (7) whether the individual's duties are akin to a regular employee's duties; (8) whether the individual is assigned solely to the putative employer; and (9) whether the individual and putative employer intended to enter into an employment relationship.

*Id.* The court also clarified that, generally, the first three of these factors will be "most important"; that "courts can modify the factors to the specific industry context"; and that the ninth factor will generally be "of minimal consequence." *Id.* at 414–15, 414 n.12.

### ii. *Application of the* Butler *factors*

Turning to the *Butler* factors, the Court concludes that Defendants were not Elsayed's joint employer and that Defendants are therefore entitled to judgment as a matter of law. Regarding the first factor, as discussed at length above, Defendants had no power to hire employees at the Reynolda Road store and did not have the power to fire employees outside of the limited context where employees harmed Defendants' brand by breaking the law. As for the second factor, there is no evidence that Defendants disciplined Elsayed or any other

24

worker and further, the control exercised by Defendants was only over brand standards and did not amount to day-to-day supervision of individual employees.[15] The third factor asks "whether the putative employer furnishes the equipment used and the place of work." *Butler*, 793 F.3d at 414. As the Fourth Circuit explained in Butler, this factor is "valuable for determining how similar the work functions [of the plaintiff] are compared to those of an ordinary employee [of the putative employer]." *Id.* at 414–15 (applying this factor in the temporary-staffing context and finding that the defendant, a manufacturer, was more likely to be the plaintiff's employer because the plaintiff worked "side by side" with the defendant's ordinary employees on the factory floor). It is therefore less helpful in the franchisor–franchisee setting than in the temporary-staffing setting from which it originated. *See id.* at 406. Nonetheless, the Court finds that this factor weighs slightly in Plaintiff's favor because Defendants provided some equipment to the Reynolda Road store and leased it to Almy. Thus, looking at the three most important factors, two weigh decidedly in favor of Defendants and one, though less helpful to the analysis here, favors Elsayed.

In reviewing the additional relevant factors—factors four, six, and nine—the Court concludes that while factor six favors Elsayed, factors four and nine favor Defendants.[16]

---

[15] Under Title VII, the "principal guidepost" of the joint employer analysis is the putative joint employer's control of the franchisee's employee, not the putative employer's control of the franchisee itself. *See Wright v. Mountain View Lawn Care, LLC*, No. 7:15-cv-00224, 2016 WL 1060341, at *6 (W.D. Va. Mar. 11, 2016) (quoting *Butler*, 793 F.3d at 410–11, 414).

[16] As the Court noted in its prior Opinion, factors five, seven, and eight "are not well-suited for a joint employment analysis in the [franchisor–franchisee] context." (*See* ECF No. 62 at 32 n.8.) The fifth factor, "is of little assistance in the instant analysis, as the fundamental question to be answered is whether [Elsayed] was, in fact, ever employed by [Defendants]." *Wright*, 2016 WL 1060341, at *5; *see also Wallace v. Bd. of Educ. of Calvert Cty.*, No. PX 16-3242, 2017 WL 2361161, at *4 (D. Md. May 31, 2017) (finding that the fifth factor "provid[ed] little assistance in demonstrating whether the [putative employer] exerted any supervisory control over [the plaintiff]" when the plaintiff had "been employed

