IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA


AMRO ELSAYED and LOLA SALAMAH,* Case No. 1:18CV1045
                              *
            Plaintiffs,   *
                              *
vs.                      *  Greensboro, North Carolina
                              *  February 2, 2021
FAMILY FARE, LLC, et al.,   *
                              *
            Defendants.   *
*******************************


**PARTIAL BENCH TRIAL TRANSCRIPT OF**
**RULE 52(c) MOTION AND COURT'S RULING**
BEFORE THE HONORABLE CATHERINE C. EAGLES
UNITED STATES DISTRICT JUDGE


APPEARANCES:

For the Plaintiffs:       AMRO ELSAYED, Pro Se
                        LOLA SALAMAH, Pro Se
                        2615 Wyman Road
                        Winston-Salem, North Carolina 27106


For the Defendants:       WILLIAM S. CHERRY, III, ESQUIRE
                        JESSICA B. VICKERS, ESQUIRE
                        Manning, Fulton & Skinner, P.A.
                        Post Office Box 20389
                        Raleigh, North Carolina 27619


Court Reporter:           Lori Russell, RMR, CRR
                        P.O. Box 20593
                        Winston-Salem, North Carolina 27120


Proceedings recorded by stenotype reporter.
Transcript produced by Computer-Aided Transcription.

1                    **P R O C E E D I N G S**

2        (All parties present.)

3            **THE COURT:**  Okay.  Does the Defendant want -- do the

4  Defendants want to be heard at the close of the Plaintiffs'

5  evidence?

6        Right, the Plaintiffs are resting?

7            **MR. ELSAYED:**  Yes, Your Honor.

8            **MS. SALAMAH:**  Yes, Your Honor.

9            **THE COURT:**  Okay.

10           **MR. CHERRY:**  Yes, Your Honor.

11       The Defendants at this time make a motion pursuant to Rule

12  52(c) of the Federal Rules of Civil Procedure, a motion for

13  judgment on partial findings, and I'd like to be heard on that.

14           **THE COURT:**  All right.  Go ahead.

15           **MR. CHERRY:**  So, Your Honor, as a starting point for

16  this motion, the key is that the franchise business

17  relationship between Almy and Family Fare was terminated on

18  November 30th, 2018, as a result of a lottery shortage.

19           **THE COURT:**  You're going to have to speak up or a

20  little closer into the mic.

21           **MR. CHERRY:**  I don't know why I'm having such a time.

22  Clearly I'm not good at this mask thing.

23           **THE COURT:**  The masks make it hard; I appreciate.

24           **MR. CHERRY:**  So, as I was saying, the franchise

25  agreement was terminated.  The validity of the termination --

1          **THE COURT:**  I mean, if you would rather try with just

2  the mask and not the shield, I'm amenable.  I can be understood

3  through the mask, but most people have trouble with that.

4          **MR. CHERRY:**  Well, I'd like to try, Your Honor.

5          **THE COURT:**  Okay.  If you'd rather try with just a

6  mask --

7          **MR. CHERRY:**  One of the problems I'm having now is the

8  mask -- the shield is so big it's bumping this.

9          **THE COURT:**  Yeah, I appreciate that.  That's why I'm

10  offering you the mask.

11          **MR. CHERRY:**  We'll see how this goes.

12          **THE COURT:**  You'll have to keep your voice way up

13  because -- we've had a lot of criminal court, and people are

14  leaving their masks on.  As long as they speak up, it's okay,

15  but when they start looking down or looking away, it's a

16  problem.

17      Go ahead.

18          **MR. CHERRY:**  The validity of the franchise termination

19  is not in dispute.  Judge Biggs has held that the franchise

20  termination was for legitimate nondiscriminatory reasons, and

21  in doing so, she dismissed discrimination claims and claims for

22  termination of the franchise in bad faith and breach of

23  contract claims relating to termination of the Franchise

24  Agreement.

25      The Court's summary -- in Judge Biggs' summary judgment

1  order, she expressly stated that, viewed in the light most

2  favorable to Plaintiffs, Plaintiffs may ultimately struggle to

3  prove damages proximately caused by any wrongful eviction,

4  which is the issue here today is the wrongful eviction.  The

5  Court said this in the context of emotional distress damages

6  specifically, but the evidence thus far has shown that

7  Plaintiff has struggled and has not proven proximate cause with

8  respect to other types of damages as well.

9      So as -- and just to wrap up that part, being that we're

10  here on the wrongful eviction claim and the unfair and

11  deceptive claim arising out of that, for both of those, the

12  wrongful eviction and the unfair and deceptive, the case law

13  says that the essential -- that actual injury is an essential

14  element of both.

15      And I actually do -- that reminded me I have notebooks of

16  other -- of case law that I intend to cite during this motion.

17  Does Your Honor -- I'd like to hand those up as I would during

18  a normal hearing.

19          **THE COURT:**  That would be great.  Please.

20          **MR. CHERRY:**  Do you want me to wipe them or do I

21  just --

22          **THE COURT:**  Everybody has sanitizing wipes on their

23  tables, so you can just set it down, and then people can wipe

24  them off or not as they please.

25      All right.  You gave Mr. Elsayed and Ms. Salamah one to

 1 | share?

 2 | **MR. ELSAYED:**  Yes, Your Honor.

 3 | **THE COURT:**  Okay.

 4 | **MR. CHERRY:**  So turning then to the actual arguments

 5 | on proximate cause -- and I want to start first with what I'm

 6 | broadly referring to as the economic damages.  Now, we have

 7 | looked at multiple times the agreements that govern this

 8 | relationship:  The Franchise Agreement, the Inventory

 9 | Consignment Agreement, the Lease Agreement, and the equipment

10 | agreement -- the Equipment Promissory Note, whatever the

11 | specific language for that is.  Each of those agreements

12 | cross-reference each other and say that, hey, look, a

13 | termination -- I mean, a default and a termination of the

14 | franchise agreement is a default and termination of all three.