25

Factor six asks whether Defendants provided Elsayed with formal or informal training. *Butler*, 793 F.3d at 414. This factor favors Elsayed because Defendants played at least some role in training workers at Reynolda Road, even though Salamah herself took the lead in training her employees. (*Compare* ECF No. 94-1 at 21 (Defendants setting up a training for Salamah's employees), *with* ECF Nos. 48-9 at 13–14; 57-3 at 136 (Salamah training employees).) On the other hand, the fourth factor—possession of and responsibility over Elsayed's employment records, including payroll, insurance, and taxes—favors Defendants because Salamah, not Defendants, was responsible for payroll, insurance, and taxes. Finally, regarding factor nine— the intent of the parties—there is ample evidence that Elsayed and Defendants did not intend to enter into an employment relationship. Defendants made it plain they did not wish to enter into an employment relationship with Elsayed when they included language in their franchise agreement that stated that "neither [Almy] nor any other person performing any act in connection with the operation of [its] business . . . shall be deemed to be an employee or agent of Family Fare." (ECF No. 8-3 at 24.) Likewise, the record evidence shows that as late as November of 2018, Elsayed did not view himself as employed by Defendants. (*See* ECF No. 11 at Civil_Matter-4.mp4 at 25:45 through 26:25 (demonstrating that Elsayed believed that employees at the store worked for his company, Almy, and not for Defendants.)) Though the Court assigns little weight to this final factor per the Fourth Circuit's instruction, it does not

---

in connection" with the putative employer for several years, but always through a third party). The seventh and eighth factors appear designed to address employment by temporary staffing agencies, as was the case in *Butler*. *See* 793 F.3d at 406. To the extent they are relevant here, they weigh against Elsayed. The seventh factor would weigh against him as his job working at Reynolda Road appears to have differed from the jobs performed by ordinary employees of Defendants, like Donald Pilcher, who helped run the broader Family Fare operation. Likewise, the eighth factor would weigh against Elsayed because he was not assigned to work for Defendants at all.

Case 1:18-cv-01045-LCB-LPA   Document 97   Filed 08/10/20   Page 26 of 38

discount it altogether. *See Wallace*, 2017 WL 2361161, at *4 (looking at a contract between a plaintiff's formal and putative employers to determine the intent of the parties and finding that an express desire by the putative employer to not be an employer "counsel[ed] against treating [it] as [the plaintiff's] employer").

In conclusion, just as Defendants were not joint employers under the FLSA, nor are they joint employers under the narrower definition of the term in the Title VII context. Elsayed's Title VII claim against the corporate Defendants therefore fails as a matter of law and the Defendants are entitled to summary judgment as to it.

### C. Plaintiffs' Section 1981 Claim

Defendants have also moved for summary judgment on Plaintiffs' 42 U.S.C § 1981 claim. (*See, e.g.*, ECF No. 50 at 16–18.) Plaintiffs argue that Defendants terminated their franchise agreement because Defendants are prejudiced against Arab Americans. (*See* ECF No. 57 at 15.) Defendants respond that they terminated the agreement because of the lottery shortfall, not because of Plaintiffs' race. (*See* ECF No. 50 at 17–18.)

   *i.   Section 1981*

"Section 1981 prohibits racial discrimination in public and private contracts." *Tshibaka v. Sernulka*, 673 F. App'x 272, 278 (4th Cir. 2016).[17] "To prove a § 1981 claim . . . a plaintiff must ultimately establish both that the defendant intended to discriminate on the basis of race, and that the discrimination interfered with a contractual interest." *Denny v. Elizabeth Arden*

---

[17] The law provides that all "persons within the jurisdiction of the United States shall have the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens." 42 U.S.C. § 1981(a). It further defines the term "make and enforce contracts" to include "the making, performance, modification, and termination of contracts." *Id.* § 1981(b).

27

*Salons, Inc.*, 456 F.3d 427, 434 (4th Cir. 2006). Plaintiffs can make these showings in two ways: either by presenting "direct evidence of intentional discrimination," or else by "proffer[ing] sufficient circumstantial evidence to satisfy the familiar *McDonnell Douglas* analytical framework." *Williams v. Staples*, 372 F.3d 662, 667 (4th Cir. 2004).