15 | Specifically, in the Franchise Agreement on page 24, which

16 | is at Joint Exhibit 2, it says:  "Any default by Franchisee

17 | under this Agreement shall be a default under any" of the

18 | "other agreements between Family Fare (or any of Family Fare's

19 | affiliates) and Franchisee."

20 | **THE COURT:**  Between family Fare what?

21 | **MR. CHERRY:**  "...between Family Fare (or any of Family

22 | Fare's affiliates) and Franchisee."

23 | Similarly, the Inventory Consignment Agreement at

24 | paragraph 6 states:  "The term of this Agreement shall commence

25 | on the date first written above [sic] and terminate:  On the

1  date that either Consignee shall default in the performance of

2  Consignee's obligations under this agreement; the termination,

3  expiration or non-renewal of the Franchise Agreement; or the

4  termination, expiration or non-renewal of the Lease

5  Agreement...."

6      And then the third agreement, the Lease Agreement, states

7  at paragraph 27(iii):  The "Tenant "-- which is the default

8  provision.  It says:  "Tenant is declared in default if Tenant

9  is declared in default of its Family Fare Franchise Agreement

10 of even date by and between Family Fare, LLC (franchisor) --

11         **THE COURT:**  Slow down.

12         **MR. CHERRY:**  -- "(franchisor) and Tenant

13 (franchisee)."  Then it's also a default of the Lease

14 Agreement.

15     Also, in this -- in the Franchise Agreement --

16         **THE COURT:**  Okay.  Well, let me just ask you a basic

17 question.

18         **MR. CHERRY:**  Sure.

19         **THE COURT:**  One of those agreements says that they can

20 take over by force.

21         **MR. CHERRY:**  Yes.

22         **THE COURT:**  Now, I do not understand that to be the

23 law.

24         **MR. CHERRY:**  That is correct, Your Honor.  That

25 agreement -- that language that is seen in commercial leases

1  regularly, to my understanding, does not permit a landlord to

2  do something differently than what the case law says.

3       **THE COURT:**  Yeah.  Okay.  All right.  So go ahead.

4       **MR. CHERRY:**  And under the Franchise Agreement in

5  paragraph 21, which is at page 27 --

6       **THE COURT:**  Uh-huh.

7       **MR. CHERRY:**  -- its "Obligations Upon Termination," it

8  says that upon termination, franchisee shall immediately cease

9  to operate the business.

10      It also says later in that subparagraph (iv), the

11  franchisee shall immediately and permanently cease to use in

12  any manner confidential information, methods, procedures the

13  Family Fare trademarks that are used in the franchise system.

14      So at the time of the franchise termination, she had no

15  right to operate the Family Fare franchise business at the

16  Reynolda store.  Because of that she -- and by "she," I mean

17  Ms. Salamah and Almy, which is -- it's our contention that's

18  the only one that ever had any rights under the Franchise

19  Agreement or any of these other agreements.  She lost rights

20  with respect to a number of things that they're now claiming

21  damages with respect to.

22      So, for example, in the inventory agreement, my

23  understanding is that they're claiming damages related to the

24  proceeds from the inventory.  Now, the Inventory Consignment

25  Agreement specifically says that the inventory, the merchandise

1  in the store, is owned by Fowler.  So they never had an

2  ownership right over the inventory that they could exercise.

3     In addition to that, though, what they appear to be

4  claiming, the way I heard the evidence, is they're entitled to

5  proceeds from the inventory.  Well, there's no evidence in

6  front of the Court as to what that inventory would have sold

7  for, as to when that inventory would have sold, and there's no

8  evidence of what the cost of that inventory would have been had

9  it sold.  So any -- any argument that they're entitled to

10 proceeds of the inventory is entirely speculative.

11     They're also arguing in the same vein that they're entitled

12 to cash proceeds that would be this cash that Mr. Pilcher

13 counted in front of the police officer and made the deposits in

14 the Family Fare -- excuse me, the M.M. Fowler bank account in

15 the way that it's always deposited on a daily basis.  That

16 amount is set out in the police report, and I don't think that

17 amount that he deposited is -- is disputed.  It's $3,422 even.

18 The inventory agreement also says that those proceeds belong to

19 M.M. Fowler.

20     We do have this issue of this other -- this other missing

21 cash, which there's never been a firm number put on it, at

22 least the number -- except for possibly something in these

23 EOPs, but there's no evidence in the record that directly ties

24 that number to this -- to the exact amount of cash that was

25 allegedly in a drawer in a -- in the office or in a jar in the

1  drawer in the office.  There's also testimony that, you know,
2  Ms. Salamah had not seen that money in a couple of days.  She
3  had not worked at the store.

4      Plaintiffs had time during the eviction, while the police
5  officer was there, to gather their belongings.  They opened
6  drawers in the office.  Nothing was ever said to the police
7  officer, or anyone that we could tell, about the cash, but yet
8  we saw on the video -- I think we saw this clip multiple times,
9  where they were asking the police officer to make sure his
10 report was detailed to protect their rights.

11     With respect to the equipment, the evidence -- there's no
12 evidence in the record -- and by "the equipment," I mean the
13 computer, the time clock, and the gondolas.  There's no
14 evidence in the record as to the actual value of that
15 equipment.  The equipment was purchased in 2013.  Termination
16 was in late 2018.  Ms. Salamah testified that she didn't think
17 the tax value that's in the record was the actual value of that
18 equipment.  She also testified that they had not appraised that
19 equipment or had any other analysis done of the fair market
20 value.