"Direct evidence encompasses conduct or statements that both (1) reflect directly the alleged discriminatory attitude and (2) bear directly on the contested employment decision." *Laing v. Fed. Express Corp.*, 703 F.3d 713, 717 (4th Cir. 2013). For instance, in *Denney v. Elizabeth Arden Salons*, the Fourth Circuit found "strong" direct evidence of racial discrimination in a § 1981 case where a hair salon refused to perform on a contract for hair styling on the explicit grounds that it "did not 'do black people's hair.'" *See* 456 F.3d at 434–35 (4th Cir. 2006). Direct evidence does not, however, encompass "remarks by non-decision makers or remarks unrelated to the decisionmaking process itself." *Williams v. PPG Indus., Inc.*, No. 1:01 CV 00459, 2002 WL 32667169, at *4 (M.D.N.C. July 16, 2002) (quoting *Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998)). As such, "a showing of direct evidence essentially requires an admission by the decision-maker that his actions were based on the prohibited animus." *KFC Corp. v. Gazaha*, No. 1:15-cv-1077 (AJT/JFA), 2016 WL 1245010, at *5 (E.D. Va. Mar. 24, 2016).

To prevail under the *McDonnell Douglas* framework, a plaintiff must first establish a prima facie case of discrimination. *Williams v. Staples*, 372 F.3d at 667. "To establish a prima facie case of discriminatory termination under § 1981, [a] [p]laintiff must show that:

(1) he is a member of a protected class; (2) his contract was terminated; (3) at the time of the termination, he was performing at a level that met [his contracting partner's] legitimate expectations; and (4) [that his contracting

28

partner] subsequently contracted with a similarly qualified applicant outside [his] protected class."[18]

*Dalton v. Avis Rent A Car Sys., Inc.*, 336 F. Supp. 2d 534, 537 (M.D.N.C. 2004).  If the plaintiff makes out this prima facie showing, a "rebuttable presumption" arises that the defendant has discriminated against him.  *Williams v. Staples*, 372 F.3d at 668.  The defendant must then "respond with evidence that it acted with a legitimate nondiscriminatory reason."  *Dalton*, 336 F. Supp. 2d at 537.  This "burden is one of production, not of persuasion."  *Williams v. Staples*, 372 F.3d at 668.  If the defendant can state a legitimate, non-discriminatory reason for their action, then "the presumption of discrimination raised by the prima facie case is rebutted and drops from the case," leaving the plaintiff with the ultimate burden of demonstrating by a preponderance of the evidence that the reason articulated by the defendant is untrue and that the true reason was racial discrimination.  *See id.*

### ii.  *Plaintiffs lack direct evidence of discrimination*

Here, Plaintiffs cannot present direct evidence of discrimination for two reasons.  First, assuming Pilcher made anti-Arab statements, such statements were not linked to the termination of the franchise agreement, meaning they did not "bear directly on the contested employment decision."  *See Laing*, 703 F.3d at 717.  Second, the evidence demonstrates that Pilcher was not a decisionmaker, and thus any remarks by him do not constitute direct evidence.  *Williams v. PPG*, 2002 WL 32667169, at *4; *see also, e.g., Shell v. Tyson Foods, Inc.*, NO.

---

[18] "In determining the prima facie case for § 1981 actions, it is of no consequence that the plaintiff is an agent or independent contractor [or franchisee] instead of an employee."  *See Dalton v. Avis*, 336 F. Supp. 2d at 537 n.7; *Gazaha*, 2016 WL 1245010, at *5 (applying a similar test to § 1981 "claims concerning franchise terminations"); *Dunkin' Donuts Franchised Rests. LLC v. Sandip, Inc.*, 712 F. Supp. 2d 1325, 1328 (N.D. Ga. 2010) (same).