21     And then the last -- well, actually, that's not the last.
22 The next economic damage would be this amount that is -- they
23 contend they weren't able to sell the franchise for.
24 Obviously, when the franchise rights are terminated because of
25 the lottery shortage, that cuts off any ability to -- to sell

1  the franchise to anyone.  And there's no evidence of any offers

2  being made, and there's, frankly, no evidence about when

3  specifically any discussion was had about that or who that was

4  had with.

5      There also was mention of -- and I'm going to paraphrase

6  this the best way I remember it, but I think it was lost wages

7  and also lost payment from I think the two -- the two months

8  preceding termination.  And -- and, Your Honor, those issues

9  are issues that relate to the FLSA and the other wage and hour

10  claims that were dismissed by Judge Biggs, and I just think

11  they're not relevant at this point in the case.

12      Moving on to the next big category of damages or the next

13  category of damages that I understand them to be arguing is

14  Mr. Elsayed's emotional distress.  Now, Ms. Salamah also

15  referenced on her testimony that she had emotional distress,

16  but there was no evidence put on of any financial damages for

17  that.  As far as Mr. Elsayed, we have seen that no doctor

18  provided testimony on his behalf.

19          **THE COURT:**  Can I ask you about that?

20          **MR. CHERRY:**  Yes.

21          **THE COURT:**  So if this were a negligent infliction of

22  emotional distress claim or an intentional infliction of

23  emotional distress claim, you know, the cases are very specific

24  about that and the kind of proof you have to have to be

25  sufficient.

1    But if this were just a negligence case and there's a car

2  wreck and you hit -- you know, somebody's car runs into mine

3  and I'm -- I have whatever physical injury I have, I can

4  testify about that I had mental suffering, basically, you

5  know --

6         **MR. CHERRY:**  Right.

7         **THE COURT:**  -- pain and suffering we say in our car

8  wreck cases -- and you don't have to have medical proof to get

9  money for mental suffering.

10    So where does this tort fall, wrongful eviction or unfair

11  trade practices?  You know, I don't -- I was just trying to

12  think if I'd ever seen an unfair trade practices with mental

13  suffering as an element of damages and -- I don't know.  I

14  probably have.  I've been a judge 8,000 years, so -- but I'm

15  not remembering one.

16    So can you help -- do you have a case that would help me?

17         **MR. CHERRY:**  Well, I don't actually have a case, and I

18  haven't found a case either.  But I think the key is that in

19  the unfair and deceptive trade practice claim, you've got to

20  show -- they have to show that their emotional distress was

21  proximately caused by the unfair and deceptive act or the

22  eviction.  There's no -- there's nothing that -- in fact, there

23  are doctors that he saw, but there's no -- no connection

24  whatsoever to the emotional distress being related directly to

25  that eviction.  For all we know, it could be related to the

1  termination of the Franchise Agreement.  It could be --

2        **THE COURT:**  Let's just talk about that night.

3        **MR. CHERRY:**  Okay.

4        **THE COURT:**  I mean -- so -- or afternoon actually, I

5  guess, though it was night by the time it was all over because

6  it was dark out there I could see on the video.

7     So both of them said that Ms. Salamah was crying.  Both of

8  them said they felt humiliated.  Both -- Ms. Salamah talked

9  about being accused of being a thief in front of customers

10  and -- so actually -- I mean -- so -- but the damages, as you

11  say, have to flow from the forceful eviction.  I mean, that's

12  what we're talking about.  When we say wrongful eviction, what

13  we're talking about here is by force, whether this was --

14  eviction was by force, and they have to flow from that.

15     So they -- her -- their evidence is that Mr. Pilcher called

16  the police.  The police report also says she called the police.

17  So, you know, there's some evidence both ways on that.  But

18  viewed in the light most favorable to the Plaintiff, which I

19  have to do at this stage --

20        **MR. CHERRY:**  Actually, that's not the case --

21        **THE COURT:**  No?

22        **MR. CHERRY:**  -- on a 52(c).  There's two cases in

23  the --

24        **THE COURT:**  Oh, because it's a nonjury trial.

25        **MR. CHERRY:**  That's correct.

1    **THE COURT:** Oh, thank you.

2    **MR. CHERRY:** It's a preponderance theory.

3    **THE COURT:** Right, right. Yeah, you're correct.

4    Thank you for correcting me about that.

5    So -- but in any event, I guess I'm just trying to -- if we

6    just are looking at that night, one could see -- one could see,

7    if this were a term -- a forceful eviction under -- looking at

8    all the circumstantial evidence and they had just the

9    experience of going through it, is -- you know, whatever that

10   might be worth, I'm not talking about that. But is that actual

11   injury, the humiliation from a forceful termination in front of

12   customers, involvement of law enforcement in front of employees

13   when, you know, you're supposed to go get a court order for

14   that? So I'm asking about that -- just that little, tiny part.

15   **MR. CHERRY:** And, Your Honor, I don't have a case to

16   cite to you, but it seems to me like there's nothing -- there's

17   no evidence to put a number -- any number at all on what they

18   claim to be their -- what you just described.

19   **THE COURT:** Uh-huh.

20   **MR. CHERRY:** There's no evidence whatsoever that can

21   be -- a number can be put in that. There's no causal

22   connection there. And I think that because both the eviction

23   case law, which is the *Marina* case in the notebook, and the

24   unfair and deceptive case law specifically says proximate cause

25   and actual injury, I think the actual injury means, you know,

1    monetary damages and --

2           **THE COURT:**  Okay.