5:15-CV-00037-RLV-DCK, 2016 WL 4490716, at *4–7 (W.D.N.C. Aug. 25, 2016) (holding that a plaintiff's direct supervisor's frequent discriminatory comments were not direct evidence of discrimination under the ADEA because the supervisor was not the "actual decision-maker" who decided to fire the plaintiff). As the Fourth Circuit held in *Hill v. Lockheed Martin Logistics Management*, "to survive summary judgment," a plaintiff who bases their discrimination claim on the "discriminatory motivations of a subordinate employee must come forward with sufficient evidence that the subordinate employee" was "principally responsible" for the challenged decision or was the "actual decisionmaker for the employer."[19] *See* 354 F.3d 277, 291 (4th Cir. 2004) (en banc), *abrogated in part on other grounds*, *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167 (2009). Here, Defendants have produced unrebutted evidence that Lee Barnes alone possessed the authority to terminate the franchise agreement and that Barnes, not Pilcher, ultimately ended Defendants' relationship with Almy.[20] (ECF No. 48-3 at 5–6.) Thus, even taking Plaintiffs' allegations regarding Pilcher's anti-Arab statements as true, they do not constitute direct evidence of discrimination because Pilcher was not the "actual decision-maker" who terminated the franchise agreement.[21] Having failed to produce direct evidence

---

[19] While *Hill* addressed Title VII and the ADEA, *id.*, courts routinely apply legal principals developed in the Title VII context to § 1981 cases, *see, e.g.*, *Guessous v. Fairview Prop. Invs., LLC*, 828 F.3d 208, 216 (4th Cir. 2016).

[20] Plaintiffs have not produced any evidence that Barnes harbored racial prejudices.

[21] To be clear, the law provides no protection to defendants whose formal, non-biased decision-maker "acts merely as a cat's paw for or rubber-stamps a decision . . . actually made by a [biased] subordinate." *See Hill*, 354 F.3d at 290 (4th Cir. 2004) (explaining the "cat's paw" theory of liability for employers). Here, Plaintiffs are not proceeding under a cat's paw theory and have produced no evidence that Barnes merely rubber-stamped a decision already made by Pilcher.

30

of discrimination, Plaintiffs must now advance their § 1981 claim through the *McDonnell Douglas* burden-shifting framework.

### *iii. Plaintiffs cannot satisfy* McDonnell Douglas

Even assuming *arguendo* that Plaintiffs can make out their prima facie case for termination of a contract, Plaintiffs' § 1981 claim fails under the *McDonnell Douglas* framework.[22] Here, Defendants have articulated a legitimate, non-discriminatory reason for terminating their franchise agreement with Almy: Lee Barnes learned of the "significant lottery shortages [at the Reynolda Road store]" in October 2018. (*See* ECF Nos. 50 at 17–18; 96 at 11.) This shifts the burden to Plaintiffs to raise a genuine issue of material fact as to pretext— that is, to produce evidence that could convince a jury that Defendants' legitimate non-discriminatory reason was a sham and that Defendants really terminated their franchise agreement with Almy because Plaintiffs are Arabs. As set forth below, Plaintiffs cannot make this showing.

In arguing that they were victims of racial discrimination, Plaintiffs focus on Pilcher's allegedly discriminatory actions. (*See* ECF No. 94 at 22–23.) However, as discussed above, Plaintiffs cannot survive summary judgment by resting their claims on the discriminatory motivations of an employee who did not actually make the decision to terminate their franchise. *Hill*, 354 F.3d at 291. Furthermore, while Plaintiffs have argued that some evidence exists in the record going to the discriminatory motivations of Defendants other than Pilcher, none of it suffices to establish a genuine issue of material fact as to pretext.

---

[22] There is some doubt as to whether Plaintiffs were meeting Defendants' legitimate expectations.