3           **MR. CHERRY:**  I would also note along those lines

4    that -- because I -- I kind of misspoke a bit as I was saying,

5    you know, the *Marina* case requires proximate cause, but maybe I

6    should take a look at that in a moment -- a moment.  That's at

7    Tab 6 of the notebook.

8           **THE COURT:**  Yes.

9           **MR. CHERRY:**  What's interesting about the *Marina* case

10   is -- it's a constructive eviction case, and it talks about --

11   it lists out the types of damages that someone could receive

12   from any eviction case, and you will see on page -- it's

13   actually 14 of 15 on the Lexis numbers.  In the right-hand

14   column right before the page number there that's 25, it starts

15   with "A tenant...."

16          **THE COURT:**  Yes.

17          **MR. CHERRY:**  It says:  "A tenant may recover damages

18   that proximately result from" --

19          **THE COURT:**  Read slower for the court reporter.

20          **MR. CHERRY:**  Yes.  It says:  "A tenant may recover

21   damages that proximately result from a wrongful eviction."

22      It goes on to further say:  "A tenant's general damages in

23   such a case are the value, at the time of the eviction, of the

24   unexpired term, less any rent reserved."  That's not applicable

25   here because the franchise agreement was terminated.  There was

1  no further term.

2      "However, a tenant's recovery is not limited to the value

3  of the leasehold interest only, but may also include

4  compensatory damages for pecuniary losses proximately resulting

5  from the eviction, including conversion of personal property

6  and, in the case of a business, loss of profits when such loss

7  is ascertainable to a reasonable degree of certainty."

8      Now, one thing that doesn't say is emotional distress, but

9  it also does say that it has to be -- the damages it does list

10 in an eviction case have to be proved when the loss is

11 ascertainable to a reasonable degree of certainty.

12          **THE COURT:**  Okay.

13          **MR. CHERRY:**  One additional thing I would point out,

14 although this is not a residential case, there is a statute,

15 North Carolina General Statute 42-25.9, that deals with

16 evictions in the residential context, and that specifically

17 says:  "Damages in any action brought by a tenant under this

18 Article shall be limited to actual damages as in an action for

19 trespass or conversion and shall not include...damages for

20 emotional distress."

21     So that's in the residential context, where it certainly

22 would be emotional, you would presume, for someone to lose

23 their home.  But it's also consistent with the *Marina* case when

24 it talks about actual damages in the nature of trespass or

25 conversion, which is what this discussion I read in the *Marina*

1   case talks about is ascertainable damages in that respect.

2       One other thing with -- before I leave this topic, one

3   other thing specifically with respect to Mr. Elsayed.  We have

4   cited a number of cases in our trial brief where it says that

5   in order for any damages to be recovered from an eviction, it

6   has to be in the landlord-tenant context.

7       Now, I think that -- we didn't argue it in our trial brief

8   because Ms. Salamah didn't clearly make that claim until she

9   was on the stand.  She wasn't the tenant either.  The evidence

10  is very clear that Almy, LLC, is the tenant and -- but

11  certainly the evidence is also that Mr. Elsayed is -- didn't

12  even sign the agreements in any capacity.

13          **THE COURT:**  So is your -- is your argument there that

14  only the tenant can recover for wrongful eviction?  Is that

15  what you're --

16          **MR. CHERRY:**  Yes, that is what the case law says that

17  we have cited in the trial brief, yes.

18          **THE COURT:**  Okay.  And the tenant is Almy or Almee

19  (phonetic), however you say it, LLC?

20          **MR. CHERRY:**  That's what the Lease Agreement holds or

21  states.

22          **THE COURT:**  All right.  Okay.  How much longer is your

23  argument going to be?

24          **MR. CHERRY:**  I have one topic that should be very

25  short.

1    **THE COURT:**  All right.  Go ahead.

2    **MR. CHERRY:**  This last topic has not come up, but it

3  was -- it did come up in the evidence.  I'm not so sure it

4  should have come up in the evidence, but I know -- I see in

5  some of the recent filings they've made a claim for punitive

6  damages.  The Franchise Agreement at paragraph 33(d) on page 38

7  has an express mutual waiver of punitive damages.  That

8  language is in all caps.

9    There are cases cited in the notebook, specifically the

10  *Dunkin' Donuts Franchised Restaurant versus Manassas Donut* at

11  Tab 2 -- it's in the Eastern District of Virginia -- where it

12  says Dunkin' Donuts filed a motion to strike the jury demand

13  and claim for punitive damages.  It was upheld.

14    Also, at Tab 3, a Fourth Circuit case, *Fanczi,* F-a-n-c-z-i,

15  *Screw Company versus Orix*, upheld a mutual punitive damages

16  claim.

17    In the Eastern District of North Carolina, *Keating versus*

18  *Baskin-Robbins* upheld waiver -- that's a franchise case --

19  upheld waiver of punitive damages.

20    And then the fourth case at Tab 9 is a North Carolina

21  Business Court case which, in a bank and borrower relationship,

22  enforces a mutual waiver of punitive damages.

23    **THE COURT:**  Okay.  So what we're going to do now is

24  take the afternoon recess, and when we come back, I'll hear

25  from the Plaintiffs.

1   Defendant was asking me about the time.  My -- my rough
2   calculation is that the Defendants have used a little over
3   three hours, you know, like 10 or 15 minutes over three hours,
4   something like that.  So I always like to check my math because
5   I'm so terrible at it without a calculator.  But that's roughly
6   what I show.  So you had asked me about that.  And I counted
7   your argument time for you.

8   I did not add the Plaintiffs' time up because they've
9   rested, and we can do that later.  But however much time they
10  have left is available for closing argument or rebuttal
11  evidence if the case goes forward.