First, Plaintiffs point to the supposedly fishy timing of the termination of the franchise agreement. (*See* ECF No. 57 at 16–17.) According to Plaintiffs, "the fact that Plaintiffs received a warning letter regarding the [lottery] shortages in March [of] 2018, months before the termination, and that Defendants subsequently renewed the Franchise and Lease Agreements in May [of] 2018 . . . suggest[s] that the reason given for termination was pretextual." (*Id.*) The record does demonstrate that on March 8, 2018, Pilcher and Salamah had a meeting to discuss Defendants' concerns with how the store was running and that these concerns were formalized in a "warning letter."[23] (*See* ECF No. 48-3 at 7, 11.) The letter documents that the Reynolda Road store reported lottery shortages from November 2017 through February 2018 totaling about $3,400. (*See id.*) Despite this reported lottery shortage, Defendants and Almy renewed their lease and franchise agreement on May 10, 2018. (ECF No. 8-8 at 2.) Then, in the late summer and fall of 2018, the Reynolda Road store reported far larger lottery shortages, amounting to over $10,000. (*See* ECF Nos. 48-3 at 7; 48-12 at 2.) Shortly after Barnes learned the scope of the lottery shortages for the first time in October 2018, Defendants terminated the franchise agreement. (*See* ECF No. 48-3 at 6–7.) It is difficult to see how this sequence of events is evidence of pretext. If anything, this shows that Defendants had ongoing concerns with Almy's performance and that when these concerns intensified in the fall of 2018, Barnes terminated his agreement with Almy.

Next, Plaintiffs argue that the Court should infer pretext from the fact that Defendants once "provided a loan to [a] non-Arab [franchisee] at another store that suffered a similar

---

[23] Other topics included Defendants' beliefs that payroll was "not being run [in] a consistent and timely manner," and that the store's cigarette inventory was too high. (*See id.* at 11.)

lottery shortage to that at the Reynolda Store." (*See* ECF No. 94 at 23 n.12.) Here, Plaintiffs refer to an incident where B.P., the thief at the Reynolda Road store, also stole lottery tickets from a franchisee named Teresa Colon. (*See* ECF No. 57-6 at 8, 17–19.) After B.P. stole $4,800 from Colon, she "worked . . . out" an arrangement with Defendants to pay the first half of that debt the month it occurred and the second half the following month. (*Id.* at 18–19.) This prompt repayment fundamentally differentiates Colon's experience from Salamah's. Furthermore, this incident is in not probative of discrimination because, taking Plaintiffs' alleged facts as true, Pilcher gave them a more favorable arrangement, allowing them to quietly pay off their debt over an indefinite period that lasted for years. Plaintiffs cannot prove pretext by showing that similarly situated non-Arab franchisees were treated less favorably than they were.

In conclusion, while Plaintiffs have put forward evidence that Defendant Pilcher was prejudiced against Arab Americans, the undisputed record evidence shows that Barnes, not Pilcher, terminated the franchise agreement. Furthermore, no evidence exists showing that Barnes or other Defendants discriminated against Plaintiffs. Accordingly, the Court concludes that Plaintiffs have failed to produce evidence that, when taken together, would allow a reasonable factfinder to determine that Defendants' stated reason for terminating the franchise agreement was a pretext for race discrimination. Defendants are therefore entitled to summary judgment on Plaintiff's § 1981 claim as a matter of law.

As Plaintiffs' claim in Count Seven for termination in bad faith and breach of contract essentially restates their § 1981 claim, (*see* ECF Nos. 1 at 34; 57 at 21), Defendants are also entitled to summary judgment as to that claim and the Court declines to discuss it further.

33

## D. Plaintiffs' UDTPA and Wrongful-Eviction Claims

Finally, Defendants move for summary judgment on Plaintiffs' Unfair and Deceptive Trade Practices Act ("UDTPA"), N.C. Gen. Stat. § 75-1.1, claims. (*See* ECF No. 50 at 18–21.) As a threshold matter, it is not entirely clear to the Court what conduct Plaintiffs contend violated the UDTPA.[24] However, Plaintiffs appear to limit their UDTPA claims to two categories. First, Plaintiffs appear to argue that the same facts that gave rise to their FLSA claim also give rise to a UDTPA claim. (*See* ECF Nos. 1 ¶ 190; 57-5 at 119–20.) To the extent that Plaintiffs attempt to assert such a claim, it fails because "the Supreme Court of North Carolina has not recognized causes of action for . . . unfair trade practices in employer-employee disputes over unpaid wages . . . and there is no basis for concluding that it would do so if given the opportunity." *Anderson v. Sara Lee Corp.*, 508 F.3d 181, 190 (4th Cir. 2007) (affirming dismissal of a UDTPA claim based on alleged wage and hour violations). Second, Plaintiffs appear to argue that Defendants violated the UDTPA by wrongfully evicting them and by repossessing goods in the Reynolda Road store. (*See* ECF Nos. 57 at 18–19; 57-5 at 119–20.) This claim appears to be coextensive with Plaintiffs' claim in Count Eight, which Plaintiffs label "wrongful forcible self-help eviction, unlawful forcible self-help repossession, [and] breach of the peace." (*See* ECF No. 1 ¶ 209.) The Court will therefore analyze these claims together.