12  So let's take a 15-minute break, and when we come back,
13  I'll hear from the Plaintiffs on what I sometimes still call a
14  motion for a directed verdict, even though that's not what it's
15  called anymore.  So Rule 52(c) motion is what the Defendant has
16  made.

17  So let's take a 15-minute recess.

18  (An afternoon recess was taken from 3:20 p.m. until
19  3:35 p.m.; all parties present.)

20  **THE COURT:**  All right.  I'll hear from the Plaintiffs
21  on the motion at the close of the Plaintiffs' evidence.  Who is
22  going to speak first?

23  **MS. SALAMAH:**  I will, Your Honor.

24  **THE COURT:**  All right.  Just speak into the
25  microphone.

1    **MS. SALAMAH:** Okay. This is regarding whether the

2    Defendants are above the law or not, whether they're going to

3    do the same mistakes again or not. During the police video,

4    several times -- the police asked us to leave several times.

5    Mr. Pilcher asked us to leave. It was forcible. It was

6    unethical. At the end of the police video when Mr. Pilcher was

7    talking to the police, he declared that these things get ugly.

8    So when they get ugly, when do they stop? When do they halt

9    the process and decide that this is too much and there should

10   be a better, more civil way?

11       He also said that I could have sold the store. During the

12   deposition, during everything, we've brought up that point

13   several times. We've brought in the applications. There was

14   communication about it. It was something I was trying to do

15   and again being ignored.

16       I don't understand how I can follow and understand a

17   contract that I don't have, that I'm denied a copy of. If I

18   had questions, I could refer back to it.

19       I don't understand how they justify repossessing the

20   equipment that I have paid for in cash. I -- when I have

21   something and it's paid for and they claim I owe money on

22   something else, they don't take anything that they can take and

23   put their hands on that belongs to me. They give me a bill

24   first. They tell me, "This is what you owe, and either you pay

25   or we will take our stuff." That's what they say.

 1     I think their major concern was to be rid of me and my

 2   husband and to keep the store open.  They didn't care how or

 3   what they had to do.  They didn't even have the decency to talk

 4   to me about it when I tried to talk to them about it.  I never

 5   talked to Danny Bass or Mr. Barnes until this situation

 6   happened.  So when it escalated and went up the ladder that

 7   high, they could have had the decency to talk to me so we could

 8   have worked it out.

 9     Thank you, Your Honor.

10         **THE COURT:**  Thank you.

11     All right.  Mr. Elsayed.

12         **MR. ELSAYED:**  Yes, Your Honor.  Can you hear me?

13         **THE COURT:**  Yes.

14         **MR. ELSAYED:**  Okay.  Your Honor, 75-1 -- 75-1-16 is

15   very clear in its language.  It says any person, any person can

16   be harmed -- or any person harmed by a business action, he has

17   standing to sue.  The North Carolina Court of Appeals --

18         **THE COURT:**  What?  What?

19         **MR. ELSAYED:**  I'm sorry, Your Honor, but I had a

20   packet -- I had a binder, but I did not bring it with me today.

21     But North Carolina Court of Appeals has determined that a

22   person who not a bystander can recover under 75-1-16.  Any

23   person that not a bystander, he can recover under the Unfair

24   and Deceptive Trade Practices Act.  The evidence we showed you

25   today, Your Honor, I was not a bystander.  I was involved in

1  this business from the first day.  I was foreseeable to be seen
2  in the business when the forcible eviction happened.
3      The second argument that Defendant made, he talks about the
4  actual damage.  We demonstrated evidence that there's actual
5  damage of converted property, of money was taken an improper
6  way.  We show evidence the last two days that the Defendant
7  made the deposit for them that's almost $4,000 short.  Who took
8  the money?  Mr. Pilcher took it, someone else took it.  This --
9  all of this chaos happened because of their misaction.
10          **THE COURT:**  All of this what happened?
11          **MR. ELSAYED:**  Chaos.
12          **THE COURT:**  What?
13          **MS. SALAMAH:**  Chaos.
14          **THE COURT:**  Chaos.  Okay.
15          **MR. ELSAYED:**  Because of unprofessional action.  The
16 Defendant is now using agreements, trying to enforce it, that
17 no one of the Defendant can understand -- could understand this
18 agreement.  The Defendant tell the police officer that
19 Ms. Salamah just signed, unconscionable because a reasonable
20 person in Ms. Salamah's position would not sign this agreement.
21          **THE COURT:**  Okay.  We're not here about the contract.
22 We're here about the wrongful eviction.
23          **MR. ELSAYED:**  I do understand, but he's talking about
24 the contract prevent us from punitive damage.
25          **THE COURT:**  I'm sorry?

1      **MR. ELSAYED:**  I'm just, like, rebutting his argument
2 of the punitive damage pursuant to the contract.
3      **THE COURT:**  Okay.
4      **MR. ELSAYED:**  The actual damage, like I said, she
5 suffered damage for the money was taken from her.  She suffered
6 the money that she was supposed to receive from the operation.
7 We suffered the money --
8      **THE COURT:**  What?  The -- oh, the operation of the
9 business.
10      **MR. ELSAYED:**  Yes.
11      **THE COURT:**  Okay.
12      **MR. ELSAYED:**  And none of this -- just that
13 suffering -- you know, there is business expenses that till
14 today we're still paying for it.  Till this minute -- moment
15 we're still paying for it.  When they took the business, we had
16 to pay a bill, had to pay the people in the store who was
17 working.
18      **THE COURT:**  There had to be what?
19      **MR. ELSAYED:**  Pay employees, the people -- the workers
20 of the store.
21      **THE COURT:**  Oh, employees.  Okay.
22      **MR. ELSAYED:**  Yeah.  Until this moment, Your Honor,
23 we're still making these payments.  The actual damage -- it was
24 clear today there's an actual damage.
25    General damage, we demonstrate evidence that I -- in my