---

[24] Plaintiffs, who were *pro se* for much of this litigation, bundled many different causes of action into a consolidated fifth claim, several of which have already been dismissed by the Court. (*See* ECF No. 62 at 18 & n.3.) Plaintiffs briefing on the UDTPA did not dispel the Court's uncertainty regarding the exact scope of the claim. (*See* ECF No. 57 at 18–19.)

The UDTPA declares "unfair or deceptive acts or practices" unlawful. N.C. Gen. Stat. § 75-1.1(a). "A practice is unfair if it is unethical or unscrupulous," *Dalton v. Camp*, 548 S.E.2d 704, 711 (N.C. 2001), or if it "it offends established public policy," *Bumpers v. Cmty. Bank of N. Va.*, 747 S.E.2d 220, 228 (N.C. 2013). "Whether an act or practice is unfair or deceptive under the UDTPA is a question of law." *Smith v. Premier Prop. Mgmt.*, 793 F. App'x 176, 180 (4th Cir. 2019). To prevail on a UDTPA claim, a plaintiff must demonstrate: "(1) the defendant committed an unfair or deceptive act or practice; (2) the act or practice in question was in or affecting commerce; and (3) the act or practice proximately caused injury to the plaintiff." *Id.*

Regarding the first prong, Plaintiffs have put forth evidence that despite their repeated objections, Donald Pilcher locked them out of the Reynolda Road store on the day Defendants terminated their franchise agreement with Almy. (*See* ECF No. 57-4 at 7–9.) Furthermore, Plaintiffs have produced unrebutted evidence that Pilcher pushed a worker at the store to take possession of the store's cash register. (*See* ECF No. 57-8 at 6.) Such conduct violates North Carolina's long-standing public policy against forcible self-help evictions.[25] *See Spinks v. Taylor*, 278 S.E.2d 501, 505 (N.C. 1981) (holding that a landlord may only use "peaceful means to reenter and take possession of [a] leased premises subject to foreclosure" and that any "objection by the tenant elevates the reentry to a forceful one," leaving the landlord with the "sole lawful recourse" of evicting his tenant through the judicial process). As such, North Carolina courts have recognized UDTPA claims for self-help evictions in the residential and commercial context. *See, e.g.*, *Shepard v. Bonita Vista Props., L.P.*, 664 S.E.2d 388, 395 (N.C. Ct.

---

[25] Residential tenants in North Carolina cannot be evicted even by a *peaceful* self-help eviction, *see* N.C. Gen. Stat. § 42-25.6, but that is not at issue here as Plaintiffs were commercial tenants.

App. 2008) (affirming award of UDTPA damages to residential tenants whose landlord disconnected their electricity); *Mosley & Mosley Builders, Inc. v. Landin, Ltd.*, 389 S.E.2d 576, 580–81 (N.C. Ct. App. 1990) (concluding that defendants violated the UDTPA by entering plaintiff's commercial premises and "remov[ing] his merchandise and property" without his consent when plaintiff had a right to be on the premises); *see also Stanley v. Moore*, 454 S.E.2d 225, 229 (N.C. 1995) (clarifying that wrongfully evicted residential tenants could be awarded treble damages and attorney's fees under the UDTPA). These cases are consistent with the ancient precept that non-peaceable self-help evictions are to be avoided, lest we live in a "society in which the principle is recognized that He may take who has the power, [a]nd he may keep who can." *See Spinks*, 278 S.E. 2d at 505 (quoting *Reader v. Purdy*, 41 Ill. 279, 285 (1866)). Indeed, viewed in the light most favorable to Plaintiffs, all the dangers of the forcible self-help evictions were on display here—tempers flared, the police were summoned, and a (minor) physical altercation occurred. (*See* ECF Nos. 57-4 at 8–9; 57-8 at 6.) The Court also notes that had the Winston-Salem police not spent hours at the store monitoring a situation that should have been handled through the judicial process, the incident could have grown far more violent. Viewing the facts in the light most favorable to Plaintiffs, the Court concludes that Defendants committed an unethical and unfair act in violation of public policy when they forcibly evicted Plaintiffs without utilizing the judicial process.