1  entire life, I never had any anxiety symptoms.  I was always an
2  easygoing person, a person who a lot laugh, play, joke.  I
3  never had an anxiety problem.  Not just me suffer from such an
4  anxiety.  Now my whole family to suffer from such an anxiety,
5  so we entitle for general damage.  That term is right.  It's
6  not determinable.  It's not ascertainable.  Yes, it's not
7  ascertainable because it has no value.  How can he pay for
8  somebody that he cannot -- who has not been even able to sleep
9  without medication for two years?  Yes, has no value.  How are
10  you going to reimburse me for that?  How are you --
11          **THE COURT:**  You've got to slow down.  I can't
12  understand you.
13          **MR. ELSAYED:**  I'm sorry, Your Honor.
14          **THE COURT:**  I'm trying.
15          **MR. ELSAYED:**  Your Honor was very correct.  This --
16  all agreements is against public policy.  An agreement that
17  gives them the right to forcible evict a tenant?
18          **THE COURT:**  Well, who -- oh, the part about the
19  forcible.
20          **MR. ELSAYED:**  Yes, Your Honor.
21          **THE COURT:**  Okay.
22          **MR. ELSAYED:**  That's against public policy.
23          **THE COURT:**  Uh-huh.
24          **MR. ELSAYED:**  So then they can think we can expect
25  from them that they're going to kill the tenant?

1          **THE COURT:**  I'm sorry.  What?

2          **MR. ELSAYED:**  They will kill the tenant.  They will

3   murder the tenant, and the tenant will --

4          **THE COURT:**  Okay.  He's already agreed and they've

5   conceded that that's not enforceable.

6          **MR. ELSAYED:**  But they force it, Your Honor.

7          **THE COURT:**  I'm sorry?

8          **MR. ELSAYED:**  They force it.

9          **THE COURT:**  Uh-huh.

10         **MR. ELSAYED:**  They evicted her forcibly, and he told

11  her he's going to remove her by force pursuant to this

12  agreement.  Lola testified to Your Honor that's not just the

13  agreement and all of this.  They requested her to sign the

14  release form to release all her rights.  They know what they're

15  doing is wrong.  They know what they're doing is against public

16  policy.

17         **THE COURT:**  So do you have any forcible eviction cases

18  where the -- anyone other than the tenant recovered damages?

19         **MR. ELSAYED:**  I -- give me just one second, Your

20  Honor.

21      (Pause in the proceedings.)

22         **MR. ELSAYED:**  Your Honor, it's going to take me a

23  while to get this case out for I have every forcible eviction

24  case in my --

25         **THE COURT:**  Well, you can take a minute.

1    **MR. ELSAYED:**  It's going to take me probably longer

2  because of the Internet.

3        **THE COURT:**  I'm sorry.  What?

4        **MR. ELSAYED:**  It's probably going to take me longer

5  because of the Internet.

6        **THE COURT:**  But -- I could not understand you, other

7  than you said it's going to take you longer --

8        **MR. ELSAYED:**  Because of the Internet and the Internet

9  access.

10        **THE COURT:**  Uh-huh.

11     (Pause in the proceedings.)

12        **THE COURT:**  Do you want to make another argument while

13  we're waiting on those cases and you can answer that question

14  when the case comes up?  If there's anything else you want to

15  say while we're waiting on --

16        **MR. ELSAYED:**  Your Honor, I believe one of the cases

17  is in his binder.  It's a case in Exhibit No. 10.  I believe

18  the (indiscernible).

19        **COURT REPORTER:**  You're going to have to speak up.

20        **THE COURT:**  You believe what?

21        **MR. ELSAYED:**  Sure, sure.  I believe -- yeah, case

22  number 10, that was a North Carolina Court of Appeals case.

23     (Pause in the proceedings.)

24        **THE COURT:**  Can you direct my attention?  The case is

25  quite long.

1    **MR. ELSAYED:**  Yeah, yeah, I'm just looking for Your
2    Honor.  I'm sorry.  I should be better prepared.  I thought
3    this we were going to do tomorrow.
4        (Pause in the proceedings.)
5        **THE COURT:**  This doesn't even appear to be a wrongful
6    eviction case.
7        **MR. ELSAYED:**  Yeah, but this is very similar to this
8    case because, Your Honor, the Court of Appeals found that the
9    trial court did not err to allow the defendant -- the plaintiff
10   amend the complaint in the trial for conversion and punitive
11   damage.
12           **THE COURT:**  For what?
13           **MR. ELSAYED:**  Punitive damage.
14           **THE COURT:**  Punitive?
15           **MR. ELSAYED:**  Yeah, punitive damage.
16       So in this case, Your Honor -- all I remember from this
17   case, it was a plaintiff file an action for Unfair and
18   Deceptive Trade Practices Act, and in that trial, he amend his
19   complaint for conversion, which something -- you know, I know
20   it's -- I filed a motion to amend for that reason, but, Your
21   Honor, you know, that conversion happens.  In this case, it's
22   even the contract of the lease that was between two
23   corporations.  You can see the plaintiff names personally in
24   the case.
25       Forcible eviction, Your Honor, is very rare.  It's very

1  rare, the cases, probably like in the whole nation, just like

2  (indiscernible) cases, and there's like -- not many people do

3  that forcible eviction anymore.

4      But the language is very clear, Your Honor, in the 75-1-16.

5  It says any person, any person harmed.

6      And I -- I'll just -- and, Your Honor, just my last

7  argument.  I'm sorry.  It's -- there is a confusion between a

8  forcible conversion -- I'm sorry -- a forcible eviction and a

9  wrongful eviction.  Forcible eviction is when force is used to

10 force a defendant -- I mean the plaintiff, I'm sorry, the

11 tenant.  Wrongful eviction can happen by constructive eviction.