Turning to the second prong of a UDTPA claim, the Court finds that the act in question, the forcible self-help eviction of a commercial tenant, "was in or affecting commerce." *See Smith*, 793 F. App'x at 180. The UDTPA defines "commerce" to "include[ ] all business activities, however denominated." N.C. Gen. Stat. § 75-1.1(b). The operation of

36

a for-profit gas station and convenience store sits comfortably within this expansive definition and Defendants have not argued to the contrary.

This leaves only the question of whether Plaintiffs have raised a genuine issue of material fact as to whether Defendants' act proximately caused them injury. *See Smith*, 793 F. App'x at 180. Plaintiffs have put forward evidence that Elsayed "visited the emergency room on December 1, 2018, the day after [the] termination, after suffering from a severe anxiety attack because of Defendants' outrageous misconduct, resulting in several medical bills," and that he has "been treated for anxiety ever since." (*See, e.g.*, ECF Nos. 57 at 19–20; 57-7 at 4; 94-4 at 8–10.) Though Plaintiffs may ultimately struggle to prove that these medical bills were proximately caused by Defendants' specific act of self-help eviction (rather than the termination of the franchise agreement itself or any other cause), for now, they have raised a genuine issue as to damages.[26] Defendants' motion for summary judgment is therefore denied as to Counts Five and Eight insofar as Plaintiffs assert a UDTPA claim for Defendants' allegedly wrongful self-help eviction, though any injury Plaintiffs claim they suffered must be proximately caused by the eviction itself.

For the reasons stated above, the Court enters the following:

---

[26] Plaintiffs have also argued that they were harmed when, during the self-help eviction, Defendants seized a computer, gondolas, and time clocks belonging to Plaintiffs. (*See* ECF Nos. 50 at 24; 57 at 22–23.) Defendants reply that they "retained a security interest in the equipment" and used it to satisfy a $1,847.23 debt that Plaintiffs owed them. (*See* ECF No. 50 at 24–25.) However, as discussed above, Defendants may owe Plaintiffs UDTPA damages. Should a fact-finder determine that Plaintiffs are owed UDTPA damages of more than $1,847.23, Defendants might also owe Plaintiffs for the value of the equipment they seized, less Plaintiffs' $1,847.23 debt.

37

**ORDER**

IT IS THEREFORE ORDERED that Defendants' Motion for Summary Judgment, (ECF No. 48), is GRANTED in part and DENIED in part. Defendants' motion is GRANTED as to Plaintiffs' FLSA, Section 1981, and termination-in-bad-faith and breach-of-contract claims, which are Counts One, Three, and Seven, respectively. These listed claims are DISMISSED WITH PREJUDICE. It is DENIED as to Plaintiffs' UDTPA claim and wrongful-eviction claim (Counts Five and Eight) insofar as Plaintiffs assert a UDTPA claim for forcible self-help eviction.

IT IS FURTHER ORDERED that Defendants' Motion for Summary Judgment as to Plaintiff Elsayed's Title VII claim, (ECF No. 87), is GRANTED and that claim is DISMISSED WITH PREJUDICE.

This, the 10th day of August 2020.

/s/Loretta C. Biggs
United States District Judge