12 It's mainly termination of a contract.  But forcible eviction

13 is a tort, and they then have to owe me a duty of care.  To

14 breach is intentional tort.

15     (Pause in the proceedings.)

16         **THE COURT:**  Did you find any cases you wanted to bring

17 to my attention?

18         **MR. ELSAYED:**  Not right now, Your Honor.

19         **THE COURT:**  Now is the time.

20     (Pause in the proceedings.)

21         **THE COURT:**  Okay.  So I think it's, I don't know, been

22 10 minutes, 15 or so.  Anything -- I mean, not right this

23 second, but since you said your Internet was slow, any other

24 cases you want to bring to my attention?

25         **MR. ELSAYED:**  Other cases, Your Honor, I just want to

1  cite the cases that were in my findings of fact and conclusions
2  of law that I submitted to the Court.
3          **THE COURT:**  All right.  I did look at those.
4      Rebuttal?
5          **MR. CHERRY:**  No, Your Honor.
6          **THE COURT:**  So, you know -- let me take my mask off
7  and use the shield since I talk for short periods through the
8  mask pretty well.
9      But the primary problem here is that wrongful eviction is a
10 cause of action that accrues to the tenant.  You can't have --
11 I mean, that's who is wrongfully evicted, the tenant.  The
12 tenant is Almy, LLC.  They are not a plaintiff.  The unfair and
13 deceptive trade practices claim flows from the wrongful
14 eviction claim.
15     You know, I've tried to think about this several different
16 ways since I started learning more about this case last week
17 and evaluating that, but all of the evidence is that Almy is
18 the tenant -- that's uncontradicted -- and I don't see how
19 somebody who is not the tenant can recover for wrongful
20 eviction or for an unfair trade practice associated with the
21 eviction.
22     You know, I hear where the Plaintiffs are coming from.  You
23 know, there's certainly some disputed questions of fact that I
24 might have to resolve if -- but, you know, I think it is fair
25 to say, based on the evidence so far, that the Defendant --

1    that Mr. Pilcher was, you know, perhaps not prepared for

2    resistance, and there might have been -- certainly been other

3    ways that this could have been handled.  They might have

4    involved closing the store down, and that would have probably

5    been a breach of contract by the Plaintiffs, and then they're

6    subject for all kinds of damages themselves.

7        But on the other hand, you know, forceful eviction is not

8    appropriate, and the Plaintiffs have presented evidence

9    sufficient to show a forceful eviction of Almy, but Almy is not

10   the plaintiff, and -- so that's reason number one to grant the

11   motion at the close of the Plaintiffs' evidence.

12       I would also just note that as to Mr. Elsayed, his

13   connection is even more tenuous than Ms. Salamah's.  She is at

14   least, I believe the testimony was, the member-manager of the

15   LLC was Mr. Barnes' testimony about her, and she was the

16   guarantor, but she was not the tenant.  But Mr. Elsayed is

17   even, you know, more tenuous, and his evidence on the medical

18   bills is insufficient, I believe, as a matter of law to prove

19   that it was proximately caused by the wrongful eviction.

20       If they were the tenants, possibly they could recover a

21   fairly small amount of money for emotional suffering, you know,

22   mental pain, as we say in car wreck cases or personal injury

23   cases, caused by an arguably wrongful eviction, but the other

24   damages that are claimed, even if the Plaintiffs were proper

25   persons to assert a wrongful eviction claim, their evidence is

1  insufficient to connect the lost wages, the claims about the

2  inventory, sale of the business.  Those are just not there.  To

3  the extent the Plaintiff -- those are not connected to the

4  wrongful eviction.  Plus, they have not been proved beyond a

5  speculative amount.

6      And the punitive -- to the extent there's a motion to amend

7  to add a conversion claim, the same problem.  Almy owns the

8  computer, the printer, the gondolas, not the -- not the

9  Plaintiffs here, and the evidence is, you know -- I do not

10 think the evidence is sufficient for punitive damages in any

11 event.  Certainly there was -- there was evidence of some

12 amount of physical force, fairly mild, not directed against

13 either of these people but against an employee -- an employee,

14 and otherwise law enforcement was involved.

15     Yes, I appreciate that's -- you know, I appreciate the

16 Plaintiffs' argument that this was a forceful eviction, and if

17 I had to decide that, I would probably have to hear from the

18 Defendants because they have certainly presented evidence that

19 it was a wrongful eviction of a tenant.  But, you know, that's

20 really not enough to get punitive damages.  Punitive damages

21 has to be outrageous.  It has to be malicious.  There is just

22 no evidence of that here.

23     So there's kind of several layers here, but the main

24 problem is the tenant is not the plaintiff and only the tenant,

25 it seems to me, can recover for wrongful eviction or unfair

1  trade practices arising out of a wrongful eviction.  A forceful
2  eviction is what we're talking about here.
3      And even if that were not the case, the Plaintiffs have not
4  shown any damages other than short-term mental suffering
5  damages of the day and, you know, maybe a few days after that.
6  There's certainly no hard damages associated that they've
7  proven, like medical bills.  That's definitely not been shown,
8  and -- to be connected to the wrongful eviction.
9      And, you know -- but I'm really -- I don't think we have to
10 go forward with the trial because the right plaintiff is not
11 here, and I'm not sure I really need to say anything else about
12 it, other than to grant the motion -- the Defendants' motion
13 and deny the motion to amend as futile.
14     Would the Defendant ask me to address anything else that I
15 might have forgotten to address?
16          **MR. ELSAYED:**  Yeah, I --
17          **THE COURT:**  Just a second.  You're not the Defendant.
18 I'll give you a chance in a second.  I'm asking the Defendants
19 first.
20          **MR. CHERRY:**  No, Your Honor.
21          **THE COURT:**  All right.  Mr. Elsayed, is there
22 something else you would like me to address?
23          **MS. SALAMAH:**  I was wondering, Your Honor, if we could
24 amend to add Almy.  I am, essentially, Almy.
25          **THE COURT:**  Well, the rules require that a corporate

1  entity or an LLC has to be represented by a lawyer who is a

2  member of the Bar of this Court.

3          **MS. SALAMAH:**  I will bring a lawyer.

4          **THE COURT:**  I'm sorry?

5          **MS. SALAMAH:**  I will get one and bring one tomorrow,

6  if need be.

7          **THE COURT:**  You know, now is the time, which I have

8  been saying.  This is the trial.

9      So anything else for the Plaintiffs?

10     Mr. Elsayed, you stood up earlier.  Did you want to say

11  something?

12         **MR. ELSAYED:**  Yeah.  Your Honor, I'll try to get a

13  lawyer to represent the case --

14         **THE COURT:**  I'm sorry.  I can't understand you.  Slow

15  down.

16         **MR. ELSAYED:**  I'm sorry.  I will try to get a lawyer

17  to represent Almy in just, like, amount of time today.

18         **THE COURT:**  I -- I'm not -- you will try to get a

19  lawyer in an amount of time, is that what you said?

20         **MR. ELSAYED:**  Yes.

21         **THE COURT:**  Okay.  All right.  Well, I'm dismissing

22  the case because the evidence is in.  There's no evidence that

23  either of you was the tenant; and there's no evidence that

24  Mr. Elsayed has any damages flowing from the wrongful eviction,

25  other than, perhaps, momentary suffering, same for Ms. Salamah;

1  and since they're not the tenants, that's not recoverable here.

2       All right.  So I will get a judgment done as time permits.

3  I do not intend to make any additional findings of fact or

4  conclusions of law beyond what I have said here in the

5  courtroom.  I think it's an adequate explanation for appellate

6  review.  Of course, they can always take up alternative grounds

7  for affirming me if there are any.  But, you know, I've

8  explained why I've decided what I decided, and I don't think I

9  need to write anything long and complicated, and Judge Biggs

10 has fully explained the decision on all the rest of the claims.

11 So as soon as I sign the judgment, that will be final too.

12      And that means that we're done unless there's something

13 else.

14            **MR. CHERRY:**  The only thing I would point out -- I'm

15 sorry.  And Your Honor may know this, and this may be adequate.

16 But Rule 52(c) does say that "a judgment on partial findings

17 must be supported by findings" --

18            **THE COURT:**  Say again.

19            **MR. CHERRY:**  "A judgment on partial findings must be

20 supported by findings of fact and conclusions of law as

21 required by Rule 52(a)."

22      So I just wanted to point that out.  It may be, Your Honor,

23 that you feel that what you said was fine, and that's fine with

24 me.  I just wanted to point that part out.

25            **THE COURT:**  Yeah, exactly.  Findings of fact may be --

1  and conclusions may be stated on the record after the close of

2  the evidence.

3          **MR. CHERRY:**  In fairness, I didn't read 52(a).

4          **THE COURT:**  Yeah, yeah.  Thank you.  No, I -- that's

5  why I asked you did I neglect to address any matters of fact or

6  conclusions of law that you would have me address as part of

7  what's required.

8          **MR. CHERRY:**  None.

9          **THE COURT:**  I just want to be sure I'm complete.

10         **MR. CHERRY:**  Correct.

11         **THE COURT:**  And, you know, if the Plaintiffs want me

12 to address any other specific facts that they think are

13 relevant to my findings, I'll be glad to, you know, hear from

14 them on that because I want to be sure -- you know, I don't

15 want to do a written order.  It will take me forever.  You-all

16 will have to wait.  I have lots of other things to do.

17    I believe this is adequate.  I make findings of fact and

18 conclusions of law all the time in criminal cases on motions to

19 suppress and such, so I believe it's sufficient here.

20    But if anybody wants me to address any other factual matter

21 that I have not addressed, I will be glad to at least take it

22 under consideration.  No?

23    Hearing nothing --

24         **MR. ELSAYED:**  Yes, Your Honor.

25         **THE COURT:**  What?

1      **MR. ELSAYED:**  The fact that the money was taken from
2 the store on -- on the day of the termination.

3      **THE COURT:**  Well, I appreciate your argument about
4 that.  You know, certainly it is very suspicious that there
5 were only very small cash shortages when you-all were running
6 the store, and then miraculously there's large ones the last
7 two days.  But, you know, that's not y'all's money.  That's
8 Almy's money, and there's -- so same result for that.

9      All right.  Anything else?

10      All the evidence is that it was Almy's money because it was
11 obtained by running the store.

12      All right.  Thank you.

13      Court is adjourned.

14      (Proceedings concluded at 4:11 p.m.)

15

16                  **C E R T I F I C A T E**

17      I, LORI RUSSELL, RMR, CRR, United States District Court
   Reporter for the Middle District of North Carolina, DO HEREBY
18 CERTIFY:

19      That the foregoing is a true and correct transcript of the
   proceedings had in the within-entitled action; that I reported
20 the same in stenotype to the best of my ability and thereafter
   reduced same to typewriting through the use of Computer-Aided
21 Transcription.

22

23 *Lori Russell*

24 Lori Russell, RMR, CRR        Date:  3-9-21
   Official Court Reporter

25